IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SHEET METAL WORKERS LOCAL NO. 20
WELFARE AND BENEFIT FUND, and
INDIANA CARPENTERS WELFARE FUND,
on behalf of themselves and all others similarly
situated,

                Plaintiffs,

  v.

CVS PHARMACY, INC.,

                Defendant.

Case No. 1:16-cv-00046-S

**AMENDED CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION ................................................................................. 1

II.    PARTIES ...................................................................................................... 2

    A.    Plaintiffs ........................................................................................... 2

    B.    Defendant ......................................................................................... 3

III.    JURISDICTION AND VENUE .................................................................. 4

IV.    FACTS ......................................................................................................... 4

    A.    Third-Party Plan Coverage and Claims Submission ........................ 4

    B.    The HSP Program ............................................................................ 5

    C.    CVS's Unlawful Conduct ................................................................ 7

V.    CLASS ALLEGATIONS .......................................................................... 11

        a.    Whether CVS artificially inflated the U&C prices that it reported pursuant to the NCPDP reporting standard; ................................................................... 12

        b.    Whether CVS omitted and concealed material facts from its communications and disclosures regarding its pricing scheme; ...................................... 12

        c.    Whether CVS has overcharged and continues to overcharge TPPs (including Plaintiffs and the Class) which paid for some of the most commonly prescribed generic drugs from CVS Pharmacies around the country; .................................................. 12

        d.    Whether CVS has engaged in fraud, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the pricing and sale of generic prescription drugs; .................................................. 12

        e.    Whether, as a result of CVS's conduct, Plaintiffs and the Class have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and ............................................................... 12

f.      Whether, as a result of CVS's misconduct, Plaintiffs
        and the Class are entitled to injunctive, equitable
        and/or other relief, and, if so, the nature of such
        relief. ........................................................................................... 12

VI.     TOLLING OF THE STATUE OF LIMITATIONS ....................................................... 13

VII.    CAUSES OF ACTION ................................................................................................. 14

COUNT I:  VIOLATIONS OF STATE CONSUMER PROTECTION ACTS ......................... 14

COUNT II:  NEGLIGENT MISREPRESENTATION .............................................................. 18

COUNT III:  UNJUST ENRICHMENT ..................................................................................... 19

PRAYER FOR RELIEF ............................................................................................................... 20

Plaintiffs Sheet Metal Workers Local No. 20 Welfare And Benefit Fund and Indiana Carpenters Welfare Fund (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against CVS Pharmacy, Inc. ("CVS"), to recover monetary damages, injunctive relief, and other remedies for violations of state laws.

## I.     NATURE OF ACTION

1.     CVS knowingly and intentionally overcharged Plaintiffs and private health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third-party payors and any other health benefit providers ("Third-Party Payors" or "TPPs") for generic prescription drugs by submitting claims for payment to Third-Party Payors at fraudulently inflated prices. CVS's false and deceptive pricing scheme caused TPPs, which paid for generic prescription drugs on behalf of their members and beneficiaries, to pay significantly more than CVS charges its cash-paying customers to purchase the same drugs.

2.     When a plan participant fills a prescription under a third-party health care plan, a TPP pays the majority of the participant's prescription drug costs, excluding deductibles and co-pays. For purposes of the Class (defined below), the amount collected by CVS may not exceed CVS's usual and customary price, which is generally defined as the cash price to the general public for the same drug.

3.     CVS commonly submits electronic claims for payment to Third-Party Payors when it fills prescriptions. In submitting electronic claims for payment, CVS is required to state accurately its usual and customary price for every dispensing event, in accordance with the National Council for Prescription Drug Program ("NCPDP") requirements. But for years, CVS has knowingly and intentionally submitted false and artificially inflated usual and customary

- 1 -

prices for generic drugs to Third-Party Payors. Beginning in 2008, CVS orchestrated and carried out a massive fraud that resulted in substantial ill-gotten gains, and substantial harm to Plaintiffs and the members of the Classes they represent. CVS created the "Health Savings Pass" ("HSP") program—the vehicle for its fraud— to overcharge Third-Party Payors for covered drugs.

