UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                )
SHEET METAL WORKERS LOCAL NO. 20 )
WELFARE AND BENEFIT FUND; and    )
INDIANA CARPENTERS WELFARE FUND, )
on behalf of themselves and all  )
others similarly situated,       )   C.A. No. 16-046 S
                                )
          Plaintiffs,           )
                                )
     v.                         )
                                )
CVS HEALTH CORPORATION,          )
                                )
          Defendant.            )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, Chief Judge.

    Before the Court are Defendant's Motion to Dismiss (ECF No.
13) and Motion to Certify Question to the Indiana Supreme Court
(ECF No. 24).  Plaintiffs filed Oppositions to both motions (ECF
Nos. 20 and 28) and Defendant filed Replies (ECF Nos. 22 and
31).  For the reasons that follow, Defendant's Motions are
DENIED.

I.  Background[1]

    Plaintiffs are suing CVS Health Corporation ("CVS"), on
behalf of themselves and a nationwide putative class of entities
providing prescription drug insurance ("Third-Party Payors" or

_____
    [1]  As this is a motion to dismiss, all well-pled facts
alleged by Plaintiffs are taken to be true.  See Rederford v.
U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).

"TPPs"), alleging that CVS perpetrated an eight-year fraud by reporting an inflated Usual and Customary ("U&C") price for generic drugs, rather than the significantly cheaper price associated with CVS's Health Savings Pass ("HSP") program.

In 2006, "big-box" retailers with pharmacy departments, such as Wal-Mart and Target, began offering hundreds of generic prescription drugs at significantly reduced prices. (Compl. ¶¶ 18-19, ECF No. 1.) In November 2008, CVS responded by introducing its HSP program, which provided special pricing for approximately 400 generic prescription medications to individuals who paid an annual membership fee. (Id. ¶¶ 20-24.)

CVS is required to "report[] to Third-Party Payors CVS's [U&C] price for the drug being dispensed. The U&C price is generally defined as the cash price to the general public, which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed." (Id. ¶ 16.) Plaintiffs claim that because "CVS offers the HSP price as the cash price to the general public and the HSP price is the most common price paid by CVS's cash-paying customers[,] [t]he HSP price is CVS's U&C price." (Id. ¶ 30.) However, instead of reporting the HSP price, "CVS has reported U&C prices for generic prescription drugs that are up to eleven (11) times the U&C prices reported by some of its most significant competitors and its own HSP prices." (Id. ¶ 38.) In contrast, the "big-box"

2

retailers "report the discounted price as the U&C price." (Id. ¶ 37.) According to Plaintiffs, CVS's "fraudulent scheme" has resulted in CVS "overcharg[ing] hundreds or thousands of TPPs (including Plaintiffs and others similarly situated) which paid for some of the most commonly prescribed generic drugs from CVS Pharmacies around the country." (Id. ¶ 41.)

II.  Discussion

CVS argues that: (1) the Complaint does not satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure; (2) Plaintiffs have failed to state a claim under Indiana's Deceptive Consumer Sales Act ("IDCSA"), or in the alternative, the question of whether TPPs are "consumers" under the IDCSA should be certified to the Indiana Supreme Court; (3) named Plaintiffs, who are Indiana TPPs, do not have standing to assert state law claims on behalf of putative class members, and Plaintiffs have not properly pled the elements of the state consumer protection statutes they attempt to invoke; and (4) Plaintiffs' negligent misrepresentation and unjust enrichment claims fail because they are contract claims masquerading as tort claims.  The Court will discuss each of these arguments in turn.

A.   Rule 9(b) of the Federal Rules of Civil Procedure

Rule 9(b) of the Federal Rules of Civil Procedure requires that a pleading alleging fraud "must state with particularity

3

the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The Complaint "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127-28 (2d Cir. 1994)). In other words, Rule 9(b) requires plaintiffs to allege the "'who, what, when, where, and how' of the alleged fraud." United States ex rel. Ge v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 123 (1st Cir. 2013) (quoting United States ex. rel Walsh v. Eastman Kodak Co., 98 F. Supp. 2d 141, 147 (D. Mass. 2000)).

