UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                              )
SHEET METAL WORKERS LOCAL NO. 20    )
WELFARE AND BENEFIT FUND, and       )
INDIANA CARPENTERS WELFARE FUND,    )
on behalf of themselves and all     )      C.A. No. 16-46 WES
others similarly situated,          )
                              )
        Plaintiffs,           )
                              )
    v.                        )
                              )
CVS PHARMACY, INC.,           )
                              )
        Defendant.            )
_____)
                              )
PLUMBERS WELFARE FUND, LOCAL 130,   )
U.A., on behalf of itself and all   )
others similarly situated,          )
                              )      C.A. No. 16-447 WES
        Plaintiffs,           )
                              )
    v.                        )
                              )
CVS PHARMACY, INC.,           )
                              )
        Defendant.            )
                              )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Presently before the Court is Plaintiffs' Motion for Leave to File First Amended Complaint (ECF No. 56), in which they ask permission to update their story about alleged fraud spearheaded by Defendant CVS Pharmacy, Inc., ("CVS"). In particular, Plaintiffs would like to revise their complaint to comport with

information they learned in discovery, namely, that Pharmacy Benefit Managers ("PBMs"), who facilitated generic-drug purchases between Plaintiffs and CVS, were allegedly aware of and abetted CVS's fraud. But not only do Plaintiffs seek to amend their factual allegations; they also hope to add two claims under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. For the reasons that follow, Plaintiffs' Motion is GRANTED.

I.  Background[1]

Alleging negligent misrepresentation, unjust enrichment, and violations of state-consumer-protection acts, Plaintiffs had it in their original complaint that CVS overcharged them by collecting more for generic drugs than it was allowed under the National Council for Prescription Drug Program ("NCPDP"). See Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Health Corp., 221 F. Supp. 3d 227, 229-31 (D.R.I. 2016) (denying CVS's motion to dismiss). According to this complaint, a key component of CVS's fraud was its Health Savings Pass ("HSP") program, which CVS developed to compete with big-box retailers (e.g., Wal-Mart, Inc.)

---

[1] The following facts are those well-pleaded in the Plaintiffs' Proposed First Amended Complaint (ECF No. 58-1), taken in the light most favorable to and drawing all reasonable inferences in favor of Plaintiffs. Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008).

who had recently slashed prices on certain generic drugs. See id. at 229-30.

Instituted November 2008 and discontinued February 2016, the HSP program allowed individual cash-paying CVS customers to access discounted prices by paying an annual membership fee. (Pls.' Proposed First Am. Compl. ("PAC") 3, ECF No. 58-1). Though nominal, the fee paid substantial dividends. CVS saved large sums by purposefully structuring the HSP program to prevent Plaintiffs, and others similarly situated, from accessing the program's discounts while remaining (or so it thought) in compliance with NCPDP's requirement that CVS charge Plaintiffs no more than the general public, that is, no more than the "Usual and Customary" ("U&C") price for drugs. (Id. at 1-4, 43.) The thought was that because the HSP price was not available to cash customers, but only to HSP members, CVS was not required to offer that price to Plaintiffs, but could instead report the higher price paid by non-HSP-member cash customers as the U&C price.[2] (Id. at 25.) This allowed CVS to retain cash customers without passing on the price cut to purchasers like Plaintiffs. (Id. at 20-24.)

Since filing its original complaint, Plaintiffs claim discovery has revealed a more complex scheme whereby CVS did not

---

[2] Plaintiffs pay the lowest of several prices CVS reports. The U&C price is usually the highest of the reported prices, but is nonetheless reported to ensure Plaintiffs pay no more than cash customers. (Id. at 15.)

act alone, but rather enlisted the help of various other entities to develop and conceal the gambit described above to bilk Plaintiffs and others out of billions of dollars. (Id. at 31-43.) One of these entities was Caremark, LLC, ("Caremark"). Caremark helped CVS design the HSP program, and in particular, developed the nominal-membership-fee feature as a way to compete with the big-box stores for cash customers without offering similar savings to Plaintiffs. (Id. at 20-24). Caremark also administered the HSP program from its inception in 2008 to 2013, when Medical Security Card Company ("ScriptSave") took it over. (Id. at 26-27.) Both Caremark and ScriptSave recognized that the program allowed CVS to "'protect' loyalty member price[s] from third parties." (Id. at 29.) But, anticipating that these third parties would consider such protection a bug, not a feature, of the program, they worked with CVS to keep it a secret. (Id. at 31.)