4.       CVS intended that the HSP program would hide CVS's true usual and customary prices from Third-Party Payors. By submitting false and inflated usual and customary prices to Third-Party Payors, CVS knowingly and wrongfully overcharged TPPs amounts that exceeded the HSP drug prices available to the general public for the same drugs.

5.       As a result of CVS's unlawful scheme, CVS overcharged Plaintiffs and the other Class members for generic prescription drugs (in many cases by more than three or four times the usual and customary price) from November 2008 to the present. CVS's misconduct has caused Plaintiffs and the other Class members to suffer significant damages.

## II.       PARTIES

### A.       Plaintiffs

6.       Plaintiff Sheet Metal Workers Local No. 20 Welfare and Benefit Fund is a Third-Party Payor which maintains its principal place of business in Indianapolis, Indiana. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees. Plaintiff paid for generic drugs

- 2 -

purchased at CVS stores on behalf of its members and beneficiaries and was damaged by the conduct alleged herein.

7.     Plaintiff Indiana Carpenters Welfare Fund is a Third-Party Payor with its principal place of business located in Indianapolis, Indiana.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.   Plaintiff paid for generic drugs purchased at CVS stores on behalf of its members and beneficiaries and was damaged by the conduct alleged herein.

**B.     Defendant**

8.     Defendant CVS Pharmacy, Inc., a/k/a CVS/Caremark, CVS/Pharmacy, CVS/Minute Clinic and CVS/Specialty (hereinafter, "CVS") is a corporation organized under the laws of Delaware.  CVS is headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895.

9.     CVS is a nationwide retail pharmacy chain with more than 7,866 pharmacies operating under the trade names CVS Pharmacy and Longs Drugs throughout the United States, the District of Columbia, and Puerto Rico, including numerous locations in this District. As one of the nation's leading pharmacy businesses, CVS "has relationships with over 150 million consumers, one of every two Americans, and has access to data on 30 percent of all prescriptions in the United States." CVS fills or manages more than 1 billion prescriptions per year, and, in 2014, earned net revenue of $139.37 billion. Significantly, CVS's retail prescription drug sales accounted for approximately $67 billion in revenue in 2014.

## III.    JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds of thousands, and likely millions, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and CVS is a citizen of a State different from that of Plaintiffs and members of the Class. This Court also has subject matter jurisdiction over Plaintiffs' and the proposed Class' claims pursuant to 28 U.S.C. § 1367(a).

11.    Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## IV.    FACTS

**A.    Third-Party Plan Coverage and Claims Submission**

12.    The majority of patients in the United States have a health care plan (either private or public) that covers all or a portion of their medical and pharmaceutical expenses.

13.    CVS uses a uniform process at its locations for each prescription drug transaction. When a patient fills a prescription at a CVS pharmacy, the pharmacist or pharmacy technician enters the prescription information and any applicable insurance or benefit information into CVS's computerized claims processing system. Once this information is entered, CVS submits the claim for dispensing and adjudication.

14.    Adjudication is the automated process by which CVS submits prescription claims electronically in real time to the Third-Party Payor (or its agent). During adjudication, the claim

- 4 -

is verified and/or confirmed for patient eligibility for insurance or another prescription drug benefit. Through this process, using the drug price information from CVS, the Third-Party Payor sets the reimbursement amount and any applicable copayment or coinsurance.

15. For all times relevant to the allegations in this Complaint, CVS used the industry standard NCPDP reporting for the electronic transmission and adjudication of its pharmacy claims.

16. As a required component of the adjudication process, CVS reports to Third-Party Payors CVS's usual and customary ("U&C") price for the drug being dispensed. The U&C price is generally defined as the cash price to the general public, which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed. Pursuant to the NCPDP reporting standard, pharmacies are required to report the amount of its U&C price for each prescription transaction using NCPDP's mandatory pricing segment code 426–DQ.

17. Based on the data reported by CVS, Third-Party Payors reimburse the pharmacy.

**B.    The HSP Program**

18. In 2006, large "big-box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.

19. For example, in September 2006, Wal-Mart began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply. In November of that same year, Target began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply. Other retailers with pharmacy departments, which were able to absorb lower margins on generic drug sales, followed suit. Wal-Mart and Target report to Third-Party Payors, as their U&C prices, the lower $4 per 30-day prices for generic prescription drugs.