Here, CVS argues that "the Complaint does not allege that CVS (or anyone) ever communicated an alleged false statement, a U&C price, to the Indiana Funds," which "is the most basic requirement of Rule 9(b)." (Def.'s Mot. to Dismiss 8, ECF No. 13 (emphasis in original).) Moreover, Plaintiffs supposedly

> do not allege their plan beneficiaries actually purchased overpriced prescriptions from CVS pharmacies; or when, where, and how frequently any such (unalleged) purchases took place; or what U&C prices CVS supposedly reported during those purchases; or what amount the Indiana Funds purportedly overpaid for the purchases; or any details describing when or how CVS obtained such overpayments.

(Id. (emphases in original).)

4

Plaintiffs cite a recent decision in Corcoran v. CVS Health Corporation & CVS Pharmacy Inc., 169 F. Supp. 3d 970, 986 (N.D. Cal. 2016), in which the court denied a motion to dismiss in a similar case.  They argue that, like the plaintiffs in Corcoran, they have satisfied the "who, what, where, and when" required by Rule 9(b).

The Court finds that Plaintiffs' Complaint satisfies Rule 9(b).  It is clear from the Complaint that the alleged false statement to the Indiana Funds was the reported U&C price, which Plaintiffs claim was inflated. (See Compl. ¶¶ 16-30, ECF No. 1.) While it is true that Plaintiffs do not provide certain details - such as the specific amount of drugs purchased - that level of specificity is not required.  A complaint need not "allege specific shipments to specific customers at specific times with a specific dollar amount of improperly recognized revenue." Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997).  As long as "the complaint 'identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer,'" it is sufficient under Rule 9(b). Id. (quoting Warshaw v. Xoma Corp., 74 F.3d 955, 960 (9th Cir. 1996)); see also W. Reserve Life Assur. Co. of Ohio v. Conreal LLC, 715 F. Supp. 2d 270, 283 (D.R.I. 2010) (stating that allegations are sufficient if they "serve the goals of Rule 9(b) to 'provide a defendant with fair notice' of the claim and discourage baseless actions" (quoting

Suna, 107 F.3d at 68)).   Here, Plaintiffs' allegations are clear:

> [T]he fraud occurred each time CVS electronically submitted a claim to TPPs using the [National Council for Prescription Drug Program ("NCPDP")] reporting system wherein it misrepresented the price for a prescription generic drug to be the U&C price when, in fact, CVS cash-paying customers were charged substantially lower prices for the same drug.

(Pls.' Opp'n to Mot. to Dismiss 11, ECF No. 20-1.)   The Complaint adequately puts CVS on notice of the details of the alleged fraud.   This is particularly true given that "all of the missing details are likely in the possession of CVS." Corcoran, 169 F. Supp. 3d at 986.[2]

    B.   Plaintiffs' Claims under the IDCSA

        1.   Definition of "Consumer" under the IDCSA

One of the purposes of the IDCSA is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts." Ind. Code § 24-5-0.5-1(b)(2).   The statute prohibits deceptive acts "in connection with a consumer transaction," which is defined as a "sale . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or

---

[2]   While CVS is correct that the plaintiffs in Corcoran v. CVS Health Corporation & CVS Pharmacy Inc., gave more detail on specific transactions, such as "the number of generic drugs purchased, a time frame in which such purchases were made, the state in which the purchases were made, and the total inflated amount they were charged as a result of inflated U&C prices," 169 F. Supp. 3d 970, 986 (N.D. Cal. 2016), nothing in Corcoran indicates that the amount of detail in this Complaint would have been insufficient.

household, or a solicitation to supply any of these things." Id. §§ 24-5-0.5-2(a)(l), 24-5-0.5-3(a). "Person" is defined as "an individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation or organization, or cooperative or any other legal entity." Id. § 24-5-0.5-2(a)(2). The statute empowers Indiana's Attorney General to enjoin a supplier's deceptive or unconscionable acts and authorizes courts to order, among other things, restitution for "aggrieved consumers." Id. § 24-5-0.5-4(c). It also creates a civil remedy for a consumer claiming injury from conduct prohibited by the statute: "A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act . . . ." Id. § 24-5-0.5-4(a). The question is thus whether the TPPs suffered damages "as a consumer."