Plaintiffs also allege that four of the country's largest PBMs – Caremark, Express Scripts, Inc., OptumRx, Inc., and MedImpact Healthcare Systems, Inc. – were in on the scheme, too. (Id. at 31-43.) PBMs contract with health plans like Plaintiffs to reimburse pharmacies like CVS when a plan's members fill their prescriptions. (Id. at 4-5, 10.) PBMs ostensibly work on behalf of their health-plan clients to, among other things, negotiate low pharmacy drug prices. (Id.) The interests of PBMs and health plans are not perfectly aligned, however. (See id. at 15-17.) Health

plans want cheap drugs; PBMs want the difference between what they pay pharmacies for drugs and what they charge health plans for those drugs to be as large as possible. (Id.) In other words, the difference between what PBMs pay and what they charge is their gain, but the health plans' loss. (See id.)

The PBMs allegedly increased this spread by deliberately hiding from health plans the fact that CVS was not reporting its HSP price as its U&C price. (Id. at 31.) Each PBM developed an internal policy interpreting definitions of U&C price in their respective contracts with CVS as excluding HSP prices. (Id. at 31-43.) Plaintiffs allege that this was no coincidence – that CVS prompted the PBMs to keep the ruse a secret, and that each PBM knew the others had agreed to do so. (Id.) This assurance was paramount to the scheme, for if any one PBM had confessed, the health plans would have put a stop to it, insisting they pay no more than CVS's cash customers in accordance with their contracts with the PBMs. (Id. at 45.) Indeed, Plaintiffs say that, in a competitive market, such insistence would have been unnecessary, as one or more PBMs would have adopted HSP prices sua sponte in an effort to attract plan business. (Id. at 51-57.)

According to Plaintiffs, fraud operated here on more than a wink and a nod. Plaintiffs allege that it "was orchestrated out of the corporate headquarters of CVS, Caremark, each remaining PBM, and ScriptSave" and "required those headquarters to communicate

directly and frequently by U.S. Mail and interstate wire facilities." (Id. at 60-61.) Plaintiffs aver that these parties "share[d] information regarding various cash discount programs, the structure of those programs, and whether they [were] reporting those prices as U&C prices." (Id. at 66.) For example, in a back-and-forth between CVS executives and executives at Indiana Carpenters Welfare Fund's PBM, Medco Health Solutions, Inc., (now owned by Express Scripts), Medco assured CVS that it would interpret its definition of U&C price – "the lowest net cash price a cash . . . customer would have paid . . . inclusive of all applicable discounts" – as excluding CVS's HSP price, even though Medco had previously determined that it would consider Wal-Mart, Inc.,'s discounted price for generics as its U&C price. (Id. at 33-38.) Unsuccessful in its attempt to have Medco modify its definition of U&C price to explicitly exclude discounts associated with "card programs such as CVS' Health Savings Pass," CVS settled for Medco's sotto voce amendment. (Id.) CVS then notified an ostensible competitor of Medco's – Caremark – of Medco's decision when a vice president at CVS, Tina Egan, forwarded an email to Caremark's senior legal counsel, Roderick Bergin, containing Medco's discreet capitulation. (Id. at 37 ("Ms. Egan forwarded Medco's response to Roderick Bergin . . . as an 'FYI.'").)

Plaintiffs believe that the foregoing, if proved, supports the two RICO claims in their PAC. In the first of these claims,

Plaintiffs allege that CVS and Caremark shepherded a RICO enterprise that included the aforementioned PBMs and ScriptSave, all of whom Plaintiffs want as defendants. (Id. at 51-64.) This enterprise worked together to defraud Plaintiffs by disguising the fact that CVS failed to report HSP prices as its U&C prices for certain generic drugs. (Id.) The second claim is similar to the first, except that it splits the enterprise alleged in the first claim into three, each including CVS, Caremark, ScriptSave, and one of the three other PBMs. (Id. at 64-78.) Plaintiffs also have a standalone fraud claim in their PAC, which relies on the same alleged fraud underlying their RICO claims. (Id. at 82-83.) The remaining claims – negligent misrepresentation, unjust enrichment, and violations of state-consumer-protection acts – are holdovers from the original complaint. See Sheet Metal Workers, 221 F. Supp. 3d at 230.

II. Discussion

    A.    Legal Standard

    The parties disagree as to whether Federal Rule of Civil Procedure 15(a) or 16(b) supplies the standard by which the Court must evaluate Plaintiffs' Motion. But, in fact, both apply.

    The First Circuit has made plain that where, as here, a plaintiff seeks to amend its complaint after the deadline for doing so set by the district court's scheduling order has passed, Rule 16(b)'s "good cause" standard applies. O'Connell v. Hyatt Hotels

of P.R., 357 F.3d 152, 154 (1st Cir. 2004).[3] This standard –
"[u]nlike Rule 15(a)'s 'freely given' standard, which focuses
mostly on the bad faith of the moving party and the prejudice to
the opposing party" – "emphasizes the diligence of the party
seeking the amendment." Id. at 155. Under Rule 16(b), "[p]rejudice
to the opposing party remains relevant but is not the dominant
criterion." Id.