- 5 -

20.    CVS was unwilling to match the deep discounts on generic drugs provided to customers by big-box retailers. So, in response to lower prices and increased competition for cash customers, CVS created a custom-branded loyalty program targeted at cash customers and other price-sensitive customers.

21.    In November 2008, CVS launched its custom branded generic prescription drug program—the HSP program.

22.    The HSP program is intended to offer competitive prices to cash customers while maximizing third-party reimbursements and copayments through reporting artificially inflated U&C prices to Third-Party Payors.

23.    Specifically, as designed, the HSP program is a non-networked discount prescription drug program that offers savings on hundreds of generic medications. The HSP program is not a third-party plan; it is not insurance or a substitute for insurance. Enrollment in the HSP program was and continues to be open to cash-paying customers. From November 9, 2008 through 2010, such customers could join the HSP for a $10 fee. During this time, CVS charged HSP members $9.99 for a 90-day supply of the most commonly prescribed generic drugs ("HSP Generics"). Moreover, CVS pharmacists routinely prorated prescriptions written for less than 90-days. For example, CVS would charge a HSP member roughly $3.33 for a 30-day supply. In 2011, CVS raised its enrollment fee to $15 a year and the price of the over 400 HSP generics to $11.99 for a 90-day supply (or a prorated amount of approximately $3.99 for a 30-day supply).

24.    The 400 drugs included under the HSP program are among some of the most commonly prescribed generic drugs for cardiovascular, allergy, diabetes, pain, and arthritis,

- 6 -

cholesterol, skin conditions, mental health, women's health, viruses, thyroid conditions, glaucoma and eye care, gastrointestinal disorders, and other common ailments.

25.     CVS designed the HSP program to appeal to price sensitive customers, which, for the most part, are customers who take long-term maintenance medications. Customers who take maintenance medications, many of whom are elderly or disabled, are the most valuable to CVS.

**C.     CVS's Unlawful Conduct**

26.     Although CVS sought to retain and attract cash customers by implementing the HSP program, it was unwilling to lower the price charged to Third-Party Payors. The HSP program enabled CVS to unlawfully report artificially inflated U&C prices to Third-Party Payors, thereby allowing CVS to collect from TPPs artificially inflated charges.

27.     CVS is on notice that Third-Party Payors calculate the drug price to be paid to the pharmacy based on whether the U&C submitted to the Third-Party Payor is less than or greater than the negotiated price. Where the U&C is less than the negotiated price, CVS may not charge a drug price greater than the U&C. This is clear in contracts, network pharmacy manuals, payor sheets, and CVS's own transaction data, which contain reimbursements adjudicated under this formula.

28.     Through the HSP program, CVS implemented a scheme to create a new category of cash customers, in order to avoid lowering prices charged to Third-Party Payors. CVS designed the HSP to split CVS's cash business, formerly consisting solely of people who pay the cash price (the usual and customary price), into two segments: customers who pay the retail price, and customers who pay the HSP price.

29.     The customers who purchase prescriptions outside of the HSP program and pay the retail price make up less than 50 percent of CVS's cash business and less than three percent

- 7 -

of CVS's total prescription business. In other words, most of CVS's cash-paying customers pay the HSP price.

30.     As previously stated, the U&C price is the cash price offered to the general public for specific drugs. CVS offers the HSP price as the cash price to the general public and the HSP price is the most common price paid by CVS's cash-paying customers. The HSP price is CVS's U&C price.

31.     Nonetheless, CVS continues deceptively to submit the retail price as its purported U&C price to Third-Party Payors. CVS can accomplish this because Third-Party Payors are not privy to what prices CVS charges its cash customers, including its HSP customers, and what percentage of CVS's cash customers pay each price. Therefore, Third-Party Payors have no way of determining on their own whether the price CVS submits as its U&C is, in fact, the most common price offered to cash paying members of the general public.

32.     In essence, the HSP program serves as a camouflage or ruse to avoid reporting the HSP prices to Third-Party Payors as CVS's U&C price.

33.     Instead of reporting the more common HSP price as the U&C price, CVS reports a significantly inflated price.

34.     CVS falsely reports, and continues to report, to Third-Party Payors U&C prices for HSP Generics that are substantially higher than the HSP price it offers to the general public.