Although the IDCSA defines "consumer transaction," it does not define "consumer," which leaves some ambiguity as to what is meant by "as a consumer." CVS argues that because consumer is not defined, it must be given its "plain meaning," which is "someone who 'uses' or 'utilizes' a purchased item." (Def.'s Mot. to Dismiss 16, ECF No. 13.) CVS also points out that Indiana law has codified CVS's proposed definition in other areas, such as products liability law. (Id. (citing Ind. Code

§ 34-6-2-29(2) (defining "[c]onsumer" as "any individual who uses or consumes the product")).)

There does not appear to be any Indiana case law addressing this issue, but two federal courts have found TPPs to be "consumers" under the IDCSA. See In re Actiq Sales & Mktg. Practices Litig., 790 F. Supp. 2d 313, 325-26 (E.D. Pa. 2011); In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 495 F. Supp. 2d 1027, 1036-37 (N.D. Cal. 2007). In Bextra, the court noted that the IDCSA had been changed to define "consumer transaction" as "a sale . . . to a person" as opposed to "an individual." 495 F. Supp. 2d at 1037 (emphasis added). As noted above, the definition of "person" includes a "corporation . . . or other legal entity." Id. at 1036-37 (quoting Ind. Code § 24-5-0.5-2(2)). Therefore, the court reasoned, "a sale to a corporation 'for purposes that are primarily personal' qualifies as a consumer transaction within the meaning of the statute," even if it was not for the corporation's own use. Id. at 1037. The court then determined that "defendants have not demonstrated that their sale of Celebrex and Bextra to the TPPs for the patients' personal use does not qualify as a consumer transaction as a matter of law." Id. Relying on Bextra, the court in Actiq likewise found that a TPP could be a consumer under the IDCSA:

8

> [The IDCSA] requires only that the plaintiff's damages arise from defendant's provision of such goods. Plainly stated, there is no mandate under the IDCSA that the plaintiff must be the consumer who purchased the goods primarily for personal purposes. Plaintiff is a valid consumer for purposes of the IDCSA, as its use of Actiq, through its payment for prescriptions of its members and beneficiaries, fits squarely within the ordinary meaning of the term "consume." Plaintiff's payments for the drug arose from the sales of Actiq to its members and beneficiaries for the treatment of illnesses, with such transactions qualifying as consumer transactions for personal purposes under the IDCSA.

Actiq, 790 F. Supp. 2d at 326.

CVS points to decisions from other jurisdictions that have held that TPPs were not consumers under those states' consumer protection laws. See, e.g., In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, No. 2:06-CV-5774, 2009 WL 2043604, at *32 (D.N.J. July 10, 2009) (dismissing TPPs' claims under New Jersey's Consumer Fraud Act); In re Rezulin Products Liab. Litig., 392 F. Supp. 2d 597, 616-17 (S.D.N.Y. 2005) (finding that insurance companies were not "consumers" under New Jersey's consumer protection statute); S. Ill. Laborers' & Emp'rs Health & Welfare Fund v. Pfizer, Inc., No. 08-CV-5175(KMW), 2009 WL 3151807, at *8-10 (S.D.N.Y. Sept. 30, 2009) (finding that TPPs were not "consumers" under the New Jersey, Ohio, and Texas consumer protection statutes).  However, Plaintiffs distinguish Rezulin and Schering-Plough because in those cases "the misrepresentations concerned the efficacy or