If a plaintiff makes it over the hurdle set by Rule 16(b),
the district court must then evaluate a contested motion to amend
under Rule 15(a)'s "freely give[n]" standard. See Leary v.
Daeschner, 349 F.3d 888, 909 (6th Cir. 2006) ("Once the scheduling
order's deadline passes, a plaintiff first must show good cause
under Rule 16(b) for failure earlier to seek leave to amend before
a court will consider whether amendment is proper under Rule
15(a)."); 6A Charles Alan Wright & Arthur R. Miller, Federal
Practice and Procedure § 1522.2 (3d ed. 1998) (same). That is, the
district court must ask whether a plaintiff's amendment would cause
undue delay, was brought in bad faith, or with a dilatory motive,
or if the amendment would be futile. Grant v. News Grp. Bos., Inc.,
55 F.3d 1, 5 (1st Cir. 1995).

---

[3] Due seemingly to scrivener's error, the deadline by which
to amend the pleadings was not included in this case's scheduling
order. Nevertheless, both parties agree the deadline was March 3,
2017. (See Def.'s Sur-Reply in Opp'n to Pls.' Mot. for Leave to
File First Am. Compl. 2, ECF No. 65.)

Particularly salient at the moment are questions of undue delay[4] and futility. Undue delay, on its own, can be a basis for denying amendment in the First Circuit. <u>Acosta-Mestre v. Hilton Int'l of P.R., Inc.</u>, 156 F.3d 49, 52 (1st Cir. 1998). <u>But see</u> Wright & Miller, <u>supra</u>, at § 1488 ("In most cases, delay alone is not a sufficient reason for denying leave."). There is no delay that is per se undue. Wright & Miller, <u>supra</u>, at § 1488 ("Quite appropriately the courts have not imposed any arbitrary timing restrictions on requests for leave to amend and permission has been granted under Rule 15(a) at various stages of the litigation."). Rather, a district court mulling a motion to amend in a particular case must consider any alleged delay with that case's specific history in mind. <u>Id.</u> ("The policy of allowing amendments to be made at any time during the litigation is sound. It would be unreasonable to restrict a party's ability to amend to a particular stage of the action inasmuch as the need to amend may not appear until after discovery has been completed or testimony

---

[4] Whether the movant has delayed unduly its amendment request is relevant to – even sometimes determinative of – whether it has been diligent under Rule 16(b). <u>See, e.g.</u>, <u>Compania Embotelladora Del Pacifico v. Pepsi Cola Co.</u>, 607 F. Supp. 2d 600, 602 (S.D.N.Y. 2009) ("[C]ourts have found good cause to be lacking [under Rule 16(b)] where, as here, the moving party had knowledge of the facts and circumstances in the case for a period of several years and could have made their motion within the specified time period." (quotation marks omitted)); Wright & Miller, <u>supra</u>, at § 1522.2 ("[R]elief [under Rule 16(b)] may be granted if the court finds that the movant has not unduly delayed the action and that the opponent will not be prejudiced by the modification.").

has been taken at trial."). However, the First Circuit has not hesitated to affirm the denial of an amendment when more than a year elapses between filing the initial complaint and the motion to amend it. See, e.g., Badillo-Santiago v. Naveira-Merly, 378 F.3d 1, 7–8 (1st Cir. 2004) (thirteen-to-fourteen months); Acosta-Mestre, 156 F.3d at 52 (fifteen months); Grant, 55 F.3d at 6 (fourteen months).

Whether amendment would be futile "is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)." Hatch v. Dep't for Children, Youth, and Their Families, 274 F.3d 12, 19 (1st Cir. 2001) (noting, however, that if a plaintiff waits until after the close of discovery and the docketing of a summary judgment motion, then amendment is "properly classified as futile unless the allegations of the proposed amended complaint are supported by substantial evidence"). In other words, amendment is futile when the proposed complaint does not "contain sufficient factual matter to state a claim to relief that is plausible on its face." Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (alteration and quotation marks omitted). A plausible claim of relief is one that "support[s] the reasonable inference that the defendant is liable," not just "a sheer possibility that a defendant has acted unlawfully." Id. (quotation marks omitted). In making this determination, the Court regards "the well-pleaded

facts in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." Gray, 544 F.3d at 324.

B.    Rule 16(b)

Defendant argues that Plaintiffs have been less than diligent in prosecuting their case. (Def.'s Sur-Reply in Opp'n to Pls.' Mot. for Leave to File First Am. Compl. 3, ECF No. 65.) Defendant notes that a mere thirty pages of discovery – sworn declarations from the PBMs indicating they knew CVS was not reporting HSP prices – form the basis of Plaintiffs' PAC. (Id. at 1, 3) Moreover, Plaintiffs possessed the PBMs' declarations as early as December 23, 2016, over five months before Plaintiffs submitted their Motion to Amend on June 5, 2017. (Id.) Therefore, Defendant contends, "If they had acted diligently, Plaintiffs easily could have reviewed those documents and moved to amend the complaint by March 3, 2017, the agreed deadline." (Id. at 1).