35.     The inflated U&C reported by CVS to Third-Party Payors does not take into account the specifics of any particular third-party plan. In fact, for a given drug, strength, and quantity, CVS may report the same U&C to all Third-Party Payors despite any variations in their respective plans.

- 8 -

36.     Beginning in November 2008 and continuing through the present, CVS has reported to Third-Party Payors artificially inflated U&C prices for the same prescription drugs that CVS offers for lower prices under the HSP program. CVS has thereby caused (and continues to cause) Plaintiffs and other Class members to pay inflated prices to CVS, because they exceed the actual U&C prices.

37.     CVS directly competes for customers with other national retail pharmacies, such as Wal-Mart, Target, Costco, and ShopRite. In contrast to other national retail pharmacies who report the discounted price as the U&C price, CVS unlawfully reports a marked-up and baseless U&C price that deceives and gouges.

38.     As part of its scheme, CVS has reported U&C prices for generic prescription drugs that are up to eleven (11) times the U&C prices reported by some of its most significant competitors and its own HSP prices. The chart below shows U&C prices submitted to Pennsylvania's Medicaid program for the purposes of claims adjudication. The U&Cs submitted by CVS are unequivocally inflated.

| Drug (90 Day Supply) | Shoprite Reported U&C | WalMart Reported U&C | Target Reported U&C | Costco Reported U&C | CVS Reported U&C | CVS HSP Price |
|---|---|---|---|---|---|---|
| Carvedilol 12.5 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $120.99 | $11.99 |
| Lisinopril 20 mg tab | $9.99 | $10.00 | $10.00 | n/a | $42.19 | $11.99 |
| Lisinopril – HTCZ 20-12.5 mg tab | $9.99 | $24.00 | $24.00 | n/a | $58.59 | $11.99 |
| Metformin HCL 1000 mg tab | $9.99 | $24.00 | $24.00 | $9.99 | $86.59 | $11.99 |
| Metoprolol Tartrate 50 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $48.99 | $11.99 |

- 9 -

| Drug (90 Day Supply) | Shoprite Reported U&C | WalMart Reported U&C | Target Reported U&C | Costco Reported U&C | CVS Reported U&C | CVS HSP Price |
|---|---|---|---|---|---|---|
| Warfarin Sodium 5 mg tab | $9.99 | $10.00 | $24.00 | $28.00 | $48.39 | $11.99 |
| Meloxicam 15 mg tab | $9.99 | $10.00 | n/a | $9.23 | $79.59 | $11.99 |
| Alendronate Sodium 70 mg tab | $29.99 | $24.00 | n/a | $17.61 | $134.99 | $11.99 |

39.     For years, this pricing scheme has been a financial boon for CVS. Since 2008,

CVS has collected billions of dollars from Plaintiffs and other Class members. On information

and belief, CVS's wrongful overcharges to Plaintiffs and the other members of the Classes

comprise a meaningful portion of CVS's generic prescription drug revenue.

40.     By reporting false U&C prices to Third-Party Payors, CVS has caused Plaintiffs

and members of the Classes to pay, and continue to pay, to CVS, artificially high prices for

generic prescription drugs. On information and belief, there have been millions of instances

where CVS intentionally submitted fraudulently-inflated U&C pricing information to Third-

Party Payors for prescriptions purchased by members and beneficiaries of Plaintiffs and

members of the Classes during the class period.

41.     As a result of its fraudulent scheme, CVS has overcharged and continues to

overcharge hundreds or thousands of TPPs (including Plaintiffs and the Classes) which paid for

some of the most commonly prescribed generic drugs from CVS Pharmacies around the country.

Class members were overcharged by at least the difference between their payments and the

U&C.

## V. CLASS ALLEGATIONS

42.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and the following class:

> All Third-Party Payors that paid CVS between November 2008 and the present (the "Class Period"), for generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A.

43.     Excluded from the foregoing Class are any governmental payors, including Medicare and Medicaid, CVS, and their officers and directors.

44.     The Class consist of at least hundreds of TPPs, making joinder impractical, in satisfaction of FRCP 23(a)(1). The exact size of the Class and the identities of the individual members thereof are ascertainable through CVS's records, including but not limited to their billing and collection records.