safety of the drugs to plan members." (Pls.' Opp'n to Mot. to Dismiss 21-22, ECF No. 20-1.)   This Court agrees with Plaintiffs that, "[u]nlike _Rezulin_ and _Schering-Plough_, the misrepresentations here are not indirect.   CVS made misrepresentations about the U&C prices to TPPs directly to cause the TPPs to overpay." (_Id._ at 22.)   Moreover, the statutes and case law in New Jersey, Texas, and Ohio are different than in Indiana.   Case law in New Jersey has defined a "consumer" as "one who uses (economic) goods, and so diminishes or destroys their utilities." _S. Ill. Laborers_, 2009 WL 3151807, at *9-10 (citation omitted); _see also Rezulin_, 392 F. Supp. 2d at 616. Similarly, "Texas courts have expressly stated that to state a cause of action under the Texas Act . . . the 'goods and services . . . must be purchased or leased for use by the party seeking to state a cause of action.'" _S. Ill. Laborers_, 2009 WL 3151807, at *9 (quoting _Crown Life Ins. Co. v. Casteel_, 22 S.W.3d 378, 386 (Tex. 2000)).   And in Ohio, "a sale must be to a natural person in order to constitute a 'consumer transaction' within the meaning of the Ohio Act." _Id._

The Court finds that TPPs can qualify as consumers under the IDCSA.   First, if the intent of the statute was to bar anyone from bringing a claim who did not actually use the product themselves, that could have easily been made clear. Indeed, as CVS notes, "consumer" is defined that way in Indiana

statutes concerning products liability;[3] here, however, it was not. Second, "consumer transaction" was specifically defined to include corporations, and there is no indication that definition would not include a scenario like this one where the party making the payment is not the end-user. Third, the IDCSA states that "[t]his chapter shall be liberally construed and applied to promote its purposes and policies," which include "protect[ing] consumers from suppliers who commit deceptive and unconscionable sales acts" and "encourag[ing] the development of fair consumer sales practices." Ind. Code § 24-5-0.5-1. Finally, the two federal district courts to consider this issue have both found that TPPs can be consumers under the IDCSA.

CVS argues in the alternative that the Court should certify the question regarding the definition of "consumer" under the IDCSA to the Indiana Supreme Court. Rule 64(A) of the Indiana Rules of Appellate Procedure provides, in relevant part, that "any federal district court may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." The decision to certify a

---

[3]   In the products liability context, it makes sense to limit causes of action to those who actually use the product, as they are the ones damaged by any defect.

state-law question "rests in the sound discretion of the federal court." Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974).

Despite the lack of guidance from Indiana courts on this issue, the Court finds that it is not a good candidate for certification. The Court is not inclined to delay this complex case with the hope that one part of it could be resolved with certification. Moreover, the two other federal district courts to confront this issue have both interpreted the statute the same way that this Court has, without seeking to certify a question.

2.   Transactions that Occurred Prior to July 1, 2014

CVS alternatively argues that Plaintiffs' claims under the IDCSA prior to July 1, 2014 should be dismissed. The version of the IDCSA prior to July 1, 2014 enumerated the types of conduct that could be considered a "deceptive act." See Lawson v. Hale, 902 N.E.2d 267, 273-74 (Ind. Ct. App. 2009). The version that has been in effect since July 1, 2014 has a new catch-all fraud category. CVS argues that its alleged conduct does not fit into any of the pre-2014 enumerated categories. Plaintiffs disagree, stating that the following category applies:  "That a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." (Pls.' Opp'n to Mot. to Dismiss 23, ECF No. 20-1 (quoting Ind. Code § 24-5-0.5-3(b)(6);

see also id. ("That is exactly what Plaintiffs allege here —
TPPs were guaranteed to pay no more than their contracted price
or the U&C price, which CVS then manipulated to ensure that no
price advantage existed." (emphasis in original)).)

The Court agrees with Plaintiffs that CVS's alleged conduct
could fall under the "specific price advantage" category.  CVS
cites one case from Ohio interpreting a more specific "price
advantage" provision in Ohio's Consumer Sales Practice Act, see
Martin v. Lamrite West, Inc., 41 N.E.3d 850, 852-53 (Ohio Ct.
App. 2015), but can point to no authority in Indiana indicating
that the conduct alleged here would not constitute a deceptive
act concerning a "specific price advantage."