The closest case Defendant finds to these facts is Steir v. Girl Scouts of the USA, 383 F.3d 7 (1st Cir. 2004). In Steir, plaintiff moved to amend her complaint nine months after defendant tacitly conceded facts relevant to the proposed amendment, three months after the defendant openly conceded such facts, and a week after discovery had closed. Steir, 383 F.3d at 13-14. Notwithstanding plaintiff's "somnolence," the First Circuit considered the question whether plaintiff met Rule 16(b)'s good-cause standard a difficult one, finding that "[w]hile it would

have been well within the discretion of the district court to allow the motion, it was not an abuse of discretion to deny it." Id. at 14.

This case is different. Plaintiffs here moved to amend their complaint five months after CVS began producing documents which now number in the hundreds of thousands of pages. (Pls.' Mem. in Supp. of Their Mot. for Leave to File First Am. Compl. 2-3, ECF No. 56-1). Indeed, Defendant's production was ongoing at the time Plaintiffs moved to amend. (Id.) And unlike in Steir, discovery had not yet closed. (Id.) While it may be true that Plaintiffs received the thirty pages they rely on in their PAC on December 23, 2016, these thirty pages were among 3,024 they received that day, followed by 401,175 pages they received a few weeks later. (Pls.' Reply Brief in Supp. of Their Mot. for Leave to File First Am. Compl. 11, ECF No. 62.) Under these circumstances, the Court finds that Plaintiffs, while perhaps less diligent than they could have been, were diligent enough in their review of the documents to meet Rule 16(b)'s good-cause standard.[5] See Salomon v. Adderly

---

[5] Defendant also argues that allowing Plaintiffs' amendment would cause it undue prejudice. (Def.'s Mem. in Supp. of Obj. to Pls.' Mot. for Leave to File First Am. Compl. 17-18.) But this argument is unavailing: when Plaintiffs filed their Motion to Amend, discovery was still open; Defendant had yet to take any depositions; and Defendant had already responded to broad document requests relevant to the PAC's allegations. (Pls.' Mem. in Supp. of Their Mot. for Leave to File First Am. Compl. 13.) Furthermore, amendment here is unlikely to cause a "major alteration in [Defendant's] trial tactics and strategy." Cf. Steir, 383 F.3d at

Indus., Inc., 960 F. Supp. 2d 502, 507–08, 511 (S.D.N.Y. 2013) (allowing amendment where plaintiff learned material information "through discovery after the expiration of the scheduling order deadline"); Burns v. Hale & Dorr LLP, 242 F.R.D. 170, 174–75 (D. Mass. 2007) (allowing amendment where it was argued that "the claims which the plaintiff seeks to add, for conversion and breach of contract, are based on facts which were only discovered during the course of discovery").

C.   Rule 15(a)

Defendant's arguments under Rule 15(a) are that Plaintiffs' Motion to Amend was unduly delayed and that amendment would be futile. Neither is persuasive.

1. Undue Delay

Defendant marshals the same facts to argue undue delay as it did to argue lack of diligence, namely, that Plaintiffs waited five months after they had received documentation supporting their new theories to move for amendment. (Def.'s Mem. in Supp. of Obj. to Pls.' Mot. for Leave to File First Am. Compl. ("Def.'s Obj.") 16, 19, ECF No. 60-1.) Defendant also notes that Plaintiffs filed

---

12-13 (quotation marks omitted) (finding major alteration likely where plaintiff sought to add a legal claim to a complaint that had sounded only in equity, and where allowing addition of such a claim "would have required the re-opening of discovery . . . [and] a postponement of the hearing scheduled on the pending motions for summary judgment").

their Motion over sixteen months after they filed the original complaint. (Id. at 16.)

These delays might suffice to establish undue delay in a vacuum, but not in the context of this case. To be sure, where significant time has elapsed between filing the complaint and moving to amend, the movant must show a valid reason for the delay. See In re Lombardo, 755 F.3d 1, 3 (1st Cir. 2014). And here, even though the time between filing the complaint and moving to amend is considerable, Plaintiffs have in fact provided a valid reason for the delay: before receiving their declarations, Plaintiffs were under the impression that the PBMs too were unaware of CVS's alleged pricing scheme. See Enzymotec Ltd. v. NBTY, Inc., 754 F. Supp. 2d 527, 535–39 (E.D.N.Y. 2010) (allowing motion to amend filed over twenty months after complaint and nine months after scheduling order deadline where plaintiff learned new facts during discovery); Lanigan v. LaSalle Nat'l Bank, 108 F.R.D. 660, 663 (N.D. Ill. 1985) ("It is not uncommon that facts disclosed in discovery lead to new claims, and courts may properly allow the plaintiff to amend the complaint in light of this new information.").