45.     The claims of Plaintiffs are typical of the Class. The claims of the Plaintiffs and the respective Classes are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiffs and their respective Classes.

46.     The respective Classes have a well-defined community of interest. CVS has acted and failed to act on grounds generally applicable to the Plaintiffs and the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the respective Classes.

47.     There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of FRCP 23(a)(2) and 23(b)(2).

010582-11  941155 V1

48.     Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

      a.     Whether CVS artificially inflated the U&C prices that it reported pursuant to the NCPDP reporting standard;

      b.     Whether CVS omitted and concealed material facts from its communications and disclosures regarding its pricing scheme;

      c.     Whether CVS has overcharged and continues to overcharge TPPs (including Plaintiffs and the Class) which paid for some of the most commonly prescribed generic drugs from CVS Pharmacies around the country;

      d.     Whether CVS has engaged in fraud, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the pricing and sale of generic prescription drugs;

      e.     Whether, as a result of CVS's conduct, Plaintiffs and the Class have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

      f.     Whether, as a result of CVS's misconduct, Plaintiffs and the Class are entitled to injunctive, equitable and/or other relief, and, if so, the nature of such relief.

49.     Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

50.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members, and have the financial resources to

- 12 -

do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

## VI.    TOLLING OF THE STATUE OF LIMITATIONS

51.    Plaintiffs and the Class had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

52.    Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

53.    CVS engaged in a secret scheme that did not reveal facts that would have put Plaintiffs or the Class on inquiry notice that CVS was charging inflated prices for generic prescription drugs.

54.    Because CVS's scheme was kept secret, Plaintiffs and the Class were unaware of CVS's unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for generic prescription drugs in the United States during the class period.

55.    CVS actively misled the public about the HSP scheme by not disclosing to Plaintiffs and the Class that the U&C prices reported to Third-Party Payors for the generic drugs in the HSP program were far higher than the HSP prices. CVS charged Plaintiffs and the Class prices for the drugs that reflected CVS' artificially inflated U&C prices. CVS also failed to post drug prices in a clear manner and in a way that would alert Plaintiffs and the Class to the artificially inflated prices charged by CVS. By so doing, CVS misled Plaintiffs and the Class into paying to CVS inflated prices for these drugs.

- 13 -

56.     CVS's affirmative acts alleged herein, including acts in furtherance of its unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

57.     CVS's unlawful pricing activities were inherently self-concealing because they involved misrepresenting and falsely reporting the U&C price. If CVS had been open and notorious about its fraudulent pricing scheme, it would never have succeeded.

58.     Plaintiffs and the Class could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because CVS employed deceptive practices and techniques of secrecy to avoid detection of their activities. CVS fraudulently concealed their activities by various means and methods, including misrepresentations regarding the real U&C prices of generic prescription drugs.

59.     Because CVS affirmatively concealed its scheme, Plaintiffs and the Class had no knowledge until recently of the alleged fraudulent activities or information which would have caused a reasonably diligent person to investigate whether CVS committed the actionable activities detailed herein.

60.     As a result of CVS's fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class have as a result of the unlawful conduct alleged in this Complaint.

## VII.    CAUSES OF ACTION

### COUNT I:  VIOLATIONS OF STATE CONSUMER PROTECTION ACTS

61.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

- 14 -

62. Count I is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of each of the following states for violations of the state consumer protection acts including:

a. the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, et seq.;

b. the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, et seq.;

c. the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, et seq.;

d. the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. and 17500, et seq.;

e. the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.;

f. the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101, et seq.;

g. the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110, et seq.;

h. the Delaware Consumer Fraud Act, 6 Del. Code § 2513, et seq.;

i. the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, et seq.;

j. the Idaho Consumer Protection Act, Idaho Code Ann. § 48-601, et seq.;

k. the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 50111, et seq.;

l. the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, et seq.;

m. the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623, et seq.;

n. the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, et seq.;

- 15 -

o.       the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, et seq.;

p.       the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207, et seq.;

q.       the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A, et seq.;

r.       the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, et seq.;

s.       the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, et seq.;

t.       the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601, et seq.;

u.       the Nevada Deceptive Trade Practices Act, Nev. Rev. St. §§ 41.600, et seq.;

v.       the New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. § 358-A:1, et seq.;

w.       the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8, et seq.;

x.       the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, et seq.;

y.       the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, et seq.;

z.       the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, et seq.;

aa.      the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15, et seq.;

bb.      the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, et seq.;

cc.      the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, et seq.;

dd.      the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.;

010582-11 941155 V1

ee.     the South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24-1, et seq.;

ff.     the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code Ann., Bus. & Con. § 17.41, et seq.;

gg.     the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, et seq.;

hh.     the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199, et seq.;

ii.     the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, et seq.;

jj.     the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, et seq.; and

kk.     the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, et seq.