The next question is whether Plaintiffs adequately pled
violations of the pre-July 2014 IDCSA.  CVS argues that
Plaintiffs are improperly attempting to amend their Complaint
through their opposition.  CVS is correct that Plaintiffs'
Complaint never specifically mentions the "price advantage"
issue; however, they do say generally that "[t]he acts,
practices, misrepresentations and omissions by Defendant
described above, and Defendant's dissemination of deceptive and
misleading U&C prices, occurring in the course of conduct
involving trade or commerce, constitute unfair methods of
competition and unfair or deceptive acts or practices within the
meaning of each of the above-enumerated [consumer protection]

13

statutes." (Compl. ¶ 64, ECF No. 1.)  While ideally the Complaint would have been more specific, the Court finds that the "price advantage" issue is sufficiently covered by Plaintiffs' allegation about "deceptive and misleading U&C prices" to put CVS on notice, and does not warrant dismissal.

    C.   Plaintiffs' Claims under State Laws Other than Indiana

        1.   Plaintiffs' Standing to Bring Non-Indiana State Law Claims on Behalf of Class Members from Other States

Plaintiffs' Complaint pleads violations of 37 different state consumer protection laws on behalf of putative class members.  However, because the named Plaintiffs are both Indiana TPPs, CVS argues they do not have standing to bring claims based on other states' consumer protection laws.

"The interplay between Article III standing and class standing presents a surprisingly difficult question." In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-MD-02503-DJC, 2015 WL 5458570, at *13 (D. Mass. Sept. 16, 2015). In Ortiz v. Fibreboard Corp., the United States Supreme Court held that where "class certification issues are . . . 'logically antecedent' to Article III concerns, . . . Rule 23 certification should be treated first, 'mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints . . . .'" 527 U.S. 815, 831 (1999) (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 612-13 (1997)).  In the wake of Ortiz,

"[c]ourts have taken different views about how to evaluate Article III and class standing at the motion to dismiss stage where putative class representatives assert claims arising under the laws of states where they neither reside nor allege to have suffered injury." Solodyn, 2015 WL 5458570, at *14.

In Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., the First Circuit dismissed defendants against whom absent class members, but not the named plaintiffs, had alleged claims. 632 F.3d 762, 770-71 (1st Cir. 2011). However, the Court acknowledged Ortiz and clarified that the holding of Plumbers' Union was with one "qualification":

> The qualification, on which we reserve judgment, is one where the claims of the named plaintiffs necessarily give them — not just their lawyers — essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members.

Id. at 770. Several district courts have used this rationale to defer ruling on standing issues until the Rule 23 analysis in antitrust suits. See, e.g., Solodyn, 2015 WL 5458570, at *14 (deferring consideration of standing where "[a]ll members of the putative class have a common interest in litigating claims arising from the Defendants' [conduct]" (citation omitted)); In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 407 (D. Mass. 2013) ("This Court holds that the requisite 'identity of issues' and 'alignment of incentives' is present

15

amongst the End-Payors here.   All members of the putative class have a common interest in litigating claims arising from the Defendants' allegedly anticompetitive collusion designed to cause the End-Payors to pay supracompetitive prices across the several states."); see also In re Relafen Antitrust Litig., 221 F.R.D. 260, 269 (D. Mass. 2004) (certifying class that did not have named plaintiffs from each state because "[t]he more traditional inquiry, which . . . would require class counsel to identify representatives from each state involved in a multistate class action, would render class actions considerably more cumbersome to initiate, and in turn, less effective in overcoming a lack of incentives to prosecute individual rights and in 'achiev[ing] economies of time, effort, and expense.'" (quoting Amchem, 521 U.S. at 615)).

However, courts in other jurisdictions have noted that "deferring [the] standing determination would 'allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union.'" In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 758 n.20 (E.D. Pa. 2014) (citation omitted) (collecting cases).   CVS cites a number of cases where courts have dismissed claims because the named plaintiffs did not have individual standing.   See, e.g., In re

16

Aggrenox Antitrust Litig., 94 F. Supp. 3d 224, 251 (D. Conn. 2015); Niaspan, 42 F. Supp. 3d at 757-58; In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig., 1 F. Supp. 3d 34, 48-49 (E.D.N.Y. 2014); Pardini v. Unilever U.S, Inc., 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013); In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig., No. 09-CV-3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013); In re Refrigerant Compressors Antitrust Litig., No. 2:09-MD-02042, 2012 WL 2917365, at *6-7 (E.D. Mich. July 17, 2012); Cornelius v. Fidelity Nat'l Title Co., No. C08-754MJP, 2009 WL 596585, at *9-10 (W.D. Wash. Mar. 9, 2009). In addition, the court in Corcoran recently dismissed claims brought by California named plaintiffs under the laws of 38 other states, rejecting the plaintiffs' argument that this issue would be more appropriately handled at the class certification stage. Corcoran v. CVS Health Corp., No. 15-cv-3504YGR, 2016 WL 4080124, at *2-3 (N.D. Cal. July 29, 2016).