Furthermore, the five-month delay between receiving the declarations and moving to amend would perhaps support a finding of undue delay if they had not been received amidst a veritable avalanche of discovery. Even the most well-staffed firm would need

14

some time to sort and parse 400,000 documents. See Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 279 (4th Cir. 1987) (allowing amendment despite three-month delay between discovery of new evidence in deposition and motion based thereon because "plaintiffs were entitled to a reasonable time to investigate through other sources the information they had secured from the deposition of defendant's witnesses").

### 2. Futility

Defendant's other argument under Rule 15(a) against allowing amendment is that to do so would be futile. (Def.'s Obj. 19-34.) As discussed above, the Court uses the familiar 12(b)(6) motion-to-dismiss standard to pass on the proposed amendment's futility.

This Court has already held that Plaintiffs' negligent-misrepresentation, unjust-enrichment, and statutory consumer-protection claims meet the 12(b)(6) standard. See Sheet Metal Workers, 221 F. Supp. 3d at 237-39. Updating these claims in light of the allegation that the PBMs were privy to CVS's alleged chicanery does not change the Court's analysis as to these claims.[6]

---

[6] Plaintiffs do add a common-law fraud claim to their statutory claims under various states' consumer protection acts. But because the same fraudulent activity is alleged as the predicate to both kinds of claim, the Court need not revisit its conclusion that Plaintiffs have met the Rule 9(b) standard, "adequately put[ting] CVS on notice of the details of the alleged fraud." Sheet Metal Workers, 221 F. Supp. 3d at 231.

They continue to clear Rule 12(b)(6)'s plausibility threshold, and therefore their amendment would not be futile under Rule 15(a).

The thornier question here is whether the same can be said of Plaintiffs' RICO claims. A viable RICO claim under § 1962(c) requires four elements: "1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." <u>Libertad v. Welch</u>, 53 F.3d 428, 441 (1st Cir. 1995). Defendant argues that Plaintiffs' RICO claims are futile because they properly allege neither a RICO enterprise, a pattern of racketeering, predicate acts of racketeering, nor causation. (Def.'s Obj. 19-34.)

RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Particularly relevant to this case are so-called "association-in-fact" enterprises. An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981). The Supreme Court – in keeping with a line of its cases correcting lower-court decisions that unduly restricted RICO's scope, <u>see</u> <u>Odom v. Microsoft Corp.</u>, 486 F.3d 541, 545–47 (9th Cir. 2007) – recently admonished that the universe of enterprises covered by the statute is "obviously broad," <u>Boyle v. United States</u>, 556 U.S. 938, 944 (2009). <u>See also</u> <u>Nat'l Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 257 (1994)

("RICO broadly defines 'enterprise' . . . ."); <u>Sedima, S.P.R.L. v.</u> <u>Imrex Co.</u>, 473 U.S. 479, 497 (1985) ("RICO is to be read broadly."). And as to association-in-fact enterprises in particular, the <u>Boyle</u> court found that their "definition has a wide reach," and that "the very concept of an association in fact is expansive." <u>Boyle</u>, 556 U.S. at 944.

Accordingly, an association-in-fact enterprise can be without various accoutrements typically attending "businesslike entities." <u>Id.</u> at 945. For example, an association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command[,]' [and] decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." <u>Id.</u> at 948. Moreover, "the existence of an association-in-fact is oftentimes more readily proven by what i[t] does, rather than by abstract analysis of its structure," which is to say that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." <u>Id.</u> at 951 (quotation marks omitted); <u>accord</u> <u>United States v. Patrick</u>, 248 F.3d 11, 19 (1st Cir. 2001) ("While 'enterprise' and 'pattern of racketeering activity' are separate elements of a RICO offense, proof of these two elements need not be separate or distinct but may in fact coalesce." (quotations marks omitted)).

In their PAC, Plaintiffs allege that CVS, the various PBMs, and ScriptSave formed either one global or three separate association-in-fact enterprises. (PAC 51-78.) Defendant argues that both the alleged global and separate RICO enterprises amount to unactionable "hub-and-spoke" structures. (Def.'s Obj. 21-22.) An enterprise with a hub-and-spoke structure exists where one entity (the hub) transacts similarly with several other entities (the spokes) after a design typically hatched by the hub. See, e.g., United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015). And indeed hub-and-spoke enterprises have routinely been found insufficient to support RICO claims. See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172, 183 (D. Mass. 2003) ("Most courts have found that complaints alleging hub-and-spoke enterprises fail to satisfy the RICO enterprise requirement.") (collecting cases); In re Trilegiant Corp., 11 F. Supp. 3d 82, 98 (D. Conn. 2014) ("Hub-and-spoke enterprises have long been held by courts in this circuit to be insufficient as a matter of law to constitute the requisite enterprise for a RICO violation.").