63.     Plaintiffs have complied with the applicable notice requirements of the state statutes.

64.     The acts, practices, misrepresentations and omissions by Defendant described above, and Defendant's dissemination of deceptive and misleading U&C prices, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

65.     Defendant's acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged Plaintiff and members of the Class in connection with the sale of and payments for generic prescription drugs. Defendant's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or

- 17 -

advertisement of goods whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

66.    Plaintiffs, on behalf of themselves and the Class members, seek monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

## COUNT II:  NEGLIGENT MISREPRESENTATION

67.    Plaintiffs repeat paragraphs 1 through 66 above.

68.    Under the circumstances alleged, CVS owed a duty to Plaintiffs and members of the Class to provide them with accurate information regarding the prices of their generic prescription drugs.

69.    CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to Third-Party Payors.

70.    CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that CVS reported to Third-Party Payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

71.    CVS intended to induce Plaintiffs and Class Members to rely on its misrepresentations and/or omissions. CVS knew that Plaintiffs and Class Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

72.    Plaintiffs and Class Members justifiably relied upon CVS's misrepresentations and/or omissions in that Plaintiffs and Class Members would not have purchased generic

- 18 -

prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions. Plaintiffs' and Class Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

73.     As a proximate result of CVS's negligent conduct, Plaintiffs and Class Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

74.     CVS is therefore liable to Plaintiffs and members of the National Class for the damages they sustained.

## COUNT III:  UNJUST ENRICHMENT

75.     Plaintiffs repeat paragraphs 1 through 74 above.

76.     By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

77.     CVS knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Class. In so doing, CVS acted with conscious disregard for the rights of Plaintiffs and Class Members.

78.     As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Class.

79.     CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

80.     Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Plaintiffs and members of the National Class in an

- 19 -

unfair and unconscionable manner. CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

81.     Plaintiffs and the other Class Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained proceeds.

82.     CVS is therefore liable to Plaintiffs and members of the National Class for restitution in the amount of CVS wrongfully obtained profits.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court certify the putative Class, appoint Plaintiffs as the representatives for the Class, appoint their attorneys as Class Counsel, enter judgment for Plaintiffs and the Class, and grant such other and further relief as this Court deems appropriate.

Dated:  March 3, 2017

Respectfully submitted,

By:  */s/ Stephen M. Prignano*

Stephen M. Prignano (3649)
MCINTYRE TATE LLP
321 South Main Street, Suite 400
Providence, Rhode Island 02903
Tel: (401) 351-7700 Ext. 227
Fax: (401) 331-6095
Email: smp@mtlesq.com

Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email:  steve@hbsslaw.com

- 20 -

Elizabeth A. Fegan (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Tel: (708) 628-4949
Fax: (708) 628-4950
Email:  beth@hbsslaw.com

William Riley (*Pro Hac Vice*)
RILEY WILLIAMS & PIATT, LLC
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, Indiana  46204
Tel: (317) 633-5270
Fax: (317) 426-3348

010582-11  941155 V1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of March, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties noted below by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filling as indicated on the Notice of Electronic Filing. Parties may access this filing for viewing and/or downloading through the Court's CM/EDF System.

Robert C. Corrente
WHELAN, CORRENTE, FLANDERS, KINDER & SIKET LLP
100 Westminster Street; Suite 710
Providence, RI 02903

Enu Mainigi *(Pro Hac Vice)*
Luba Shur *(Pro Hac Vice)*
Grant A. Geyerman *(Pro Hac Vice)*
WILLIAMS & CONNOLLY LLP
725 12th St., NW
Washington, D.C. 20005

*/s/ Stephen M. Prignano*
Stephen M. Prignano

010582-11 941155 V1