Although there is authority going both ways on this issue, the trend in the First Circuit seems to be deferring the standing analysis to the class certification stage, so long as the named plaintiffs have "essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members." Plumbers' Union, 632 F.3d at 770. Here, the scheme alleged by Plaintiffs — that CVS

17

has been fraudulently reporting its U&C price to TPPs — is the same across the country.  Plaintiffs have a collective interest in litigating their claims together to attempt to recover and have CVS change its system going forward.  Moreover, "this is not a case where the Named Plaintiffs are attempting 'to piggy-back on the injuries of the unnamed class members.' Rather, each of the Named Plaintiffs asserts a personal injury resulting from Defendants' allegedly [fraudulent conduct]." In re Grand Theft Auto Video Game Consumer Litig. (No. II), No. 06-MD-1739(SWK)(MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) (internal citation omitted).  Put another way, CVS is not challenging Plaintiffs' standing to bring their own claims; it is challenging their standing to bring claims on behalf of the class.  See id. ("The relevant question, therefore, is not whether the Named Plaintiffs have standing to sue Defendants — they most certainly do — but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action.").  This question would be appropriately, and more efficiently, addressed at the class certification stage.  Accordingly, the Court denies without prejudice Defendant's Motion to Dismiss with respect to Plaintiffs' claims under state laws other than Indiana.

2.   Failure to Separately Plead the Elements of Each
State's Consumer Protection Statute

Plaintiffs' Complaint lists 37 state consumer protection statutes, followed by an allegation that "[t]he acts, practices, misrepresentations and omissions by Defendant described above, and Defendant's dissemination of deceptive and misleading U&C prices, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes." (Compl. ¶ 64, ECF No. 1.)   CVS claims this is insufficient because Plaintiffs do not "attempt[] to allege that CVS's conduct violates those general statutory terms as interpreted by each state." (Def.'s Mot. to Dismiss 14, ECF No. 13.)   According to CVS, "[o]ther courts have dismissed claims alleged using a similar blunderbuss strategy, including claims filed by the Indiana Funds' same counsel in another consumer protection case." (Id. at 15.)   However, the cases CVS cites do not support this proposition.   In Indiana/Kentucky/Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc., which involved Plaintiffs' counsel, the court only analyzed the Indiana statute because the plaintiff "agree[d] that we need not consider any other state's statute at this stage." No. 13-7167, 2014 WL 2115498, at *8 (E.D. Pa. May 21, 2014).   The plaintiff's claim was dismissed because it did not meet the requirements of

19

the Indiana statute; the other state claims were dismissed because the named plaintiff could no longer bring its own claim. Id. at *9, 10.

The other two cases cited by CVS, which were not class actions, involved bare-bones complaints. See Williams v. Davey Tree Expert Co., No. 8:10-MC-68-T-30TBM, 2010 WL 3490992, at *1 (M.D. Fla. Aug. 16, 2010) ("This recitation of a laundry list of causes of action not only fails to include the elements for each claim, but also fails to provide any factual detail so as to give Defendant fair notice of what the claims are and the grounds upon which each rests."); Protegrity Corp. v. Paymetric, Inc., No. 3:13-CV-01549(VLB), 2014 WL 3849972, at *3 (D. Conn. Aug. 5, 2014) (dismissing complaint that "does not even offer a 'formulaic recitation of the elements of a cause of action'" (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))).

CVS is adequately on notice of the conduct Plaintiffs claim violates the various state consumer protection statutes. At the class certification stage, Plaintiffs will need to delve into the specifics of each statute to prove that the class representatives are sufficiently typical; for the moment, their pleading is sufficient.