But these unactionable hub-and-spoke enterprises were all what courts have termed – sticking with the metaphor – "rimless," meaning there lacked some connection among the enterprises' respective spokes. See, e.g., Moss v. BMO Harris Bank, N.A., 258 F. Supp. 3d 289, 303 (E.D.N.Y. 2017) (dismissing RICO claims where

plaintiff asserted "[a]t best . . . a rimless 'hub and spokes' relationship between defendant [bank] and payday lenders . . . that courts have consistently found insufficient to state a RICO claim"). For example, the Third Circuit, in a case decided after Boyle, dismissed RICO claims alleging that various insurance brokers (the hubs) worked with various insurers (the spokes) to defraud consumers of commercial- and employee-benefit insurance. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 374 (3d Cir. 2010). As to these alleged enterprises, the court stated that "[e]ven under the relatively undemanding standard of Boyle," the "plaintiffs had failed to plead facts plausibly suggesting collaboration among the insurers" and "therefore [could not] provide a 'rim' enclosing the 'spokes' of the[ ] alleged 'hub-and-spoke' enterprises." Id.

However, the Insurance Brokerage court denied a motion to dismiss the RICO claims where there were allegations of coordination among the spokes. Id. at 375–79. Like those alleged in the dismissed claim, this enterprise had an insurance broker for a hub and insurers for spokes, but in addition to evidence that the hub had entered into bilateral agreements with each of its spokes, there were also claims that this enterprise had engaged in "bid-rigging," whereby insurers would take turns submitting sham bids to fraudulently steer business in foreordained directions. Id. "In other words, the insurers provided sham bids

19

to the broker, at the request of the broker, in exchange for benefits provided by the broker." Id. at 377. The court found that "the allegations of bid rigging provide[d] the 'rim' to the . . . enterprise's hub-and-spoke configuration, satisfying Boyle's requirements." Id. at 375.

The court so found even though there was no allegation of an explicit agreement among the spokes to engage in reciprocal bid-rigging. See id. at 377. However, as the court noted, "the complaint d[id] allege that one reason the insurers were willing to furnish sham bids was so that they would be the beneficiaries of sham bids in the future." Id. The court in effect accepted the allegation of an implicit agreement – a rim – among the insurers based on their otherwise inexplicable habit of "furnish[ing] purposefully uncompetitive sham bids." Id. at 336. This alleged agreement – by which the enterprise was able to deceive insurance purchasers "to a greater extent than would have been possible on the strength of the bilateral relationships . . . alone" – "plausibly suggest[ed] an interrelationship among the insurers," which in the court's estimation was "enough to plead an enterprise." Id. at 377-78; accord Interstate Circuit v. United States, 306 U.S. 208, 226-27 (1939) (holding proof of an explicit agreement unnecessary to establish antitrust conspiracy among movie distributors where, "knowing that concerted action was

contemplated and invited, the distributors gave their adherence to the scheme and participated in it").

Unlike the Third Circuit, the First Circuit and many of its sister circuit courts of appeal have yet to comment on Boyle's impact, if any, on its association-in-fact jurisprudence, particularly as it relates to hub-and-spoke enterprises. But several district courts have weighed in, albeit to inconsistent effect. Compare Trilegiant 11 F. Supp. 3d at 98–99 (noting that the Second Circuit has similarly failed to comment, but nonetheless finding that "a classic 'hub-and-spoke' formation in which the spokes are separate, distinct and unassociated and whose actions are uncoordinated does not possess the requisite structure to constitute a RICO enterprise, even as that notion was expanded by Boyle"), and Target Corp. v. LCH Pavement Consultants, LLC, Civil No. 12-1912 (JNE/JJK), 2013 WL 2470148, at *4 (D. Minn. June 7, 2013) (noting that "the Eighth Circuit has not addressed the issue," but siding with "the Third Circuit and several district courts [that] have reasoned . . . a rimless hub-and-spoke[] organization does not qualify as an association-in-fact enterprise"), and McDonough v. First Am. Title Ins. Co., No. 10-cv-106-SM, 2011 WL 285685, at *5–7 (D.N.H. Jan. 28, 2011) (holding spoked hub with "no connecting rim" insufficient for RICO enterprise, notwithstanding that "[t]he First Circuit has yet to decide whether a [rimless] hub-and-spoke organization can qualify

as an 'enterprise' for RICO purposes"), with Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 306–08, 314 (S.D.N.Y. 2009) (denying motion to dismiss RICO claim involving rimless hub-and-spoke enterprise).