3.    Failure to State a Claim under Various States'
Consumer Protection Laws

CVS further argues: (1) that Plaintiffs "have no claim under the twenty-five statutes expressly requiring residence or injury within the relevant state," (2) that "[e]leven statutes limit suits to consumers or natural persons, which the Indiana Funds are not," and (3) that "[s]ix statutes bar class actions." (Def.'s Mot. to Dismiss 20-23, ECF No. 13.)[4]   The Court finds that it will be more efficient to address these issues at the class certification stage.   Accordingly, CVS's Motion to Dismiss with respect to these issues is denied without prejudice to raising them again when the Court addresses class certification.

D.   Plaintiffs' Negligent Misrepresentation and Unjust
Enrichment Claims

1.   Economic Loss Doctrine

The economic loss doctrine preserves the line between tort and contract, providing that:

> If tort claims are based on duties that are imposed by contract, then under the economic-loss rule, contract law provides the remedies for economic losses. The economic-loss doctrine forbids a party from suing or recovering in tort for economic or pecuniary losses that arise only from breach of contract or are associated with the contract relationship. In other words, tort damages are generally not recoverable unless the plaintiff suffers an injury that is

---

[4]   In response to these arguments, Plaintiffs have withdrawn their claims under the consumer protection statutes in New Jersey, Kansas, Ohio, and Texas.   (See Pls.' Opp'n to Mot. to Dismiss 27-28, ECF No. 20-1.)

independent and separate from the economic losses recoverable under a breach-of-contract claim.

74 Am. Jur. 2d Torts § 24 (2015); see Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C., 929 N.E.2d 722, 739 (Ind. 2010) ("A bright line distinction between the remedies offered in contract and tort with respect to economic damages . . . encourages parties to negotiate toward the risk distribution that is desired or customary." (citation omitted)). Here, CVS argues that Plaintiffs' claims stem from CVS's contractual duty to charge them the U&C price. However, as Plaintiffs note, the court in Corcoran rejected that same argument:

> CVS argues that Plaintiffs' fraud and negligent misrepresentation claims are nothing more than disguised breach of contract claims, which should be dismissed under the economic loss doctrine. The Court rejects the very premise of Defendants' argument. To support dismissal, Defendants contend the [Complaint] does not allege any wrongdoing independent of its contractual obligation to report an accurate U&C price to third-party payors. Not so. The gravamen of Plaintiffs' allegations is that CVS created the HSP program to report misleading U&C prices in a manner that contravened industry standards with the intent to deceive Plaintiffs and class members. Plaintiffs additionally allege that CVS misrepresented the availability of the HSP program and their ability to participate therein. These allegations undoubtedly fall outside of CVS's contractual obligations to third party payors.

169 F. Supp. 3d at 988 (emphasis added). CVS attempts to distinguish Corcoran because the plaintiffs there were end-payors; but this did not factor into the court's analysis.

22

Plaintiffs also point out that their Complaint states that CVS is required to report an accurate U&C price by the NCPDP. CVS takes issue with the merits of this claim, arguing that the U&C field on the relevant NCPDP form is optional. This argument may end up being successful further down the line, but at this stage, the Court must take what the Plaintiffs pled at face value. (See Compl. ¶ 16, ECF No. 1 ("Pursuant to the NCPDP reporting standard, pharmacies are required to report the amount of its U&C price for each prescription transaction using NCPDP's mandatory pricing segment code 426-DQ.").)

The bottom line is that, based on the Complaint's statement that CVS orchestrated a fraudulent scheme that violated industry standards, the economic loss doctrine does not bar their claims at this stage. It may well come out in discovery that the only basis for the claims is in contract, in which case this could be revisited at summary judgment.