Here, though, even without definitive guidance from the First Circuit, the Court can safely say that the allegations in the PAC assert rim enough around the spokes, without hazarding analysis as to perhaps the closest question arising post-Boyle, namely, whether rimless hub-and-spoke enterprises are now actionable under RICO. Before Boyle was decided, various courts had already found, or at least entertained the idea, that rimmed hub-and-spoke enterprises could support RICO claims. See, e.g., Cedar Swamp, 487 F. Supp. 2d at 451 (noting that hub-and-spoke structure may constitute a RICO enterprise when "a plaintiff . . . allege[s] that the defendants operated symbiotically and played necessary roles in the achievement of a common purpose"); Aiu Ins. Co. v. Olmecs Med. Supply, Inc., No. CV-04-2934 (ERK), 2005 WL 3710370, at *7–8 (E.D.N.Y. Feb. 22, 2005). And in this case, Plaintiffs have alleged just such an enterprise, pleading enough for the Court to find that CVS, ScriptSave, and the PBMs "associated together for a common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 583.[7]

---

[7] It is quite likely that at least one circuit court would disagree with this conclusion. See United Food & Commercial Workers

Union & Emp'rs. Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849 (7th Cir. 2013). In United Food, the Seventh Circuit held that, Boyle notwithstanding, a plausible association-in-fact enterprise is incomplete absent allegations that corporate racketeers essentially formed a new entity that they managed together and kept separate from their regular business activities. See id. at 853–56. The Seventh Circuit's position appears closer to that enunciated in Boyle's dissent than in its majority. See Boyle, 556 U.S. at 952 (Stevens, J., dissenting) ("In my view, Congress intended the term 'enterprise' . . . to refer only to businesslike entities that have an existence apart from the predicate acts committed by their employees or associates.").

Whatever United Food's congruence with Boyle, this Court declines to follow the Seventh Circuit because presumably the First Circuit would disagree with its analysis: requiring RICO plaintiffs to plead structured, intimate relations among an enterprise's members appears supererogatory given the substantial "breadth" the Boyle court read into RICO's enterprise element, as discussed above. See Boyle, 556 U.S. at 949. After Boyle, "if defendants band together to commit [violations] they cannot accomplish alone . . . they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs.'" Ins. Brokerage, 618 F.3d at 378 (quoting Gregory P. Joseph, Civil RICO: A Definitive Guide 332 (3d ed. 2010)). Even before Boyle, the First Circuit did not require that a RICO enterprise have an "ascertainable structure," recognizing the reality that not all such enterprises would "observe the niceties of legitimate organizational structures." Patrick, 248 F.3d at 19.

RICO, in other words, prohibits more than the most marked illegality. See United States v. Mubayyid, 658 F.3d 35, 57 (1st Cir. 2011) (finding sufficient evidence to support conviction for conspiracy even though "[t]he government presented no direct evidence of an agreement either among the defendants or between any defendant and an unindicted co-conspirator," because, inter alia, "[b]y their very nature, criminal conspiracies are clandestine"). The statute does not require each of an enterprise's various entities to work side-by-side with every other such entity. Indeed, various circuit courts have found that an association-in-fact enterprise can exist despite ignorance on the part of some participants as to the identity of the others. See, e.g., United States v. Rastelli, 870 F.2d 822, 828 (2d Cir. 1989) (noting proof that RICO conspirator knew all other conspirators, or had full knowledge of conspiracy was unnecessary, because "[i]t is sufficient that defendant know the general nature of the enterprise

To be sure, Plaintiffs do not allege an explicit agreement among the PBMs to look the other way as CVS failed to report HSP prices. But they do allege the PMBs communicated with each other and with CVS in order to orchestrate the alleged fraud. (PAC 33-38, 60-61, 66.) In at least one instance, CVS played courier between two PBMs – Medco and Caremark – apprising the latter that the former had agreed to participate in CVS's scheme. (PAC 33-38.) Also alleged, (PAC 31-43, 45, 51-57), is that these entities' interest in defrauding Plaintiffs was advanced to a "greater extent than would have been possible on the strength of the bilateral relationships between [CVS] and each [PBM] alone," Ins. Brokerage, 618 F.3d at 377. See also United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009) (noting that interdependence among spokes in criminal conspiracy "may be shown where one participant knows that his own success depends on the continued existence and health of the [criminal] organization as a whole"); cf. New England Carpenters Health and Welfare Fund v. Abbott Labs., Case No. 12 CV 1662, 2014 WL 4783833, at *6 (N.D. Ill. Sept. 25, 2014) (finding enterprise element not met where the complaint contained "no allegations that pharmacies that comprise the RICO enterprise are

_____

and know that the enterprise extends beyond his individual role"); United States v. De Peri, 778 F.2d 963, 975 (3d Cir. 1985) (noting that "knowledge [of the identities of all other participants] is not essential to the finding of a RICO conspiracy").

in communication with one another or are even aware that other pharmacies are part of the enterprise").