### 2. Negligent Misrepresentation

The elements of a claim for negligent misrepresentation include (1) receipt of a misrepresentation made by a defendant and (2) justifiable reliance on the misrepresentation. See Restatement (Second) of Torts § 552 (1977); Eby v. York-Div., Borg-Warner, 455 N.E.2d 623, 628 (Ind. Ct. App. 1983) (following § 552). CVS argues that, even if the economic loss doctrine does not apply, Plaintiffs' negligent misrepresentation claim

23

fails because: (1) "The Complaint alleges that U&C prices were reported to 'Third-Party Payors' generically; it does not allege that U&C prices were reported to the Indiana Funds specifically"; and (2) "the Indiana Funds have not plausibly pled that they justifiably relied on an 'erroneous' reported price." (Def.'s Mot. to Dismiss 28-29, ECF No. 13.)

Regarding the first issue, the Complaint makes clear that CVS reported the U&C price to all TPPs, including the Indiana Funds. The second issue is a closer question. CVS argues that the Complaint admits that the HSP program was well advertised and therefore Plaintiffs cannot claim they were unaware that the HSP price was lower than the reported U&C price. CVS also submitted a notice of supplemental authority (ECF No. 32) regarding the First Circuit's recent decision in United States ex rel. Winkelman v. CVS Caremark Corp., which affirmed dismissal of a False Claims Act ("FCA") claim against CVS concerning its HSP program. 827 F.3d 201, 203 (1st Cir. 2016). The First Circuit held that the "public disclosure bar" of the FCA prohibited the plaintiffs in that case from maintaining a qui tam lawsuit based on the allegation that CVS was required to, but did not, report its HSP program prices to government healthcare programs as its U&C price. Id. at 203, 213. "[T]he public disclosure bar forecloses a qui tam action 'if substantially the same allegations or transactions as alleged in

24

the action . . . were publicly disclosed' in a list of enumerated sources." Id. at 208 (quoting 31 U.S.C. § 3730(e)(4)(A). The Court found that "publicly disclosed materials [available before relators filed suit in August 2011] revealed, quite plainly, that CVS was not providing its HSP price as its U&C price . . . ." Id. at 209. CVS argues that likewise here, Plaintiffs could not have justifiably relied on the U&C price because the HSP price was so well publicized.

Plaintiffs counter that knowing the HSP price was not enough to reveal the fraud because they were unaware of the percentage of cash-paying customers enrolled in the HSP program. Without that information, they could not determine whether the U&C price — the price that the majority of cash customers pay — was the HSP price or not.

The Court agrees with Plaintiffs - at least at this stage of the litigation. The crux of their argument is that the HSP price should have been reported as the U&C price, not because it was the lowest price CVS charged, but because it was the price most cash-paying customers paid. By contrast, Winkelman dealt with Medicare Part D and Medicaid, and at least in Connecticut, "regulations mandated that CVS provide Medicaid with 'the lowest drug price' that CVS was offering to consumers . . . ." Id. (emphasis added). It was clear from the publicity that the U&C price that CVS was charging Medicaid was not the lowest price.

25

While CVS argues in its Reply that, because Plaintiffs are sophisticated parties, they should have inquired as to the percentage of customers enrolled in the HSP program, the Court finds that, at the motion to dismiss stage, Plaintiffs have sufficiently pled justifiable reliance.

### 3.   Unjust Enrichment

Aside from the economic loss doctrine, CVS's main argument as to Plaintiffs' unjust enrichment claim is that it concerns the same conduct that CVS argues is not actionable under consumer protection statutes or the common law of negligent misrepresentation.   Therefore, "[i]f the Court finds that Plaintiffs have not stated valid claims for consumer protection violations and negligent misrepresentation, the unjust enrichment claim must fail as well, since Plaintiffs provide no independent basis for finding that CVS acted 'unjustly' by reporting a U&C price that was not the HSP program price." (Def.'s Mot. to Dismiss 31, ECF No. 13.)   Because the Court finds that Plaintiffs have sufficiently alleged a fraudulent scheme, the unjust enrichment claim may also go forward.

III. Conclusion

For the foregoing reasons, CVS's Motion to Dismiss and Motion to Certify Question to the Indiana Supreme Court are both DENIED.   As stated herein, denial of CVS's Motion to Dismiss is WITHOUT PREJUDICE to CVS raising its arguments concerning claims

under state laws other than Indiana at the class certification stage.


IT IS SO ORDERED.

William E. Smith
Chief Judge
Date: November 1, 2016