Plaintiffs have also claimed that the PBMs acted contrary to their individual interests by participating in the alleged scheme. (PAC 51-57.) See Apple, Inc., 791 F.3d at 314 (finding necessity of implicit agreement among spokes often derives from the fact that "the spokes would not have gone along with [their various agreements with the hub] except on the understanding that the other [spokes] were agreeing to the same thing." (quotation marks omitted)). The PBMs compete with each other for the business of entities like Plaintiffs. (PAC 51-57.) It would stand to reason, then, that each PBM would be incented to require CVS to report HSP prices as its U&C prices – in order to secure lower drug prices for its current customers and to attract those of its competitors. That the PBMs in this case seemingly did not act as they would be expected to in a competitive market, but rather in a manner that increased profit to both the PBMs and CVS at the expense of the plans, lends further credence to Plaintiffs allegation that they acted together. Cf. Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 50 (1st Cir. 2013) (finding relevant to motion-to-dismiss analysis of plaintiff's antitrust claim the fact that "[t]he complaint . . . state[d] that the defendant[s] . . . acted against their own best interests when refusing to deal with [plaintiff]," because doing so "would have produced abundant

savings to customers and resulted in a higher volume of customer sales due to the attractiveness of potential savings and environmental benefits").

This is not to say that each PBM's interpretation of its contracts to exclude HSP prices, on its own, risked RICO liability. Even that they all did so more or less simultaneously may be mere coincidence, the result of non-collusive contract interpretation in their respective legal departments. On the other hand, "it is well established that vertical agreements, lawful in the abstract, can in context 'be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel,' particularly where multiple competitors sign vertical agreements that would be against their own interests were they acting independently." Apple, Inc., 791 F.3d at 319–20 (quoting Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 893 (2007)) (citing Interstate Circuit, 306 U.S. at 222; and Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928, 935–36 (7th Cir. 2000)). The question of coincidence or not will undoubtedly be raised again at summary judgment and, if necessary, at trial. See Liu v. Amerco, 677 F.3d 489, 497 (1st Cir. 2012) ("The place to test factual assertions for deficiencies and against conflicting evidence is at summary judgment or trial . . . ."). But for now, at the motion-to-dismiss stage, the Court finds it at least plausible, assuming the allegations in the PAC are true, that each PBM, at the behest of

CVS, acted against its individual interest by choosing to adopt an internal policy interpreting U&C price to exclude CVS's HSP price, with the expectation (and in at least one instance, a confirmation) that competitors would do the same. In short, Plaintiffs have adequately pleaded a rim around a spoked hub.[8]

Defendant's remaining arguments for why amendment would be futile are similarly unconvincing. Contrary to Defendant's argument that the PAC fails to allege multiple schemes and therefore a pattern of racketeering, (Def.'s Obj. 25), the First Circuit has expressly stated that "showing a 'pattern' does not necessarily require proof of multiple criminal 'schemes,'" Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 16 (1st Cir. 2000) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240-41 (1989)). "[O]ne scheme that extends over a substantial period of time, or that shows signs of extending indefinitely into the future, can establish a pattern." Efron, 223 F.3d at 16. Such was, allegedly, the case here. Furthermore, the alleged scheme consisted of various well-pleaded instances of the RICO predicates mail and wire fraud. See Sheet Metal Workers, 221 F. Supp. 3d at

---

[8] Because the Court finds the global enterprise is adequately pleaded, the same is true a fortiori of the lesser-included enterprises, especially given that Defendant's arguments as to the latter track those as to the former. See Schwartz v. Lawyers Title Ins. Co., 970 F. Supp. 2d 395, 405 (E.D. Pa. 2013) (finding multiple bilateral association-in-fact RICO enterprises well-pleaded after finding same as to larger enterprise).

231 ("The Court finds that Plaintiffs' Complaint satisfies Rule 9(b). It is clear from the Complaint that the alleged false statement to the Indiana Funds was the reported U & C price, which Plaintiffs claim was inflated."). Finally, the Court finds that Plaintiffs have adequately pleaded causation. Despite Defendant's argument that Plaintiffs knew they were not paying HSP prices and therefore would have paid those prices but for the fraud, (Def.'s Obj. 26-30), the Court must, at this stage, credit all Plaintiffs' well-pleaded allegations, including that they were unaware of the alleged fraud, (PAC 44).

III. Conclusion

For the above reasons, Plaintiffs' Motion (ECF No. 56) is GRANTED.

William E. Smith
Chief Judge
Date: March 31, 2018