IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SHEET METAL WORKERS LOCAL NO. 20 WELFARE AND BENEFIT FUND, and INDIANA CARPENTERS WELFARE FUND, on behalf of themselves and all others similarly situated, | Case No. 1:16-cv-00046-S |
| Plaintiffs, | |
| v. | |
| CVS PHARMACY, INC., CAREMARK, L.L.C. | |
| Defendant. | |
| PLUMBERS WELFARE FUND, LOCAL 130, U.A., on behalf of itself and all others similarly, | Case No. 1:16-cv-00447-S |
| Plaintiff, | |
| v. | |
| CVS PHARMACY, INC., CAREMARK, L.L.C. | |
| Defendants. | |

## FIRST AMENDED COMPLAINT


## REDACTED VERSION

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION .................................................................................................. 1

II.   PARTIES ....................................................................................................................... 5

    A.    Plaintiffs ............................................................................................................ 5

    B.    Defendants ......................................................................................................... 8

        1.    CVS and Caremark ............................................................................... 8

        2.    Un-named Co-Conspirators. ................................................................. 9

III.  JURISDICTION AND VENUE ................................................................................. 10

IV.   THE ENTITIES INVOLVED IN DRUG PRICING ................................................. 10

V.    HOW CVS REPORTS USUAL & CUSTOMARY ("U&C") PRICES ..................... 11

    A.    U&C Pricing ..................................................................................................... 11

    B.    How CVS Reports U&C ................................................................................... 12

VI.   MORE ON THE ROLE OF THE PBMS .................................................................. 13

    A.    PBMs' Unique Role in Administering Claims ................................................. 13

    B.    PBM Contracts with Pharmacies and Health Plans ......................................... 14

    C.    CVS Carefully Monitored its U&C to Ensure It Was Not Paid for
        Transactions with Insured Customers Based on U&C ...................................... 15

    D.    When U&C Prices Are Inflated, Both Pharmacies and PBMs Make
        Money ............................................................................................................... 17

VII.  CVS AND CAREMARK DESIGNED THE HSP PRICING
    ENTERPRISE TO ALLOW CVS TO SUBMIT FRAUDULENT U&C
    PRICES TO HEALTH PLANS ................................................................................. 18

    A.    CVS Was Pressured by Its Competitors to Implement a Discount
        Program for Generic Prescription Drugs ......................................................... 18

    B.    CVS Worked with Caremark to Develop HSP, and Together Made
        the Decision to Operate the HSP Pricing Enterprise So As Not to
        Report HSP as CVS's U&C Price ..................................................................... 20

C.      In November 2008, CVS Launched the HSP Program and, Until the Program Ended in February 2016, Never Reported Its HSP Price as Its U&C Price ...................................................................... 24

D.      CVS and Caremark Concealed Their Fraud from Health Plans ........................ 25

E.      Caremark's Participation in the HSP Pricing Enterprise During Its Administration of the HSP Program ................................................ 26

VIII.   SCRIPTSAVE, THE SECOND ADMINISTRATOR OF THE HSP PROGRAM, ALSO PARTICIPATED IN THE HSP PRICING ENTERPRISE ................................................................................................... 26

IX.     CAREMARK, EXPRESS SCRIPTS, OPTUMRX AND MEDIMPACT BENEFITED FROM THE HSP PRICING ENTERPRISE  AND PARTICIPATED IN ITS OPERATION ........................................................ 31

        1.      Caremark ................................................................................. 31

        2.      Express Scripts ....................................................................... 33

                a.      Medco ......................................................................... 33

                b.      Express Scripts ........................................................... 38

                c.      The combined Express Scripts company ..................... 40

        3.      OptumRx .................................................................................. 41

        4.      MedImpact ............................................................................... 42

X.      DEFENDANTS PROFITED FROM THE HSP SCHEME ........................... 43

XI.     TOLLING OF THE STATUTE OF LIMITATIONS ................................... 44

XII.    DAMAGES TO PLAINTIFFS AND THE CLASSES ................................. 46

XIII.   CLASS ALLEGATIONS ............................................................................ 47

XIV.    CAUSES OF ACTION ................................................................................ 51

COUNT ONE  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.* ......................................................................................................... 51

A.      The HSP Pricing Enterprise ......................................................... 51

B.      Conduct of the HSP Pricing Enterprise .......................................... 57

C.     CVS's Pattern of Racketeering Activity ................................................. 59

D.     CVS's Use of the U.S. Mail and Interstate Wire Facilities ................................ 60

E.     Motive and Common Purpose ........................................................... 62

F.     Damages Caused by CVS's HSP Pricing Fraud ................................... 63

COUNT TWO  VIOLATION OF THE RACKETEER INFLUENCED AND
         CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET
         SEQ.* ................................................................................. 64

A.     The Express Scripts HSP Pricing Enterprise, the OptumRx HSP
       Pricing Enterprise, and the MedImpact HSP Pricing Enterprise ........................ 64

B.     Conduct of the HSP Pricing Enterprise ............................................. 71

C.     CVS's Pattern of Racketeering Activity ............................................. 72

D.     CVS's Use of the U.S. Mail and Interstate Wire Facilities ................................ 74

E.     Motive and Common Purpose ........................................................... 76

F.     Damages Caused by CVS's HSP Pricing Fraud ................................... 77

COUNT THREE  VIOLATIONS OF STATE CONSUMER PROTECTION
         ACTS ................................................................................. 78

COUNT FOUR  NEGLIGENT MISREPRESENTATION ....................................... 81

COUNT FIVE  FRAUD ................................................................... 82

COUNT SIX  UNJUST ENRICHMENT ................................................... 83

PRAYER FOR RELIEF ................................................................... 84

Plaintiffs Sheet Metal Workers Local No. 20 Welfare and Benefit Fund, Indiana

Carpenters Welfare Fund, and Plumbers Welfare Fund, Local 130, U.A. ("Plaintiffs"), on behalf

of themselves and all others similarly situated, bring this action against Defendants CVS

Pharmacy Inc. ("CVS") and Caremark, L.L.C. ("Caremark") to recover monetary damages and

other remedies for their violations of federal and state law.

## I.      NATURE OF ACTION

1.      Usual and Customary, or U&C, prices are charged to customers who are

uninsured or otherwise paying cash for generic prescription drugs.  Yet even when *insured*

patients purchase generic prescription drugs, pharmacies are required to report their U&C prices

for those drugs to that patient's insurance company in accordance with the National Council for

Prescription Drug Program ("NCPDP") requirements, which defines U&C as "the amount

charged cash customers for the prescription exclusive of sales tax or other amounts charged."

Pharmacies must report U&C even in transactions involving insured customers because the U&C

is used to ensure that health plans like Plaintiffs and members of the putative class are not

charged more than what is charged to patients without insurance.  Put simply, health plans pay

the "lower of" several prices, including U&C, for generic drugs.  Since U&C is typically the

highest of the prices, and health plans pay for generic drugs based on the "lower of" several

prices, reporting an honest U&C price ensures health plans pay less than consumers who pay

cash.

2.      Beginning in 2006, Walmart turned the world of generic prescription drugs

upside-down by offering certain 30-day generics for $4.  Despite the attention that Walmart's

program received, CVS initially resisted developing a generic discount program to compete with

Walmart.  Walmart had many other lines of business other than its pharmacy business, and its

customers consisted of many uninsured patients.[1]  Therefore, CVS knew that Walmart could

report the $4 charged under its program as its U&C without compromising its relatively small

health plan business.  But CVS, which in contrast was a pharmacy first-and-foremost and had a

substantial health plan business but a relatively small cash customer business, knew that it could

not report the prices charged under a generic discount program as its U&C price without losing

*billions* of dollars because, if its generic discount program price became CVS's U&C price, all

health plans—over 90% of CVS's business—would pay that lowered U&C.

3.     However, when Walgreens, CVS's biggest competitor, introduced its Prescription

Savings Club program, CVS decided it had no choice but to develop a generic discount program

of its own.[2]  CVS therefore embarked on a scheme ("the HSP Pricing Enterprise") that concealed

from health plans its discount prices when reporting U&C prices.  To carry out its plan, CVS

enlisted the participation of Caremark, L.L.C. ("Caremark"), a fellow subsidiary of CVS Health

Corporation and a Pharmacy Benefits Manager ("PBM"), and three of the other largest PBMs in

the country, Express Scripts, OptumRx and MedImpact.  As part of the scheme, CVS asked

Caremark to determine how it could have its cake (offer a generic discount program) and eat it,

too (not pass on that savings to health plans).  Caremark was an ideal partner.  By virtue of

having access to other pharmacies' data, it knew how and under what circumstances pharmacies

were reporting their generic program prices as U&C prices.  In addition, because as a PBM

Caremark was also paid based on U&C, it knew that, if it helped CVS come up with a way to

develop a generic discount program that did not lower CVS's U&C price, Caremark would

benefit, too.

---

[1] Morrison dep. at 187:1-188:9 ("So it was never a starter for us.").

[2] Morrison (TX Medicaid) dep. at 72:16-73:7.

4.     In fact, when Walmart introduced its $4 generic program, Caremark drafted a "policy" for its department responsible for auditing pharmacies that distinguished between generic discount programs it called "Generic Set Price Programs" and "Club Plans."  The "policy" stated that, while Generic Set Price Programs such as Walmart's $4 generic program had to report their $4 prices as their U&C price, "Club Plans" which required a customer to "join" a program to access discounts to generic drugs did not have to report their program prices as their U&C price.  Notably, although Caremark memorialized this policy in writing, it did not share it with any of its health plan clients.  Therefore, health plans had no reason to know that Caremark considered Club Plans any differently from Generic Set Price Programs.

5.     Having established "cover" for CVS's fraud, CVS and Caremark designed what became CVS's Health Savings Pass ("HSP") program as a Club Plan.  As a result of CVS's and Caremark's scheme to conceal and not report its HSP price as its U&C price, which was followed by Caremark while it administered the program, and also by Medical Security Card Company, d/b/a "ScriptSave" when it later administered the program, CVS, with the participation of Caremark, knowingly and intentionally overcharged Plaintiffs and private health plans for generic prescription drugs by submitting claims for payment that did not account for the HSP price in reporting the U&C price.  Thus, even though at the beginning of the HSP Pricing Enterprise CVS was charging cash customers $9.99 for the generic drugs included on the program, health plans did not receive the benefit of that lower price because CVS reported a U&C that did not take into account the existence of its HSP program.  The scheme continued throughout the life of the HSP program—from November 2008 to February 1, 2016—and caused health plans, which paid for generic prescription drugs on behalf of their members and beneficiaries, to pay significantly more than CVS charges its cash-paying customers to purchase

the same drugs.  *By CVS's own calculations*, health plans were overcharged billions of dollars during the life of the HSP program.  In one internal calculation, CVS estimated the cost of reporting the HSP price as its U&C price could be as high as $866 million per year.

6.      In theory, PBMs, the "middlemen" between pharmacies and health plans who design pharmacy benefit programs ostensibly to save their health plan clients money, could have told their clients about CVS's and Caremark's fraud.  However, because they too benefited from CVS's and Caremark's scheme, they remained silent and became willing participants in the HSP pricing enterprise.  As part of a common plan, orchestrated by CVS and Caremark, Express Scripts, OptumRx and MedImpact all adopted unwritten "policies" that allowed CVS to report fraudulently-inflated U&C prices.  Had these PBMs acted in the best interests of their clients, and consistent with their contracts with CVS, they could each have, at a minimum, negotiated better rates for their clients and collectively saved them billions of dollars.

7.      This is not the first time where PBMs have been caught acting in the interests of themselves rather than their health plan clients.  In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the court certified a class of health plans alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to inflate the benchmark prices of brand name drugs.  McKesson asserted that a class could not be certified because PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health plan clients.  Part of the evidence Judge Saris relied upon in rejecting this contention was evidence showing that the PBMs wanted to keep the price inflation as a secret because they had pocketed a portion of the increase at the expense their health plan clients:

> Because these PBMs benefited from the spreads perpetuated by the
> Scheme, Plaintiffs argue that they had no incentive to inform

> [health plans] of the inflated AWP, let alone fiercely compete to
> mitigate any damage.  As proof, Plaintiffs quote an April 26, 2002
> internal ESI e-mail, sent around the same time as the ESI letter,
> that states that "the AWP increases being pushed through by First
> Data Bank [are] having a very favorable impact on our mail
> margins."  The e-mail goes on to state, "Our clients will not be
> sympathetic to our financial situation since we [will have
> benefited] from the AWP increase in the mail and they hired us to
> control drug trend."  The e-mail includes a handwritten note, in
> response, "Let's put a lid on it and not make it a big deal."[3]

Similarly here, the PBMs kept a lid on CVS's and Caremark's HSP pricing scheme, ensuring it

would remain hidden from health plans so that the PBMs could make money off the scheme.

8.     To redress CVS and Caremark's fraud—as well as the participation in that fraud

by ScriptSave, Express Scripts, OptumRx and MedImpact—Plaintiffs, on behalf of all health

plans who had Caremark, Express Scripts, OptumRx and MedImpact as their PBMs, that paid

CVS, seek an award of damages and treble damages under the Racketeer Influence and Corrupt

Organizations Act, 18 U.S.C. §§ 1961, *et seq.*, state consumer protection statutes, and any other

relief authorized by law.

## II.     PARTIES

A.     **Plaintiffs**

9.     Plaintiff Sheet Metal Workers Local No. 20 Welfare and Benefit Fund ("Sheet

Metals") is a health plan which maintains its principal place of business in Indianapolis, Indiana.

Sheet Metals is an "employee welfare benefit plan" and an "employee benefit plan" as defined in

the Employee Retirement Income Security Act ("ERISA").  Sheet Metals is a non-profit trust,

sponsored and administered by a Board of Trustees, established through collective bargaining by

labor unions and employers.  Pursuant to the trust agreement under which it was created, it

---

[3] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.  Sheet Metals paid for generic prescription drugs purchased at CVS stores on behalf of its members and beneficiaries and was damaged by the conduct alleged herein.

10.    During the life of the HSP program, Sheet Metals' PBM was Caremark.  Under the terms of its contracts with Caremark, Sheet Metals paid Caremark for generic prescription drugs based on the lower of AWP, MAC or U&C.[4]  At least one of Sheet Metals' contracts with Caremark defined U&C as "a Participating Pharmacy's usual selling price for a prescription drug."[5]

11.    Plaintiff Indiana Carpenters Welfare Fund ("Indiana Carpenters") is a health plan with its principal place of business located in Indianapolis, Indiana.  Indiana Carpenters is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Indiana Carpenters is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.  Indiana Carpenters paid for generic drugs purchased at CVS stores on behalf of its members and beneficiaries and was damaged by the conduct alleged herein.

---

[4] P_002580-82, P_002583-92 and P_002815-17 (Caremark Pricing Implementation Documents); P_001427-472 (Prescription Benefit Services Agreement).

[5] P_0001427-472 (Prescription Benefit Services Agreement) ¶ 1.26.

12.     During the life of the HSP program, Indiana Carpenters' PBM was Medco, now owned by Express Scripts.  Under the terms of its contracts with Medco, Indiana Carpenters paid Medco for generic prescription drugs based on ███████████████████████████████ [6]

13.     Plaintiff Plumbers Welfare Fund, Local 130, U.A ("Plumbers") is a health plan which maintains its principal place of business in Chicago, Illinois.  Plumbers is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plumbers is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

14.     During the life of the HSP program, Plumbers' PBM was Express Scripts.  Under the terms of its contracts with Express Scripts, Plumbers paid Express Scripts for generic prescription drugs based on ████████████████████ [7]  At least two of Plumbers' contracts with Express Scripts defined U&C as ████████████████████████████████ ███████████████████████████████████████████ ██████████████████



---

[6] ████████████████████████████████████████████████████ ████████████████████████.

[7] █████████████████████████████████████████████████████ ████████████████████

[8] ████████████████████████████████████████████████ ██████████████████████.

15.     Because Plaintiffs would have paid CVS the U&C price for generic drugs in those instances where the true U&C was lower than ████████████████████ Plaintiffs were damaged by paying CVS for generic drugs purchased by its members and beneficiaries when CVS inflated the U&C prices it reported.  Accordingly, Plaintiffs were damaged by the conduct alleged herein.

B.     **Defendants**

    **1.     CVS and Caremark**

16.     Defendant CVS Pharmacy, Inc. (hereinafter, "CVS") is a corporation organized under the laws of Delaware.  CVS is headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895.

17.     CVS is a nationwide retail pharmacy chain with more than 7,866 pharmacies operating under the trade names CVS Pharmacy and Longs Drugs throughout the United States, the District of Columbia, and Puerto Rico, including numerous locations in this District.  As one of the nation's leading pharmacy businesses, CVS "has relationships with over 150 million consumers, one of every two Americans, and has access to data on 30 percent of all prescriptions in the United States."  CVS fills or manages more than one billion prescriptions per year.

18.     Defendant Caremark, L.L.C. ("Caremark") is a California limited liability corporation with its principal place of business located in Northbrook, Illinois.  Caremark is a PBM that administers the pharmacy benefits of its health plan clients by, among other things, maintaining a network of retail pharmacies at which health plan members can fill their prescriptions.  Caremark is an indirect subsidiary of CVS Health Corporation, formerly known as CVS Caremark Corporation.  In 2007, CVS Corporation and Caremark Rx, Inc. merged to

become CVS Caremark Corporation, "the nation's premier integrated pharmacy services provider."[9]  In 2014, CVS Caremark Corporation changed its name to CVS Health.

      **2.**      **Un-named Co-Conspirators.**

19.      Express Scripts, Inc. ("Express Scripts" or "ESI") is a corporation organized under the laws of Delaware and headquartered at 1 Express Way, St. Louis, Missouri, 63121. Express Scripts is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers for purchase of drugs from CVS.  As the largest pharmacy benefit management organization in the United States, Defendant Express Scripts, Inc. covers 79 million lives and the company reported $96.5 billion in revenue in 2016.

20.      OptumRx, Inc. ("OptumRx") is a corporation organized under the laws of California and headquartered at 2300 Main St., Irvine, California, 92614.  OptumRx is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers for the purchase of drugs at CVS.  As one of the largest pharmacy benefit management companies in the United States, Defendant OptumRx covers 65 million lives and reported approximately $48.2 billion in revenue in 2015; and over $60.44 billion in 2016.

21.      MedImpact Healthcare Systems, Inc. ("MedImpact") is a California corporation with its principal place of business in the County of San Diego, State of California.  MedImpact is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers for the purchase of drugs at CVS.  MedImpact is the largest private PBM in the United States and covers more than 50 million lives.

22.      Together, Caremark, Express Scripts, OptumRx, and MedImpact are sometimes referred to herein as the "PBMs."

---

[9] https://www.cvshealth.com/about/company-history.

23.     Medical Security Card Company LLC d/b/a/ ScriptSave is headquartered in Tucson, Arizona and is a member of the MedImpact family of companies.  ScriptSave administered the HSP program from July 2013 through February 1, 2016.

### III.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of Plaintiffs is a citizen of a state different from any Defendant.  Finally, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because each Defendant transacts business in, is found in, and/or has agents in the District of Rhode Island, and because some of the actions giving rise to the complaint took place within this district.

### IV.     THE ENTITIES INVOLVED IN DRUG PRICING

26.     The prescription drug industry consists of an opaque and complex network of entities engaged in multiple distribution and payment structures.  For the purpose of this Complaint, the most important entities are health plans, their members, and PBMs.

27.     ***Health plans***.  Health plans submit payments on behalf of insured individuals to pharmacies for generic drugs purchased by their insureds.  The term "health plans" covers self-

insured businesses, insurance companies, including those that participate in Medicaid and Medicare, and union-run health plans.

28.     ***Pharmacy Benefit Managers ("PBMs")***.  PBMs act as middlemen between pharmacies and health plans.  In this role, PBMs perform a variety of services on behalf of their plan clients, including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services.

## V.     HOW CVS REPORTS USUAL & CUSTOMARY ("U&C") PRICES

### A.     U&C Pricing

29.     The vast majority of transactions for generic prescription drugs in the United States are paid for by health plans, including health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, health plans and any other health benefit providers.  Consumers who are uninsured, or who pay for cash generic prescription drugs, represent a relatively small portion of the market and, at CVS specifically, health plans represent well over 90 percent of its business.[10]

30.     Because they represent such a small portion of the market, and lack the bargaining power of health plans, cash-paying customers pay the highest price for generic prescription drugs.  That price is called the usual and customary, or U&C, price.  Cash-paying customers are enormously profitable to pharmacies, including CVS.[11]  CVS did one analysis where it determined that, from December 2010 through February 2011, CVS made a profit of $24.99 per

---

[10] Morrison dep. at 141:11-18; Gibbons dep. at 75:5-10 (roughly 97% of prescriptions are priced based on health plan contract, while remainder are priced based on U&C).

[11] *See* CVSC-0259766 ("Cash discount is profitable segment in which consumer pays the full amount of reimbursement at the point of sale.").

prescription through prescriptions from cash-paying customers, while it only made a profit of

$11.59 per prescription on HSP customers.[12]

**B.      How CVS Reports U&C**

31.      U&C is a price set by the pharmacy, and then transmitted to the PBM.  CVS

reports the same U&C regardless of how a particular contract with a PBM defines that term.[13]

32.



---

[12] *See* CVSC-0222732 (CVS Health Savings Pass Patient Breakdown Analysis); *see also* Ferschke dep. at 99:19-101:19.

[13] Gibbons dep. at 63:4-9.

- 12 -

33.     When an insured customer comes into a CVS pharmacy, CVS then reports its U&C price for each prescription drug transaction.  For all times relevant to the allegations in this Complaint, CVS used the industry standard NCPDP reporting for the electronic transmission and adjudication of its pharmacy claims.  NCPDP standards, which govern HIPAA-compliant pharmaceutical transactions, define "Usual and Customary" as "the amount charged cash customers for the prescription exclusive of sales tax or other amounts charged."  *See* NDPDP field 426-Q.  CVS's own Third Party Glossary defines U&C as "the dollar amount a cash customer usually pays."[21]

34.     The pharmacist or pharmacy technician enters the prescription information and information from the customer's insurance card into CVS's computerized claims processing system.  Once this information is entered, CVS submits the claim for dispensing and adjudication.

35.     Adjudication is the automated process by which CVS submits prescription claims electronically in real time to the health plan, or its agent the PBM.  During adjudication, the claim is verified and/or confirmed for patient eligibility for insurance or another prescription drug benefit.  Using the drug price information from CVS, the PBM determines the amount owed by the customer and transmits that amount to CVS.

## VI.     MORE ON THE ROLE OF THE PBMS

### A.     PBMs' Unique Role in Administering Claims

36.     As described above, PBMs are also responsible for setting up how pharmacy claims will be adjudicated based on directions they get from health plans.  By virtue of their

---

[21] CVSSM-0006263, at 6283 (dated July 20, 2010).

unique and powerful role in the administration of prescription drug claims, PBMs have access to enormous amounts of data, including how and when pharmacies report U&C prices.

37.     PBMs also have general knowledge about how cash discount programs work. Many of them have them own programs that they market to institutional and commercial clients as well as to individual consumers.

38.     In addition, most contracts between PBMs and pharmacies give PBMs the right to audit pharmacies to ensure the pharmacies' compliance with contractual terms.  In theory, PBMs should audit pharmacies to ensure that their U&C prices reflect "all applicable discounts" like CVS's HSP program.  ███████████████████████████████████████████
████████████████████████████[22]  The agreements Caremark, ESI, OptumRx and MedImpact had with CVS all gave those PBMs that right.[23]  However, Caremark, Express Scripts, Medco and MedImpact did not invoke this right to review CVS's submission of its U&C prices.[24]

**B.     PBM Contracts with Pharmacies and Health Plans**

39.     PBMs have contracts with health plans and, pursuant to those contracts, health plans pay PBMs for the generic drugs purchased by their members.  Health plans pay PBMs based on the "lower of" three benchmark prices:  (a) AWP - %; (b) U&C or (c) MAC.

40.     AWP means "Average Wholesale Price" and is published by various third-parties including Redbook and First DataBank.

---

[22] ██████████████████.

[23] *See* CVSC-0264280 § 5.2 (Caremark); ██████████████████████████
███████████████████████████████████████████

[24] Lavin dep. at 47:12-20; 119:6-120:2 ("If it was a club program then we didn't continually audit it because we weren't auditing U and C because those were not determined as being part of the usual and customary 'lower of' calculation where that existed.").

41.    MAC means "Maximum Allowable Cost" and is a unit price determined by a PBM for a generic drug included on its proprietary MAC list.  Typically, PBMs charge pharmacies one MAC, while charging health plans another MAC, to ensure that they make money off the spread between what the PBM pays the pharmacy and what the health plan pays the PBM.

42.    The U&C price, set, as described above, by the pharmacy, is almost always the highest of the three prices.  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████ [25]

43.    PBMs also contract with pharmacies to dispense drugs to their health plan clients, and, in those contracts, PBMs agree to pay pharmacies based on the same benchmarks (AWP, MAC and U&C) that health plans pay PBMs.[26]  However, PBMs want to pay pharmacies *less* than what they receive from health plans for those drugs, because they make money off the difference between what PBMs pay pharmacies and what PBMs charge health plans for the same transaction.  For that reason, PBMs do not disclose to pharmacies what health plans are paying PBMs and, conversely, do not disclose to health plans what PBMs are paying pharmacies.

## C.    CVS Carefully Monitored its U&C to Ensure It Was Not Paid for Transactions with Insured Customers Based on U&C

44.    As described above, U&C is by far the highest price paid for generic prescription drugs.  Because, for generic prescription drugs, pharmacies get paid by PBMs based on the

---

[25] ████████████████████.

[26] *See* Zevzavadjian dep. at 60:17-24 ("lower of" methodology in CVS contracts with PBMs is "pretty standard"); Gibbons dep. at 61:8-16 ("it is standard to have lower of, including usual and customary, language in our agreements").

<u>lowest</u> of three prices (AWP, MAC or U&C), pharmacies want to keep U&Cs as high as possible to ensure that they are paid the negotiated AWP or MAC-based rate.

45.     Indeed, CVS carefully monitors the number of transactions paid at its U&C price. Specifically, CVS tracked what it called its "U&C Default rate," the percentage of transactions at which health plans have been reimbursed at U&C.[27]  CVS runs a weekly report tracking the U&C Default rate and, if it gets too high, CVS raises U&C.[28]

46.     One of the explicit reasons CVS started the HSP program was to reduce its U&C default rate.  As the CVS-prepared chart below shows,[29] the HSP program, which began in November 2008, has its intended effect.



---

[27] Melkonian dep. at 39:20-40:25.

[28] Melkonian (TX Medicaid) dep. at 39:11-40:9; Melkonian dep. at 78:6-80:9; 82:20-83:21.

[29] CVSC-0222615 (Retail Pricing Review, dated Oct. 27, 2010), at 222620.

**D.      When U&C Prices Are Inflated, Both Pharmacies and PBMs Make Money**

47.      When U&C prices are inflated, both pharmacies and PBMs make money.  As explained above, on the pharmacy end, by failing to report its HSP prices as its U&C price, CVS ensured that it wouldn't be paid by health plans based on a U&C price that was lower than the AWP or MAC price.

48.      On the other hand, by allowing CVS to maintain an inflated U&C, PBMs ensured that they could maintain the large "spread" between what health plans pay the PBMs and what PBMs must pay pharmacies on each generic drug transaction.  When PBMs negotiate contracts with pharmacies and health plans, they know they can adjust the discounts received by pharmacies, on one hand, and paid by health plans on the other, to ensure the PBM makes money.  For example, a PBM can pay a pharmacy AWP-80% but have the health plan pay the PBM AWP-60%, and keep the difference.  Likewise, a PBM can pay a pharmacy MAC-70% but have the health plan pay the PBM MAC-50%.

49.      The "X" factor is U&C.  Because it is intended to be the highest price charged for a particular drug, it is not discounted.  Therefore, when a PBM pays a pharmacy U&C for a transaction involving a generic drug, the health plan pays the PBM U&C, and the PBM cannot make any "spread" between the difference between what it pays a pharmacy and what a health plan pays the PBM.

50.      In the case of the HSP program, the prices CVS charged were very often lower than what the price would have been under an AWP- or MAC-based formula.  Therefore, had PBMs required CVS to report its HSP prices as its U&C, under their "lower of" contracts, U&C would have been the lowest price, and the PBMs would have lost hundreds of millions of dollars in "spread" opportunities.

51.     For these reasons, Caremark, Express Scripts, OptumRx and MedImpact not only

failed to stop CVS's fraud, they insured that it remained hidden by adopting "policies" that

contradicted the language of their own contracts and provider manuals—documents that were

purportedly written to save their health plan clients money.

### VII.    CVS AND CAREMARK DESIGNED THE HSP PRICING ENTERPRISE TO ALLOW CVS TO SUBMIT FRAUDULENT U&C PRICES TO HEALTH PLANS

### A.    CVS Was Pressured by Its Competitors to Implement a Discount Program for Generic Prescription Drugs

52.     In 2006, large "big-box" retailers with pharmacy departments began offering

hundreds of generic prescription drugs at significantly reduced prices.  For example, in

September 2006, Wal-Mart began charging $4 for a 30-day supply of the most commonly

prescribed generic drugs and $10 for a 90-day supply.  In November of that same year, Target

began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10

for a 90-day supply.  Other retailers with pharmacy departments, which were able to absorb

lower margins on generic drug sales, followed suit.  Wal-Mart reported its $4 price for generic

prescription drugs as its U&C price.  Until CVS acquired Target's pharmacies in 2015, Target

likewise did the same.

53.     CVS experienced considerable pressure because it did not have a discount price

generic program.  It was viewed as being "late to the party" with a competitive offering.[30]

Eventually, because CVS was losing customers to those pharmacies offering such programs, it

began to consider offering one.  CVS was also motivated to offer such a program because,

although CVS claimed to have a policy against price matching under which individual stores

---

[30] CVSSM-0002427, at 2429 (describing input received by CVS management from stores).

could not match the prices being offered by these other programs, individual stores were, in fact, matching these prices and lowering CVS's U&C price.[31]

54.     Even at the beginning of its discussions regarding the proposed scope of what became the HSP program, CVS knew that such a program could affect its U&C prices and therefore compromise its critically important, from a revenue perspective, health plan reimbursements.  On one hand, CVS had, at one time, offered a senior discount in some of its stores and, when it applied such a discount, CVS computed a separate U&C price reflecting the senior discount and reported that U&C to certain PBMs.[32]

55.     On the other hand, CVS had been monitoring its competitors' generic programs for several years, including whether its competitors were reporting those program prices as their U&C price.  For example, when Kmart introduced its program in January 2008, one CVS employee wrote:

> I'm wondering if the [*sic*] Walgreens and KMART are billing usual and customary prices to all third party plans and only eating the difference on their own generic plan.  Since they identify their plans as third party[33] they might not be eroding their global reimbursement like Wal-Mart.  ***These are some interesting points to note if we decide to enter the game.***[34]

Similarly, several months before HSP was launched, Rite Aid, CVS's competitor, rolled out its RX Savings Card, which "require[d] no membership fee and [was] free to anyone who enrolls."[35]

---

[31] Ferschke dep. at 92:8-13.

[32] *See* Responses of CVS Pharmacy, Inc. to Demand for Written Statement Under Oath, CVSSM-0005893, Response No. 10.

[33] This employee noticed that Kmart had a Bank Identification Number, or BIN, and therefore were separating the prices from their cash prices, which do not have BINs.

[34] CVSSM-0004585 (Jan. 18, 2008 email from Gregg Pennington to multiple recipients) (emphasis added).

[35] CVSC-0314647R (Sept. 27, 2008 email between CVS and Caremark personnel, including redacted portions to CVS legal department).

Caremark's Doug Ghertner asked CVS executives: "Without any enrollment fee, will this create some of the 3rd party compression we've discussed over the past several months?"[36]  CVS's Tom Morrison responded, stating: "I have been puzzled by their offering from the start.  They expose themselves to other third parties and to Medicaid agencies.  *This is their new U&C.*"[37]

**B.    CVS Worked with Caremark to Develop HSP, and Together Made the Decision to Operate the HSP Pricing Enterprise So As Not to Report HSP as CVS's U&C Price**

56.    Therefore, at the direction of senior CVS management, Thomas E. Morrison, at the time the Vice President of CVS's Managed Care group, began developing what became the HSP program and ultimately the HSP pricing enterprise.  One of his first steps was to talk to people at Caremark about how it was administering various cash discount cards.  Caremark also knew a lot about alternative programs in the marketplace, and could therefore advise CVS how other pharmacies had designed their programs.[38]  Accordingly, when Morrison began building the HSP program, he formed a team composed of people at both CVS <u>and</u> Caremark.

57.    As early as the summer of 2007, when Caremark began meeting with CVS to discuss what eventually became the HSP program, Caremark knew that CVS would not want to submit its HSP price as a U&C price, and joined in a common plan not to do so.  Kirby Bessant, Vice President of Consumer Programs at Caremark who was intimately involved in nearly every aspect of the design of HSP, wrote to executives at CVS, including Tom Morrison, that Caremark would provide CVS advice on "[h]ow to compete on price without exposing 3rd party

---

[36] *Id.* [CVSC-0314647R].

[37] CVSSM-0024216 (Sept. 27, 2008 e-mail from Tom Morrison to Doug Ghertner, Helena Foulkes and Tom Gibbons) (emphasis added).

[38] Gibbons Dep. (Texas Medicaid) at 33:2-34:1; CVSC-0000358 (July 6, 2007 email from Kirby Bessant attaching "GAP analysis of our various programs in total as compared to the various programs in the marketplace").

contracts."[39]  Caremark knew this would be a concern because, before helping CVS to develop

the HSP program, Caremark had analyzed whether pharmacies like Walgreens and Rite Aid,

which likewise had programs that required patients to "join" a program, were required to report

their membership program prices as U&C prices.[40]  Accordingly, CVS and Caremark, including

their various legal teams,[41] worked together to design a generic program that would allow CVS

to avoid reporting its HSP price as U&C.

58.     Indeed, at one point CVS and Caremark considered setting up HSP with MAC

pricing.  This would have put all the generics offered under HSP on a Caremark MAC list, while

likely increasing the prices for drugs not on the HSP drug list.  However, as part of the common

purpose to inflate U&C prices for the benefit of both CVS and Caremark, Caremark advised

CVS that it should not pursue that option "given the impact to profit margins" and that instead

CVS should "[i]dentify a list of drugs such as the list of drugs offered by Wal-Mart . . . and "pick

a price point."[42]  Caremark advised that "[a]ll other generics will be priced at your regular U&C

price less a small discount . . ."[43]

59.     As part of the common plan and scheme, together, CVS and Caremark considered

the financial impact of setting a price for the generics on Walmart's $4 generic program and

Walgreens' Prescription Savings Club program.  Caremark asked an analyst at CVS to look at

---

[39] CVSC-000419.

[40] Gibbons Dep (Texas Medicaid) at 102:6-22.

[41] CVSC-0001825 (Jan. 9, 2008 meeting request between Tina Egan, Vice president of HealthCare Regulatory, and Roderick Bergin, in charge of managed care contracting and pharmacy).

[42] CVSC-0000803 (Feb. 13, 2008 email from Kirby Bessant to Tom Morrison and Sue Colbert).

[43] *Id.*

those drugs and "determine the impact on the $10.99 price point for these drugs"[44] because "it wouldn't only have impacted the cash paying customers, [i]t would have bled into the third party payors."[45]  In March 2008, eight months before HSP program launched, the analyst concluded that if CVS included all the drugs on the Walmart list, the "impact to the Third Party business" would be ***$866 million*** per year.  If CVS included all the drugs on the Walgreens list, the impact would be an additional ***$329 million***.[46]  Third party business refers to amounts paid by health plans.

60.     Similarly, when CVS was in the process of acquiring Target's pharmacies in February and March of 2015, CVS analyzed what type of generic discount program to offer at the acquired pharmacies.  In considering replicating Target's $4 generic program to all CVS pharmacies, CVS concluded the "[s]ignificant financial cost for CVS makes [that] option unfeasible."[47]  Even in considering whether to replicate Target's program for a limited set of drugs, CVS concluded that Target "may not agree to list that is [*sic*] satisfactorily limits financial impact at CVS."[48]

61.     Ultimately, CVS followed Caremark's advice and concluded that it was unwilling to match the deep discounts on generic drugs provided to customers by big-box retailers because "[m]aking the program 'too attractive' creates higher risk for our 3rd party plan pricing and

---

[44] CVSC-0020398 (Feb. 22, 2008 email from Kirby Bessant to Sue Colbert).

[45] Ferschke dep. at 83:1-6.

[46] CVSC-0001047 (Mar. 25, 2008 email from Tom Morrison to Kirby Bessant and Mike Hoffman at Caremark).

[47] CVSC-0305243, at 5246.

[48] *Id.*

profitability."[49]   Executives who were members of the Business Planning Committee ("BPC"), at the highest levels of CVS, therefore decided to offer discounted prices on a list of generic drugs. To "access" the discounts consumers would need "to enroll in the program and pay a nominal annual fee."[50]

62.     CVS and Caremark then continued to work together to develop a list of drugs for the HSP program "to reduce the risk of further erosion of product reimbursement in the commercial marketplace."[51]   The companies did so even though doing this analysis raised concerns about the "firewall" between CVS and Caremark that was supposed to prevent CVS from sharing how much it was paid by other PBMs, and Caremark from sharing how much it paid other pharmacies.[52]

63.     One of the reasons CVS and Caremark worked so closely together was that initially Caremark also planned to introduce a cash discount card using the HSP drug list.[53]   CVS and Caremark therefore considered an "[e]nterprise view"[54] of the potential profitability of the HSP program and together ran financials on how HSP "will impact the Company's cash

---

[49] CVSSM-0002427, at 2430 (May 8, 2008 presentation given to Larry Merlo, as edited by Bari A. Harlam at Caremark).

[50] CVSC-0001197 (Aug. 3, 2008 email from Doug Ghertner to multiple recipients).

[51] CVSC-0001249 (Aug. 15, 2008 e-mail from Matt Leonard to Tom Morrison, in chain eventually forwarded to Caremark).

[52] *Id.*  ("You can do some very simply [*sic*] math to see what we are being paid by third parties for a 90 day supply of those medications at retail."); *see also* CVSC-0001392 (Sept. 4, 2008 email from Matt Leonard to Elizabeth Wingate, *et al.*) ("Do not forward this email with our proprietary cost information.").

[53] *See, e.g.,* CVSC-0001195 (July 31, 2008 email from Bari A. Harlam to multiple recipients) (discussing potential of "coordinated offering with Caremark Cash card").

[54] *Id.* [CVSC-0001195].

business, CVS Managed care business and the Caremark client business."[55]  Even after

Caremark introduced what it eventually named its "Value Generics program," which, using the

HSP list of drugs, set the co-pay for certain generic medications at $9.99 and then "adjust[ed] the

price of brands and other generics to offset the reduction in price,"[56] CVS and Caremark agreed

to "proactively work with the VGS product manager to determine if there are any negative

impacts to the PBM as its relates to adding or deleting a specific drug from the HSP."[57]

Throughout the life of the HSP program, CVS and Caremark worked together to inflate CVS's

U&C prices and to ensure the maximum profitability of the program for CVS and Caremark.

## C.   In November 2008, CVS Launched the HSP Program and, Until the Program Ended in February 2016, Never Reported Its HSP Price as Its U&C Price

64.   In November 2008, CVS launched the HSP program, offering 400 generic drugs

for $9.99.  The 400 drugs included under the HSP program were among some of the most

commonly prescribed generic drugs for cardiovascular, allergy, diabetes, pain, and arthritis,

cholesterol, skin conditions, mental health, women's health, viruses, thyroid conditions,

glaucoma and eye care, gastrointestinal disorders, and other common ailments.

65.   From November 9, 2008, through 2010, customers could join the HSP for a $10

fee.  During this time, CVS charged HSP members $9.99 for a 90-day supply of the most

commonly prescribed generic drugs.  In 2011, CVS raised its enrollment fee to $15 a year and

the price of the over 400 HSP generics to $11.99 for a 90-day supply (or a prorated amount of

approximately $3.99 for a 30-day supply).

---

[55] CVSC-0001417 (Sept. 5, 2008 email from Elizabeth Wingate to CVS and Caremark recipients).

[56] CVSC-0269961 (presentation on CVS Caremark Generic Strategies).

[57] CVSC-0216939 (Mar. 31, 2009 email from Robert Sanchez at Caremark to multiple recipients at CVS and Caremark).

66.     From November 2008 to February 2016, when the HSP program was terminated, CVS did not report HSP prices as the U&C price.

**D.     CVS and Caremark Concealed Their Fraud from Health Plans**

67.     Both CVS and Caremark concealed their fraud from Plaintiffs and members of the health plan Class.  As described above, Caremark failed to disclose either CVS's fraud or the terms of Caremark's "policy" that distinguished between Generic Set Price Programs and Club Plans, which allowed CVS to submit inflated U&C prices to its clients.

68.     In addition, CVS and Caremark told their sales personnel who interacted with health plans not to explain that CVS was not submitting its HSP prices as its U&C price.  In a document distributed to sales and account personnel at both CVS and Caremark, entitled "Talking Points," CVS explained its plan not to submit HSP as its U&C price as follows, but marked the document "Internal Use Only" —not to be discussed with clients:

**Q7:     Why isn't CVS/pharmacy submitting the $9.99 purchases for consideration as 'usual and customary'?**

**A7:**     CVS/pharmacy chose to create a product to help the uninsured and underinsured access their prescription medications while preserving the U&C.  The Health Savings Pass membership program is comparable to other retailers' programs.[58]

The same answer was provided under a section on Caremark's Value Generics program, which asked "Why doesn't CVS Caremark submit $9.99 as their U&C price?"[59]

69.     CVS could accomplish its fraud because, as both CVS and Caremark knew, health plans are not privy to the actual prices CVS charges its cash customers, including its HSP customers.  Therefore, health plans have no way of determining on their own whether the price CVS submits as its U&C is, in fact, the price offered to cash paying members of the general

---

[58] CVSC-0269974, at 269978.

[59] *Id.* at CVSC-026979.

public.  Instead, health plans must rely on the price reported by CVS as its U&C price to be

accurate.

**E.  Caremark's Participation in the HSP Pricing Enterprise During Its Administration of the HSP Program**

70.     Caremark also knew that it could conceal CVS's fraud because, from November

2008 until July 2013, it acted as administrator of the HSP program and, in that capacity,

implemented the terms of the program it had designed with CVS.[60]  As an administrator of the

program, Caremark also saw, on a transaction-by-transaction basis, that CVS was not reporting

its HSP prices as its U&C and helped to cover it up.  Despite knowing that CVS was reporting an

inflated HSP, Caremark did not tell any of its health plan clients about CVS's fraudulent scheme

and fully participated in the HSP Pricing Enterprise.

**VIII.   SCRIPTSAVE, THE SECOND ADMINISTRATOR OF THE HSP PROGRAM, ALSO PARTICIPATED IN THE HSP PRICING ENTERPRISE**

71.     Beginning around 2010, in the middle of Caremark's administration of the HSP

program, CVS began to experience pressure from investigations from various Medicaid agencies

regarding its failure to report its HSP prices as its U&C price.  CVS feared that the result of these

investigations would be that CVS's HSP prices would become its U&C, in both the Medicaid

and private payor context.

72.     CVS decided that it could deflect some of the heat on its HSP program by having

a third-party administer it.

73.     Therefore, in August 2012, John Zevzavadjian, Vice President of Payer Relations

at CVS, asked Robert Greenwood, who had contacts within the company, to set up a meeting

with Mark Chamness, one of the executives at Medical Security Card Company, LLC, d/b/a

---

[60] Lavin Decl. ¶ 19.

"ScriptSave,"[61] a company that specializes in the provision of prescription savings cards, and, as Zevzavadjian stated, "had expertise in support of many of our competitors' club programs."[62] Speaking of the meeting to Tom Gibbons, his boss, Zevzavadjian stated that "[w]e should be moving forward with those compliance issues."[63]

74.     The meeting with ScriptSave was eventually scheduled for November 1, 2012. An agenda for the meeting states:  "[t]he purpose of this meeting is for ScriptSave to present their proposal for the Health Savings pass [*sic*] Program.  ScriptSave will provide potential solutions to the current HSP legal/compliance issues, make suggestions for how the program can grow going forward, and propose pricing."[64]

75.     CVS had a subsequent meeting with ScriptSave on December 6, 2012, during which ScriptSave pitched why CVS should give ScriptSave the job of administering the HSP program.  Its pitch explained that "ScriptSave's Pharmacy Savings Program minimizes the risk of third party U&C 'discussions' with our administration, contract content, and footprint in the pharmacy savings program space."[65]  Under "Program Features" the first item listed was "Risk of third party U&C."  In this regard, ScriptSave touted that "[a] ScriptSave program can allow CVS to protect its third party reimbursement level as ScriptSave would be the third party administrator of the program."  It explained:

- Claims pass through ScriptSave adjudication system

---

[61] Zevzavadjian dep. at 167:9-169:15; CVSC-0248932 (August 9, 2012 email to Bob Greenwood from John Zevzavadjian).

[62] Zevzavadjian dep. at 173:14-22.

[63] CVSC-0301495 (Aug. 9, 2012 email).

[64] CVSC-0314691, at 3144692.

[65] CVSC-0319524 (Business Case – Pharmacy Savings Program, dated Dec. 6, 2012), at 319526.

- Materials include ScriptSave logo and clearly state ScriptSave is the administrator of the program

- ScriptSave is responsible for filing all program materials with the states.[66]

In essence, ScriptSave offered to save CVS from its HSP "problem" by concealing that CVS's prices were, in fact, CVS's prices. This was desirable to CVS both because it would allow CVS to offer discounted prices on generic drugs without affecting its U&C, and because it minimized the discussions CVS might have to have with health plans who would want similar pricing.

76. ScriptSave also suggested that it could "make recommendations in pricing to optimize CVS revenues through its cash and third party businesses," and provided an example that would net CVS an additional $2 million by increasing its then $11.99-HSP price on ten different generic drugs to the $20.00 Walgreens was currently charging.[67] The chart is set forth below:

| Rank | Drug Name | Monthly Claims | Walgreens Copay | CVS Copay | Revenue Opportunity |
|------|-----------|----------------|-----------------|-----------|---------------------|
| 1 | LISINOPRIL 40 MG TABLET | 3,406 | $ 20.00 | $ 11.99 | $ 27,282 |
| 2 | LISINOPRIL -HCTZ 20-12.5 MG TAB | 2,442 | $ 20.00 | $ 11.99 | $ 19,558 |
| 3 | ATENOLOL 50 MG TABLET | 2,127 | $ 20.00 | $ 11.99 | $ 17,035 |
| 4 | METOPROLOL TARTRATE 50 MG TAB | 2,047 | $ 20.00 | $ 11.99 | $ 16,399 |
| 5 | CITALOPRAM HBR 20 MG TABLET | 2,021 | $ 20.00 | $ 11.99 | $ 16,186 |
| 6 | LISINOPRIL -HCTZ 20-25 MG TAB | 1,959 | $ 20.00 | $ 11.99 | $ 15,692 |
| 7 | LEVOTHYROXINE 100 MCG TABLET | 1,865 | $ 20.00 | $ 11.99 | $ 14,941 |
| 8 | LEVOTHYROXINE 50 MCG TABLET | 1,855 | $ 20.00 | $ 11.99 | $ 14,861 |
| 9 | LEVOTHYROXINE 75 MCG TABLET | 1,726 | $ 20.00 | $ 11.99 | $ 13,823 |
| 10 | METOPROLOL TARTRATE 25 MG TAB | 1,649 | $ 20.00 | $ 11.99 | $ 13,206 |
| | **Top 10 Revenue Opportunities (Monthly)** | | | | $ 168,982 |
| | **Top 10 Revenue Opportunities (Annualized)** | | | | $ 2,027,780 |

---

[66] *Id.* at 319526.

[67] *Id.* at 319531.

77.     Around the same time, CVS prepared a presentation for Emdeon, a claim switching company that was in certain aspects ScriptSave's competitor.[68]  That presentation identified as a "Top Priority" to "Resolve Current Issues," including "Best Pricing Issue."[69]

78.     One month later, ScriptSave and Emdeon wrote to executives at CVS, including John Zevzavadjian and Tom Gibbons, pitching a partnership between the companies.  Again, the email touted ScriptSave's expertise, including its "Usual and Customary strategies to 'protect' loyalty member price from third parties."[70]

79.     Based at least in part on ScriptSave's representations of its abilities to "protect [CVS's HSP prices] from third parties,"[71] and with input from "a number of stakeholders within CVS,"[72] ScriptSave was selected to administer the HSP program beginning in July 2013.  Tom Gibbons, CVS's Senior Vice President of Payer Relations, managed the relationship between CVS and ScriptSave.[73]

80.     It was almost at the same time of the ScriptSave entry that CVS executive Thomas Gibbons, in connection with an examination of the definition of U&C for medical, emailed CVS executive Zevzavadjian on June 3, 2013, suggesting Zevzavadjian "start digesting this" referring to a memo that defined U&C in a fashion contrary to the way in which CVS had been reporting U&C prices:

> Q.     Does "the lowest price routinely offered to any segment of
>         the public" include "club prices" or "discount cards"

---

[68] *See* CVSC-0304690 (Dec. 6, 2012 email).

[69] CVSC-0224349 (Presentation entitled Health Savings Pass, dated June 6, 2011 and modified Dec. 5, 2012), at 5366.

[70] CVSC-0304682 (Jan. 25, 2013 email from Richard Brook at Emdeon).

[71] Zevzavadjian dep. at 188:21-189:6.

[72] Gibbons (TX Medicaid) dep. at 37:9-15.

[73] Gibbons dep. at 32:1-9.

offered by a specific pharmacy or a pharmacy within a chain, even if members must pay a fee to belong to the club?

A.      Yes.  If the club price or discount card is routinely offered to any segment of the general public, the rate must be considered in calculating the lowest rate.[74]

81.      MedImpact then acquired ScriptSave.[75]  MedImpact proclaimed that it could "now provide[] ScriptSave clients the opportunity to capture all transaction data for better utilization management and improved outcomes."[76]

82.      Approximately a year later, Tom Gibbons at CVS considered the idea of "'selling' HSP to ScriptSave,"[77] and the companies began discussing the wind-down of the HSP program.  CVS decided that "[c]ontinued regulatory and compliance pressure requires CVS Health to reevaluate the Health Savings Pass program."[78]  ScriptSave was excited about the opportunity, and told CVS it was "very happy to be joining your team!"[79]  Both Paige Berger, ScriptSave's Executive Vice President, and Tom Gibbons at CVS acknowledged the valued "partnership" between the two companies.[80]

83.      CVS terminated the HSP program effective February 1, 2016, and thereafter enrolled existing HSP members into ScriptSave's Value Prescription Savings Card ("VPSC")

---

[74] CVSC-0319778.

[75] *See* Press Release, *MedImpact Expands Scope of Services with ScriptSave Acquisition* (July 15, 2013), available at:  https://pbm.medimpact.com/press-releases/-/asset_publisher/zxpF3EXCvxov/content/medimpact-expands-scope-of-services-with-scriptsave-acquisition.

[76] *Id.*

[77] CVSC-0318570 (July 29, 2014 email to Bob Greenwood from Tom Gibbons).

[78] CVSC-0319991 (Mar. 9, 2015 CVS Health Presentation:  HSP:  Sunset Overview), at 319992.

[79] CVSC-0245539 (October 2015 e-mail chain), at 245540.

[80] *Id.* at 255539.

program.[81]  VPSC provides discounts on both brands and generics, and can be used at

pharmacies across the United States, including Walgreens, Rite Aid and Walmart.[82]

### IX.    CAREMARK, EXPRESS SCRIPTS, OPTUMRX AND MEDIMPACT BENEFITED FROM THE HSP PRICING ENTERPRISE AND PARTICIPATED IN ITS OPERATION

84.    Because PBMs benefit from inflated U&C prices, Caremark, Express Scripts,

OptumRx and MedImpact did not disclose to health plans that CVS was not reporting its HSP

prices as U&C prices.  Instead, as described below, they actively sought to cover it up.

85.    Notably, even though all of the four PBMs had contracts with CVS that required

it to report U&Cs that included all applicable discounts, in practice, all four PBMs secretly and

in a joinder of the common plan, allowed CVS not to submit its HSP prices as its U&C price.

Unsurprisingly, as described more specifically below, every PBM witness confronted with the

plain language of their company's contracts with CVS stated that, if they had just read the

language of their contract with CVS, they would have believed the contract required CVS to

report HSP as its U&C price.

86.    CVS implicitly acknowledged that the plain language of its contracts with PBMs

required it to submit its HSP prices as U&C as well.  In 2015, CVS revised its policy on Payer

Relations Contract Administration to require contracts that provide for reimbursement at U&C

"with no discount language."[83]

### 1.    Caremark

87.    The Provider Agreement between CVS and Caremark during the HSP program

was the PCS Health Systems, Inc. Provider Agreement between PCS Health Systems, Inc., a

---

[81] Gibbons Decl. in Opp. to Class Cert. in *Corcoran* ¶ 11.

[82] *Id.* ¶ 13.

[83] CVSSM-0006020, at 6022.

predecessor entity to Caremark, and CVS Pharmacy.[84] That agreement defines U&C as: "the lowest price the Provider would charge to a particular retail customer if such customer were paying cash for an identical prescription on that particular day. This price must include all applicable discounts offered to attract customers."[85]

88.     In addition to the contracts between pharmacies and PBMs, PBMs periodically publish provider manuals which expand upon the base agreement. Caremark's Provider Manual contains the same language as the Provider Agreement.[86]

89.     In October 2008, after it had spent over a year working with CVS to develop the HSP program to avoid "risk for . . . 3rd party plan pricing and profitability,"[87] Caremark developed a policy with the assistance of its legal department that made a distinction between so-called "Set Price Generic Programs," like Walmart's $4 generic program, and "Club Plans," programs like CVS's HSP which required "membership" to receive discounts on certain generic prescription drugs.[88] Ironically, Caremark's policy was maintained in the Network Performance section, the part of the company responsible for *auditing* pharmacies, and therefore for protecting its health plan clients from fraud.[89] Yet even though, in theory, Caremark's policy *should have been* designed for the benefits of its health plan clients, Caremark has not identified any example of when the policy was distributed to any of those clients.[90]

---

[84] Lavin Decl. ¶ 7.

[85] CVSC-0264280, at 20.

[86] CVSC-0268116, at 308.

[87] CVSSM-0002427, at 2430 (May 8, 2008 presentation given to Larry Merlo, as edited by Bari A. Harlam at Caremark).

[88] Lavin Decl. ¶¶ 13-17; Lavin dep. at 92:17-93:1; 105:22-106:12; Caremark-0002102 (Troubleshooting Set Price Generic Programs).

[89] Caremark-0002102 (Troubleshooting Set Price Generic Programs).

[90] Lavin dep. at 96:6-10; 101:10-16; 108:22-109:13; 118:11-15; 133:13-134:10; 152:13-24.

90.     Slightly before the HSP program was introduced, Caremark's Senior Vice

President of Network Administration, John Lavin, had a conversation with Elizabeth Wingate,

former Vice President of Provider Relations at CVS, during which Ms. Wingate purportedly told

Lavin that CVS would not be submitting its HSP price as its U&C.[91]  Despite the fact that

allowing CVS to do this contradicted the plain language of CVS's contract with Caremark,

Mr. Lavin did not convey what CVS intended to do to any of Caremark's health plan clients,[92]

and does not know of anyone else at Caremark who did.

**2.     Express Scripts**

**a.     Medco**

91.     Medco's 2009 Pharmacy Services Manual (finalized November 2008) defined

U&C as:



[93]

92.     The 2009/2010 Medco Pharmacy Services Manual, introduced in later 2009 and

in place through 2012, was revised to define U&C as



[94]

---

[91] Lavin Decl. ¶ 22; Lavin dep. at 121:22-122:8.

[92] Lavin dep. at 95:25-96:10.

[93]

[94]                                    .

93.     Notably, neither the 2009 Medco Pharmacy Services Manual nor the 2009/2010

Manual contain the term "membership club" or refer to any specific membership club by name,

such as CVS's Health Savings Pass.  As William Strein, Vice President of Provider Relations at

Medco from 2009-2012 testified:



[95]

Similarly, when asked whether its definition of U&C ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Franceen Spadaccino, former Senior Director of Provider Relations

and Network Strategy at Medco, testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [6]

94.     Thus, like Caremark, Medco developed a "policy" that contradicted the language

in its contracts with CVS.  When Walmart introduced its $4 generic program in late 2006, Medco

determined that those $4 prices constituted Walmart's U&C price.[97]  On October 27, 2006, a few

weeks before CVS's HSP program was launched, Bill Strein, Senior Director at Medco, sent an

email to multiple pharmacy recipients stating the following:



---

95    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
96    ▮▮▮▮▮▮▮▮▮▮▮.
97    ▮▮▮▮▮▮▮▮



95.     An employee at CVS contacted Cal Corum, former Vice President of Pharmacy

Relations at Medco, regarding this email, and reported back to CVS that, despite the plain

language of the email, 

96.     Around the time CVS contacted Medco about Mr. Strein's email, Medco had, in

consultation with its attorneys, developed an unwritten policy that U&C did not encompass

membership program prices.[100]  The justification for Medco's policy was that



---

98 ████████████████████████ .
99 █
100 ████████████████████████ .



This unwritten policy was approved at the highest levels of the company, including Laizer Kornwasser, a former executive officer of Medco who reported to David Snow, Medco's CEO until Express Scripts purchased Medco.[103]

97.     Medco's unwritten policy was contradicted by the language in its contracts and its provider manual.  In fact, in January 2009, a few months after CVS had launched its HSP program, Scott Tierney, Senior Director of Payer Relations at CVS, pointed out this inconsistency to Elizabeth Wingate, his boss.  Mr. Tierney wrote:

> Beth,
>
> As I was looking up some information in the Medco Provider Manual, I came across a couple items that concern me.  Maybe I'm off base here but take a look at their definition of Usual & Customary under section 1.2 Pharmacy Standards of Practice – it seems very broad.  I'm concerned that it is asking for our HSP rates.  Not sure if there is an "approval period" for this manual, as it appears to be fairly recent, but we should challenge it.[104]

98.     In April 2009, after consulting with the Vice President of HealthCare Regulatory at CVS, Elizabeth Wingate forwarded an email to Cal Corum at Medco asking his legal department to approve the following definition of U&C:

[105]

---

[101] ■■■■■■■■■■■■■■■■.

[102] ■■■■■■■■■■■■■■■■

[103] Morrison dep. at 194:11-16; 259:5-260:16; 263:4-12; Dudley dep. at 207:13-210:6.

[104] CVSC-0067921 (Jan. 19, 2009 email).

[105] ■■■■■■■■■■■■■■■■

CVS's proposed definition was different than Medco's definition, because it explicitly excluded HSP.[106]

99.    Mr. Corum responded to Ms. Wingate that: ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ [7]

100.    Ms. Egan forwarded Medco's response to Roderick Bergin, Senior Legal Counsel at CVS Caremark, as an "FYI."[108]

101.    Medco's promised formal response was sent on April 30, 2009.  That letter, sent by Cal Corum to Tina Egan at CVS, stated: ████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ [09]

102.    In essence, Medco responded that, ██████████████████████

███████████████████████████████████████████████

██████████████████████████████

103.    As William G. Strein, Vice President of Provider Relations at Medco from 2008-2012, admitted, ████████████████████████████████████████████

---

[106] ████████████████████████████████████████████████

[107] █

[108] █

[109] ██████████





[111]

104.   ███████████████████████████████

[112]

**b.      Express Scripts**

105.     The agreement between CVS and ESI during the relevant period was the Express

Scripts, Inc. Pharmacy Provider Agreement signed on January 25, 2008.[113]   That agreement

defines U&C as: ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ [114]

106.     Despite this plain language, which would clearly require CVS to report the

discounts offered under the HSP program, ESI had an unwritten practice that allowed

"membership programs" like CVS's HSP to not report their program prices as their U&C

price.[115]

107.     Amber Compton, Vice President of Retail Strategy & Contracting at ESI since

2010, testified that ████████████████████████████████

████████████████████████████████.

---

110  ███████████████████████.

111  ███████████████████████████████

112  ███████████████████████████.

[113] Compton Decl. ¶ 14.

114  ███████████████.

115  █████████████████████.



108.    Indeed, on July 30, 2013, Express Scripts sent a memorandum to All Pharmacy Providers regarding the Submission of Usual and Customary Retail Price Claims, which stated that it had come to ESI's attention that certain providers were advertising prices on web portals like www.goodrx.com that were lower than U&C prices submitted to ESI.  The memo advised:



---

116

███████████████████████████████████████████████
██ [117]

109.    Despite this language, ESI had an unwritten policy under which it permitted

pharmacies with membership-based programs like CVS's HSP program not to submit their

program prices as their U&C price.  When she worked at Express Scripts and was his boss,

Elizabeth Wingate had a conversation with Chuck Kneese, Vice President of Provider

Contracting and Strategy at Express Scripts, during which Wingate informed ESI of CVS's

intention not to submit its HSP price as its U&C.[118]  This conversation was never memorialized

in writing, and was never communicated to any ESI health plan client.[119]

110.    No ESI witness has identified any oral or written communication with a health

plan regarding ESI's "policy" on whether membership based programs had to report their prices

at their U&C price.[120]  Specifically, Amber Compton testified that ESI never told Plumbers or

any other ESI clients that ESI knew CVS was not submitting its HSP prices as its U&C price.[121]

   **c.**  **The combined Express Scripts company**

111.    In 2012, Express Scripts, Inc. acquired Medco Health Solutions, Inc.  Effective

February 11, 2013, Express Scripts and CVS executed the Seventh Amendment to the Express

Scripts, Inc. Pharmacy Provider Agreement, which provides that any pharmacy agreement or

pharmacy services manual in effect shall remain in effect ██████████████████████████

████████████ [22]

---

[117] ████████████████████████████

[118] Wingate dep. 122:1-123:6; 123:17-124:4.

[119] Wingate dep. at 125:14-19.

[120] ██████████████████████████

[121] ███████████████████████████████

[122] Colbert Decl. ¶ 15.

### 3.    OptumRx

112.    OptumRx, Inc. is a subsidiary of UnitedHealth Group and affiliate of

UnitedHealthcare Services, Inc.  It is the product of a July 2015 merger between Catamaran

Corporation and OptumRx.

113.



114.

115.



010582-11  962197 V1

4.      **MedImpact**

116.    █████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████  29

117.    █████████████████████████████████████████████

███████████████████████████  130

118.    █████████████████████████████████████████████

██████████████████████████████████████████

██████

        ████████████████████████████████

          ████████████████████████████████████
        ██████████████████

        ██████████████████████████████████
          ████████████

        █████████████████████████████████████
        ██████████████████████████████████

        ███

        ███████████████████████████████  [131]

119.    █████████████████████████████████████████████

██████████████████████████████████████████████



128  ████████████

129  ████████████████ .

130  ██████████████

131  ███████████████



## X.   DEFENDANTS PROFITED FROM THE HSP SCHEME

120.    Defendants profited enormously from their HSP pricing scheme.  In June 2010, when CVS was facing scrutiny from confidential investigations by Medicaid agencies regarding its failure to submit HSP prices as its U&C price, CVS did an analysis of how much it would cost the company if it were required to report its HSP prices at its U&C.  CVS concluded that, for one year alone, "over 67 million private third party scripts would meet this criteria" and that doing so would result in a loss of ***over $547 million <u>per year</u>***.[135]  If this figure were applied only to 2009-2015, the full years in which the HSP program was in effect, CVS was enriched to the tune of nearly ***$4 billion dollars*** by virtue of its fraud.

121.    CVS later applied different assumptions to this analysis, and determined that the impact was $418 million per year.[136]  Even with that adjusted number, from 2009-2015 CVS was enriched by over $3 billion dollars.



[135] CVSSM-0002450 (June 23, 2010 email to Elizabeth Wingate, *et al.* from Paul Ferschke); *see also* CVSSM-0005372 (June 25, 2010 PowerPoint – CVS Pharmacy Landscape Strategy Document), at 5386 (reporting same).

[136] CVSSM-0004580 (July 22, 2010 email from Elizabeth Wingate to Paul Traficante, *et al.*).

## XI.   TOLLING OF THE STATUTE OF LIMITATIONS

122.   Plaintiffs and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

123.   Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

124.   CVS and Caremark designed a self-concealing scheme that did not reveal facts that would have put Plaintiffs or the Classes on inquiry notice that CVS was charging inflated prices for generic prescription drugs.  Moreover, CVS worked with Caremark and other PBMs to ensure that Plaintiffs did not learn that CVS was charging inflated prices for generic prescription drugs.

125.   Because CVS's and Caremark's scheme was kept secret, Plaintiffs and the Classes were unaware of CVS's unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for generic prescription drugs in the United States during the class period.

126.   CVS did not proactively advertise the HSP program.  As Tom Morrison, former CVS Vice President of Managed Care, put it, CVS "would not be hanging signs all over the store and advertising it constantly."[137]  While part of the reason CVS did not want to proactively advertise the program was because doing so would "cannibalize" its cash business, CVS also recognized that one risk of the program was "[i]mplementation of Retail program will evoke inquiries from PBM clients for access to comparable pricing."[138]

---

[137] CVSC-0222952.

[138] CVSC-0001256 (Presentation entitled Cash Discount Rx Programs, BPC Discussion: 8/18/08), at 1260; *see also id.* at 1263 ("If we launch a Retail program, PBM clients are likely to

127.     Caremark likewise sought to keep the scheme secret from its health plan clients, and instructed its employees working with those clients that "[t]his is not a strategy to proactively promote to our PBM clients. . . . [T]hese should not be offered without first working with your leadership team and requesting the appropriate analysis to determine if this is an optimal solution for your client."[139]

128.     CVS did not disclose to Plaintiffs and the Classes that the U&C prices reported to health plans for the generic drugs in the HSP program did not include HSP prices.  In addition, neither Caremark, Express Scripts, OptumRx, MedImpact nor ScriptSave disclosed to Plaintiffs and the Classes that the U&C prices reported to health plans for generic drugs in the HSP program did not include HSP prices.  Even though Caremark, Express Scripts, OptumRx and MedImpact were contractually required to audit CVS if they suspected that it was submitting fraudulent U&C prices, because all those PBMs had policies that allowed CVS to engage in fraud, they did not exercise those rights.

129.     If CVS had been open and public about its fraudulent pricing scheme, it would never have succeeded.  Health plans would have required that CVS report HSP prices as its U&C price or, at a minimum, would have demanded greater discounts for generic prescription drugs.

130.     As a result of CVS's and Caremark's fraudulent concealment, furthered by Express Scripts, OptumRx, MedImpact and ScriptSave, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Classes have as a result of the unlawful conduct alleged in this Complaint.

---

request access to that level of pricing for their plan participants – need to understand financial implications.  Creation of a CVS retail cash program may put increasing pressure on 3rd party reimbursements from other payers.").

     [139] CAREMARKSM_0000156 (Oct. 29, 2008 e-mail).

## XII.   DAMAGES TO PLAINTIFFS AND THE CLASSES

131.    As part of its scheme, CVS has reported U&C prices for generic prescription

drugs that are up to eleven (11) times the U&C prices reported by some of its most significant

competitors and CVS's own HSP prices.  The chart below shows U&C prices submitted to

Pennsylvania's Medicaid program for the purposes of claims adjudication. The U&Cs submitted

by CVS are unequivocally inflated.

| Drug (90 Day Supply) | Shoprite Reported U&C | Walmart Reported U&C | Target Reported U&C | Costco Reported U&C | CVS Reported U&C | CVS HSP Price |
|---|---|---|---|---|---|---|
| Carvedilol  12.5 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $120.99 | $11.99 |
| Lisinopril 20 mg tab | $9.99 | $10.00 | $10.00 | n/a | $42.19 | $11.99 |
| Lisinopril – HTCZ 20-  12.5 mg tab | $9.99 | $24.00 | $24.00 | n/a | $58.59 | $11.99 |
| Metformin HCL 1000 mg tab | $9.99 | $24.00 | $24.00 | $9.99 | $86.59 | $11.99 |
| Metoprolol Tartrate 50 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $48.99 | $11.99 |
| Warfarin Sodium 5 mg tab | $9.99 | $10.00 | $24.00 | $28.00 | $48.39 | $11.99 |
| Meloxicam 15 mg tab | $9.99 | $10.00 | n/a | $9.23 | $79.59 | $11.99 |
| Alendronate Sodium 70 mg tab | $29.99 | $24.00 | n/a | $17.61 | $134.99 | $11.99 |

132.    To demonstrate how this scheme damaged Plaintiff Plumbers, as well as other

health plans, the following chart provides examples demonstrating how Plaintiff paid for generic

drugs in the HSP program at a higher price than the actual or prorated HSP price for the same

period:

| Generic Drug | Ingredient Cost Paid by Plaintiff to CVS (days' supply) | CVS HSP Price (90-day supply) | Prorated CVS HSP Price (based on days' supply paid for by Plaintiff) |
|---|---|---|---|
| Acyclovir 200 mg capsule | $16.84 (10-day) | $11.99 | $1.33 |
| Bisoprolol-HCTZ 5-6.25 mg tab | $28.90 (30-day) | $11.99 | $3.99 |
| Cephalexin 250 mg capsule | $17.19 (10-day) | $11.99 | $1.33 |
| Cyclobenzaprine -5 mg tablet | $12.84 (20-day) | $11.99 | $2.66 |
| Metformin HCL 500 mg tablet | $16.01 (30-day) | $11.99 | $3.99 |

133.    As reflected above, whether CVS's true U&Cs should have been based on HSP

prices or prorated HSP prices, Plaintiff paid more for the generic drugs than it would have if

CVS had reported its true U&C price.

134.    By reporting false U&C prices to health plans, CVS intended that health plans would rely on the falsely-reported U&C prices when making payment for the HSP Generic drugs.  Health plans did, in fact, justifiably rely on the falsely-reported U&C prices when making payment for the drugs in the HSP program, thereby causing Plaintiffs and members of the Classes to pay, and continue to pay, to CVS, higher prices for generic prescription drugs than they otherwise would have.

135.    There have been millions of instances where CVS intentionally submitted fraudulently-inflated U&C pricing information to health plans for prescriptions purchased by members and beneficiaries of Plaintiff and members of the Classes during the class period.

## XIII.   CLASS ALLEGATIONS

136.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and the following Nationwide Class:

> All health plans who had Caremark, L.L.C., Express Scripts, Inc., OptumRx or MedImpact (or any of their predecessors) as their PBMs, that between November 2008 and February 1, 2016, paid for generic prescription drugs that were included in CVS's Health Savings Pass program.

Plaintiffs also bring this action pursuant to Rule 23(b)(3) on behalf of themselves and the following Multistate Class:

> All health plans who had Caremark, L.L.C., Express Scripts, Inc., OptumRx, or MedImpact (or any of their predecessors) as their PBMs, that between November 2008 and February 1, 2016, paid for generic prescription drugs that were included in CVS's Health Savings Pass program in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Vermont, Virginia, Washington, Wisconsin and Wyoming.

137.    Excluded from the foregoing Classes are (1) any governmental payors, including Medicare and Medicaid; (2) CVS, and its management, employees, subsidiaries, and affiliates; (3) Caremark and its officers and directors; (4) any co-conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates; and (5) health plans making payments processed by OptumRx after January 29, 2015.

138.    The Classes consist of at least hundreds of health plans, making joinder impractical, in satisfaction of FRCP 23(a)(1).  The exact size of the Classes and the identities of the individual members thereof are ascertainable through CVS's records, including, but not limited to, its billing and collection records.

139.    Plaintiffs' claims are typical of the Class's claims.  The claims of the Plaintiffs and the respective Classes are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiffs and the Classes.

140.    The Classes have well-defined communities of interest.  CVS has acted and failed to act on grounds generally applicable to the Plaintiffs and the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the respective Classes.

141.    There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of FRCP 23(a)(2) and 23(b)(2).

142.    Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

a.     Whether CVS artificially inflated the U&C prices that it reported pursuant to the NCPDP reporting standard or according to CVS's own definition of U&C;

b.     Whether Caremark conspired with CVS to artificially inflate CVS's U&C prices;

c.     Whether CVS omitted and concealed material facts from its communications and disclosures regarding its pricing scheme;

d.     Whether Caremark omitted and concealed material facts from its clients regarding the HSP pricing scheme;

e.     Whether each Defendant conspired with the PBMs for the purpose of carrying out its pricing fraud;

f.     Whether Defendants conducted, or participated in the conduct of, the HSP Pricing Enterprise;

g.     Whether Defendants engaged in mail or wire fraud in furtherance of the HSP Pricing Enterprise;

h.     Whether CVS and Caremark conspired with PBMs in the HSP Pricing Enterprise for the purpose of inflating CVS's U&C prices;

i.     Whether CVS and Caremark conspired with PBMs in the HSP Pricing Enterprise to keep CVS's inflation of its U&C prices a secret;

j.     Whether CVS, Caremark and the PBMs conducted, or participated in the conduct of, the HSP Pricing Enterprise;

k.  Whether CVS and Caremark engaged in a pattern or practice that caused Plaintiffs and members of the Classes to make payments based on CVS's inflated U&C prices;

l.  Whether CVS has overcharged health plans (including Plaintiffs and the Classes) which paid for some of the most commonly prescribed generic drugs from CVS Pharmacies around the country;

j.  Whether CVS and Caremark have engaged in fraud, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the pricing and sale of generic prescription drugs;

k.  Whether CVS and Caremark violated RICO or the state consumer protection statutes;

l.  Whether, as a result of CVS's and Caremark's conduct, Plaintiffs and the Classes have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

m.  Whether, as a result of CVS's and Caremark's misconduct, Plaintiffs and the Classes are entitled to injunctive, equitable and/or other relief, and, if so, the nature of such relief.

143.  Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

144.     Plaintiffs will fairly and adequately represent and protect the interests of the

Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting complex

litigation and class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting

this action on behalf of the other respective Class members, and have the financial resources to

do so.  Neither Plaintiffs nor their counsel have any interests adverse to those of the other

members of the Classes.

## XIV.   CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.*

145.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as

if fully set forth herein.

146.     This claim is brought on behalf of the class against Defendants CVS and

Caremark for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for

violations of 18 U.S.C. § 1962, *et seq.*

147.     Defendants are "person[s]" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18

U.S.C. § 1962(c).

148.     Plaintiffs and the members of the class are each "persons," as that term is defined

in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of CVS's and

Caremark's wrongful conduct.

**A.     The HSP Pricing Enterprise**

149.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact

that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

150.   CVS and Caremark formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the HSP Pricing Enterprise.  The HSP Pricing Enterprise consists of (a) CVS, including its employees and agents; (b) the PBM Caremark, L.L.C, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; (d) the PBM OptumRx, including its employees and agents; (e) the PBM MedImpact, including its employees and agents; and (f) the discount card company Medical Security Card Company, LLC, d/b/a "ScriptSave."

151.   The HSP Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to ensure that CVS could report inflated U&C prices to Plaintiffs and members of the Classes without its fraud being detected.

152.   To accomplish this purpose, the HSP Pricing Enterprise periodically and systematically inflated CVS's U&C prices and represented—either affirmatively or through half-truths and omissions—to health plans, including Plaintiffs and the class, that CVS's U&C prices were "the amount charged cash customers for the prescription exclusive of sales tax or other amounts charged" or "the dollar amount a cash customer usually pays."  The Enterprise concealed from health plans, like Plaintiffs and the class members, that HSP prices were not reported as CVS's U&C price.  This scheme translated into higher sales (and therefore profits)

for CVS and larger profits for the PBMs,[140] as well as ScriptSave, as an administrator of the HSP program.

153.   The persons engaged in the HSP Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by CVS.  There is regular communication between CVS, Caremark, each of the remaining PBMs, and ScriptSave, in which information is shared.[141]  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which CVS, Caremark, the remaining PBMs and ScriptSave share information regarding various cash discount programs, the structure of those programs, and whether they are reporting those prices as U&C prices.  Caremark and ScriptSave also shared such information with CVS through their administration of the HSP program.  CVS, Caremark and the remaining PBMs functioned as a continuing unit for the purposes of implementing the HSP Pricing Scheme and, as set forth above, when issues arose during the scheme, each agreed to take actions to hide the scheme and continue its existence.

154.   At all relevant times, Express Scripts was aware of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  Express Scripts concealed CVS's true U&C prices and adopted policies that allowed CVS to submit a fraudulent U&C price.  Express Scripts represented to its clients that it was acting to save them (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that CVS's conduct was inflating the price its clients were paying for generic prescription drugs, because CVS's U&C price was falsely inflated.  Express Scripts also knew,

---

[140] For the purpose of this count "PBMs" shall mean Caremark, Express Scripts, OptumRx and MedImpact.

[141] *See, e.g.,* Lavin Decl. ¶ 22; Lavin dep. at 121:22-122:8 (describing communications between CVS and Caremark regarding CVS's intention not to include HSP prices as U&C).

but did not disclose, that the other PBMs—Caremark, OptumRx and MedImpact—were also allowing CVS to engage in this fraud to the detriment of their health plan customers.  Express Scripts also knew that ScriptSave, which was being paid to administer the HSP program, likewise would not disclose the fraud but for the HSP Pricing Enterprise's unlawful fraud, Express Scripts would have had the incentive to disclose the deceit by CVS.  By failing to disclose this information, Express Scripts perpetuated the HSP Pricing Enterprise's scheme, and reaped substantial profits.

155.    At all relevant times, OptumRx was aware of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  OptumRx concealed CVS's true U&C prices and adopted policies that allowed CVS to submit a fraudulent U&C price.  OptumRx represented to its clients that it was acting to save them (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that CVS's conduct was inflating the price its clients were paying for generic prescription drugs, because CVS's U&C price was falsely inflated.  OptumRx also knew, but did not disclose, that the other PBMs—Caremark, Express Scripts, and MedImpact—were also allowing CVS to engage in this fraud to the detriment of their health plan customers.  OptumRx also knew that ScriptSave, which was being paid to administer the HSP program, likewise would not disclose the fraud.  But for the HSP Pricing Enterprise's unlawful fraud, OptumRx would have had the incentive to disclose the deceit by CVS.  By failing to disclose this information, OptumRx perpetuated the HSP Pricing Enterprise's scheme, and reaped substantial profits.

156.    At all relevant times, MedImpact was aware of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  MedImpact concealed CVS's true U&C prices and adopted policies that allowed CVS to submit

a fraudulent U&C price.  MedImpact represented to its clients that it was acting to save them (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that CVS's conduct was inflating the price its clients were paying for generic prescription drugs, because CVS's U&C price was falsely inflated.  MedImpact also knew, but did not disclose, that the other PBMs—Caremark, Express Scripts, and OptumRx—were also allowing CVS to engage in this fraud to the detriment of their health plan customers.  MedImpact also knew that ScriptSave, which was being paid to administer the HSP program, likewise would not disclose the fraud.  But for the HSP Pricing Enterprise's unlawful fraud, MedImpact would have had the incentive to disclose the deceit by CVS.  By failing to disclose this information, MedImpact perpetuated the HSP Pricing Enterprise's scheme, and reaped substantial profits.

157.    During the time that it was administering the HSP program, ScriptSave was aware of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  ScriptSave concealed CVS's true U&C prices and adopted policies that allowed CVS to submit a fraudulent U&C price.  ScriptSave knew that CVS's conduct was inflating the price health plans were paying for generic prescription prices, because CVS's U&C price was falsely inflated.  ScriptSave also knew, but did not disclose, that the other PBMs—Caremark, Express Scripts, OptumRx, and MedImpact—were also allowing CVS to engage in this fraud to the detriment of their health plan customers.  Especially once MedImpact acquired ScriptSave, ScriptSave particularly knew that MedImpact would not disclose the fraud.  But for the HSP Pricing Enterprise's unlawful fraud, ScriptSave would have had the incentive to disclose the deceit by CVS.  By failing to disclose this information, ScriptSave perpetuated the HSP Pricing Enterprise's scheme, and reaped substantial profits.

158.     Furthermore, neither the PBMs nor ScriptSave challenged CVS's reported U&C prices, terminated their role in the HSP Pricing Enterprise, nor disclosed publicly that CVS's U&C prices were artificially inflated.

159.     Express Scripts, OptumRx, MedImpact and ScriptSave participated in the conduct of CVS and Caremark in the HSP Pricing Enterprise, sharing the common purpose of inflating CVS's U&C prices, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.  The PBMs and ScriptSave knowingly made material misstatements to health plans in furtherance of the fraudulent scheme regarding:

    a.     CVS's actual U&C prices;

    b.     The extent to which CVS was reporting its HSP prices as its U&C price;

    c.     Whether CVS's practice of failing to report its HSP prices as its U&C price caused health plans to pay more money for generic prescription drugs; and

    d.     Whether and how the PBMs benefited from CVS's practice of failing to report its HSP prices as its U&C price.

160.     CVS alone could not have accomplished the purpose of the HSP Pricing Enterprise without the assistance of the PBMs and ScriptSave.  For CVS to profit from the scheme, the PBMs and ScriptSave needed to allow CVS to report inflated U&C prices.  And the PBMs and ScriptSave did so.  They then, through misrepresentations and failures to disclose material information, failed to tell health plans that they were paying higher prices for generic

prescription drugs, and that the PBMs were benefitting from those higher prices.  Without these misrepresentations, the HSP Pricing Enterprise could not have achieved its common purpose.

161.    The HSP Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were paid for by thousands of class members throughout the United States.

162.    The foregoing evidences that CVS, Caremark, Express Scripts, OptumRx, MedImpact and ScriptSave were each willing participants in the HSP Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through CVS's inflation of its U&C prices, coupled with the PBMs' and ScriptSave's failures to disclose that inflation and misstatements to health plans regarding that inflation.

**B.    Conduct of the HSP Pricing Enterprise**

163.    During the class period, CVS and Caremark exerted control over the HSP Pricing Enterprise and participated in the operation or management of the affairs of the HSP Pricing Enterprise, directly or indirectly, in the following ways:

a.    CVS published its U&C prices, which did not include its HSP prices;

b.    PBMs charged their clients U&C prices, which they knew did not include CVS's HSP prices and were therefore inflated;[142]

c.    PBMs and ScriptSave concealed that CVS's U&C price was inflated in order to allow themselves to charge health plans that inflated price; and

---

[142] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

- 57 -

      d.      CVS and Caremark expected and intended that the PBMs and ScriptSave would (and did) distribute through the U.S. Mail and interstate wire facilities, communications that failed to disclose that CVS's U&C prices were artificially inflated.

164.    The scheme had a hierarchical decision-making structure that was headed by CVS and Caremark.  CVS controlled the publication of its U&C price, and stood silent as PBMs charged their clients inflated prices for generic prescription prices based on the publication of that price and ScriptSave administered the HSP program such that those inflated prices would be submitted to health plans.

165.    The PBMs and ScriptSave also participated in the conduct of the affairs of the HSP Pricing Enterprise, directly or indirectly, in the following ways:

      a.      The PBMs and ScriptSave promised to, and did, keep secret that CVS was not reporting its HSP prices as its U&C;

      b.      The PBMs and ScriptSave distributed through the U.S. Mail and interstate wire facilities communications which concealed the existence of the HSP Pricing Enterprise; and

      c.      The PBMs and ScriptSave concealed the existence of CVS's inflated U&C prices to further the fraudulent pricing scheme.

166.    The scheme devised and implemented by CVS and Caremark, as well as other members of the HSP Pricing Enterprise, amounted to a common course of conduct intended to (a) allow CVS to charge inflated prices for generic prescription drugs; (b) allow PBMs to charge inflated prices for generic prescription drugs; and thereby (c) secure from health plans payment for generic prescription drugs at inflated prices.

**C.     CVS's Pattern of Racketeering Activity**

167.     CVS and Caremark conducted and participated in the conduct of the affairs of the

HSP Pricing Enterprise through a pattern of racketeering activity, including acts that are

indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire

fraud.  The pattern of racketeering activity by the HSP Pricing Enterprise likely involved

thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance

of the unlawful HSP pricing scheme.  Each of these fraudulent mailings and interstate wire

transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).

Collectively, these violations constitute a "pattern of racketeering activity," within the meaning

of 18 U.S.C. § 1961(5), through which CVS, Caremark, the remaining PBMs and ScriptSave

intended to defraud Plaintiffs, members of the class, and other intended victims.

168.     Each instance of racketeering activity alleged herein was related, had similar

purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including Plaintiffs and members of the class.  CVS, Caremark,

and the remaining PBMs calculated and intentionally crafted the HSP pricing scheme to ensure

their own profits remained high, without regard to the effect such pricing behavior had on

Plaintiffs and members of the class who would be over-billed for generic prescription drugs.  In

designing and implementing the scheme, at all times CVS and Caremark were cognizant of the

fact that those to whom it reports U&C prices rely on the integrity of those reporting those prices

consistent with NDPDP standards.

169.     By intentionally and artificially inflating its U&C prices, and then subsequently

failing to disclose such practices to the health plans, CVS, Caremark, the remaining PBMs and

ScriptSave engaged in a fraudulent and unlawful course of conduct constituting a pattern of

racketeering activity.

170.     CVS's, the PBMs' and ScriptSave's racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by CVS was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class.  CVS and Caremark have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its HSP Pricing Enterprise.

171.     The pattern of racketeering activity alleged herein and the HSP Pricing Enterprise are separate and distinct from each other.  Likewise, CVS and Caremark are distinct from the HSP Pricing Enterprise.

172.     The pattern of racketeering activity alleged herein was continuing until February 1, 2016.

**D.     CVS's Use of the U.S. Mail and Interstate Wire Facilities**

173.     The HSP Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the CVS's U&C prices; the benefits PBMs received from CVS's inflated U&C prices; and transmission of false or incomplete statements intended to mislead health plans regarding the publication of CVS's inflated U&C prices.

174.     During the class period, the HSP Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

175.     The nature and pervasiveness of the HSP pricing fraud scheme, which was orchestrated out of the corporate headquarters of CVS, Caremark, each remaining PBM, and

ScriptSave, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

176.    Many of the precise dates of the HSP Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to CVS's or the PBMs' or ScriptSave's books and records.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

177.    CVS's and Caremark's use of the U.S. Mail and interstate wire facilities to perpetrate the HSP pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

a.      Communications of CVS's U&C price to health plans, which occurred on a regular basis as health plans' members purchased generic prescription drugs;[143]

b.      Written representations and telephone calls between CVS and Caremark regarding the HSP program and CVS's inflated U&C prices;

d.      Written representations and telephone calls between CVS and Express Scripts regarding CVS's inflated U&C prices;

e.      Written representations and telephone calls between CVS and OptumRx regarding CVS's inflated U&C prices;

---

[143] *See, e.g.*, Nov. 13, 2013 transaction in which CVS reported U&C for amoxicillin 500 mg capsule that did not include HSP price; Jan. 19, 2014 transaction in which CVS reported U&C for glimepiride 2-mg tablet that did not include HSP price.

f.      Written representations and telephone calls between CVS and MedImpact regarding CVS's inflated U&C prices;

g.      Written representations and telephone calls between CVS and ScriptSave regarding the HSP program and CVS's inflated U&C prices;

h.      E-mails between CVS, the PBMs and ScriptSave agreeing to or effectuating the implementation of the HSP pricing fraud scheme;

j.      Written and oral communications directed to health plans that fraudulently misrepresented CVS's U&C price that were designed to conceal the scheme and deter investigations into CVS's U&C pricing; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

178.    In addition to the above-referenced RICO predicate acts, it was foreseeable to CVS and Caremark that the PBMs and ScriptSave would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that CVS's U&C price was fraudulently inflated.

**E.      Motive and Common Purpose**

179.    CVS and Caremark's motive and purpose in creating and conducting the scheme and the Enterprise(s) was to compete in the cash payor business while not damaging its substantial health plan business by using a lower U&C price that could cost CVS billions.  Each PBM joined in that common purpose because each PBM made more money the higher the drug cost to health plans, either in the form of rebates from the manufacturers or from the difference between the spread, the amount charged the health plan and the cost to the PBM.  Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the

rebates.  Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

## F.    Damages Caused by CVS's HSP Pricing Fraud

180.    CVS's and Caremark's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for generic prescription drugs.

181.    As described above, when a health plan pays for prescription drugs, its payment is based on the lower of AWP, MAC or U&C.  When U&C is artificially inflated, the health plan overpays due to a fraudulent price.

182.    Plaintiffs' injuries, and those of the class members, were proximately caused by CVS's and Caremark's racketeering activity.  But for the misstatements made by CVS, Caremark, the remaining PBMs and ScriptSave, and the pricing scheme employed by the HSP Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for generic prescription drugs for their members.

183.    Plaintiffs' injuries were directly caused by CVS's and Caremark's racketeering activity.  CVS's and Caremark's racketeering activity inflated the U&C price, the price upon which Plaintiffs' payments for generic prescription drugs were based.

184.    And although the HSP Pricing Enterprise was effectuated to give CVS a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by CVS's competitors.

185.     Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from CVS's and Caremark's fraudulent scheme.

186.     By virtue of these violations of 18 U.S.C. § 1962(c), CVS and Caremark are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT TWO**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.***

187.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

188.     This claim is brought on behalf of the class against Defendants CVS and Caremark for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

189.     Defendants are "person[s]" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

190.     Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of CVS's and Caremark's wrongful conduct.

**A.     The Express Scripts HSP Pricing Enterprise, the OptumRx HSP Pricing Enterprise, and the MedImpact HSP Pricing Enterprise**

191.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

192.    CVS and Caremark formed three separate such association-in-fact enterprises—consisting of:

- **The Express Scripts HSP Pricing Enterprise:**  CVS, including its employees and agents;  the PBM Caremark, L.L.C, including its employees and agents; ScriptSave, including its employees and agents; and Express Scripts, including its employees and agents.

- **The OptumRx HSP Pricing Enterprise:**  CVS, including its employees and agents;  the PBM Caremark, L.L.C, including its employees and agents; ScriptSave, including its employees and agents; and OptumRx, including its employees and agents.

- **The MedImpact HSP Pricing Enterprise:**  CVS, including its employees and agents; the PBM Caremark, L.L.C, including its employees and agents; ScriptSave, including its employees and agents; and MedImpact, including its employees and agents.

193.    The Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise and the MedImpact HSP Pricing Enterprise are ongoing and continuing business organizations consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to ensure that CVS could report inflated U&C prices to Plaintiffs and members of the class without its fraud being detected.

194.    To accomplish this purpose, the Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise and the MedImpact HSP Pricing Enterprise periodically and

systematically inflated CVS's U&C prices and represented—either affirmatively or through half-truths and omissions—to health plans, including Plaintiffs and the class, that CVS's U&C prices were "the amount charged cash customers for the prescription exclusive of sales tax or other amounts charged" or "the dollar amount a cash customer usually pays." The Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise and the MedImpact HSP Pricing Enterprise concealed from health plans, like Plaintiffs and the class members, that HSP prices were not reported as CVS's U&C price. This scheme of each Enterprise translated into higher sales (and therefore profits) for CVS and larger profits for the PBMs and ScriptSave.[144]

195.    The persons engaged in the Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise and the MedImpact HSP Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by CVS. There is regular communication between CVS, Caremark, ScriptSave and each of the remaining PBMs, in which information is shared.[145] Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which CVS, Caremark, ScriptSave and the remaining PBMs share information regarding various cash discount programs, the structure of those programs, and whether they are reporting those prices as U&C prices. Caremark and ScriptSave also shared such information with CVS through their administration of the HSP program. CVS, Caremark, ScriptSave, and Express Scripts; CVS, Caremark, ScriptSave, and OptumRx; and CVS, Caremark, ScriptSave and MedImpact, each functioned as a continuing unit for the purposes of implementing, respectively, the Express Scripts HSP pricing scheme, the OptumRx HSP pricing scheme, and the MedImpact HSP pricing

---

[144] For the purpose of this count "PBMs" shall mean Caremark, Express Scripts, OptumRx and MedImpact.

[145] *See, e.g.,* Lavin Decl. ¶ 22; Lavin dep. at 121:22-122:8 (describing communications between CVS and Caremark regarding CVS's intention not to include HSP prices as U&C).

scheme and, as set forth above, when issues arise during each scheme, each scheme's participants agreed to take actions to hide the scheme and continue its existence.

196.    At all relevant times, Express Scripts was aware of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  Express Scripts concealed CVS's true U&C prices and adopted policies that allowed CVS to submit a fraudulent U&C price.  Express Scripts represented to its clients that it was acting to save them (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that CVS's conduct was inflating the price its clients were paying for generic prescription drugs, because CVS's U&C price was falsely inflated.  Express Scripts also knew, but did not disclose, that the other PBMs—Caremark, OptumRx and MedImpact—were also allowing CVS to engage in this fraud to the detriment of their health plan customers.  Express Scripts also knew that ScriptSave, which was being paid to administer the HSP program, likewise would not disclose the fraud.  But for the Express Scripts HSP Pricing Enterprise's unlawful fraud, Express Scripts would have had the incentive to disclose the deceit by CVS.  By failing to disclose this information, Express Scripts perpetuated the Express Scripts HSP Pricing Enterprise's scheme, and reaped substantial profits.

197.    At all relevant times, OptumRx was aware of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  OptumRx concealed CVS's true U&C prices and adopted policies that allowed CVS to submit a fraudulent U&C price.  OptumRx represented to its clients that it was acting to save them (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that CVS's conduct was inflating the price its clients were paying for generic prescription drugs, because CVS's U&C price was falsely inflated.  OptumRx also knew, but did not disclose, that

the other PBMs—Caremark, Express Scripts, and MedImpact—were also allowing CVS to

engage in this fraud to the detriment of their health plan customers.  OptumRx also knew that

ScriptSave, which was being paid to administer the HSP program, likewise would not disclose

the fraud.  But for the OptumRx HSP Pricing Enterprise's unlawful fraud, OptumRx would have

had the incentive to disclose the deceit by CVS.  By failing to disclose this information,

OptumRx perpetuated the OptumRx HSP Pricing Enterprise's scheme, and reaped substantial

profits.

198.     At all relevant times, MedImpact was aware of CVS's and Caremark's conduct,

was a knowing and willing participant in that conduct, and reaped profits from that conduct.

MedImpact concealed CVS's true U&C prices and adopted policies that allowed CVS to submit

a fraudulent U&C price.  MedImpact represented to its clients that it was acting to save them

(including Plaintiffs and members of the class) money on their prescription needs.  But it knew

that CVS's conduct was inflating the price its clients were paying for generic prescription drugs,

because CVS's U&C price was falsely inflated.  MedImpact also knew, but did not disclose, that

the other PBMs—Caremark, Express Scripts, and OptumRx—were also allowing CVS to engage

in this fraud to the detriment of their health plan customers.  MedImpact also knew that

ScriptSave, which was being paid to administer the HSP program, likewise would not disclose

the fraud.  But for the MedImpact's HSP Pricing Enterprise's unlawful fraud, MedImpact would

have had the incentive to disclose the deceit by CVS.  By failing to disclose this information,

MedImpact perpetuated the MedImpact HSP Pricing Enterprise's scheme, and reaped substantial

profits.

199.     During the time that it was administering the HSP program, ScriptSave was aware

of CVS's and Caremark's conduct, was a knowing and willing participant in that conduct, and

reaped profits from that conduct.  ScriptSave concealed CVS's true U&C prices and adopted

policies that allowed CVS to submit a fraudulent U&C price.  ScriptSave knew that CVS's

conduct was inflating the price health plans were paying for generic prescription drugs, because

CVS's U&C price was falsely inflated.  ScriptSave also knew, but did not disclose, that the other

PBMs—Caremark, Express Scripts, OptumRx, and MedImpact—were also allowing CVS to

engage in this fraud to the detriment of their health plan customers.  Especially once MedImpact

acquired ScriptSave, ScriptSave particularly knew that MedImpact would not disclose the fraud.

But for the Express Scripts HSP Pricing Enterprise's, the OptumRx HSP Pricing Enterprise's and

the MedImpact HSP Pricing Enterprise's unlawful fraud, ScriptSave would have had the

incentive to disclose the deceit by CVS.  By failing to disclose this information, ScriptSave

perpetuated the scheme of the Express Scripts HSP Pricing Enterprise, the OptumRx Pricing

Enterprise and the MedImpact HSP Pricing Enterprise, and reaped substantial profits.

200.    Furthermore, the PBMs did not challenge CVS's reported U&C prices, terminate

their role in their respective HSP Pricing Enterprises, nor disclose publicly that CVS's U&C

prices were artificially inflated.

201.    Express Scripts, OptumRx, ScriptSave, and MedImpact participated in the

conduct of CVS and Caremark in their respective HSP Pricing Enterprises, sharing the common

purpose of inflating CVS's U&C prices, through a pattern of racketeering activity within the

meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in

violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. §

1343.  In each PBM-HSP Pricing Enterprise, the PBMs and ScriptSave knowingly made material

misstatements to health plans in furtherance of the fraudulent scheme regarding:

      a.        CVS's actual U&C prices;

b.      The extent to which CVS was reporting its HSP prices as its U&C price;

c.      Whether CVS's practice of failing to report its HSP prices as its U&C price caused health plans to pay more money for generic prescription drugs; and

d.      Whether and how the PBMs benefited from CVS's practice of failing to report its HSP prices as its U&C price.

202.    CVS alone could not have accomplished the purpose of the Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise or the MedImpact HSP Pricing Enterprise, without the assistance of the PBMs.  For CVS to profit from the scheme, the PBMs needed to allow CVS to report inflated U&C prices.  And the PBMs did so.  They then, through misrepresentations and failures to disclose material information, failed to tell their clients that they were paying higher prices for generic prescription drugs, and that the PBMs were benefitting from those higher prices.  Without these misrepresentations, Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise and the MedImpact HSP Pricing Enterprise could not have achieved their common purpose.

203.    The Express Scripts HSP Pricing Enterprise, the OptumRx Pricing Enterprise and the MedImpact HSP Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, they each set the price of drugs that were paid for by thousands of class members throughout the United States.

204.    The foregoing evidences that CVS, Caremark, Express Scripts, and ScriptSave were each willing participants in the Express Scripts HSP Pricing Enterprise; CVS, Caremark, OptumRx, and ScriptSave were each willing participants in the OptumRx HSP Pricing Enterprise; and CVS, Caremark, MedImpact, and ScriptSave were each willing participants in

the MedImpact HSP Pricing Enterprise, that each HSP Pricing Enterprise had a common purpose

and interest in the object of the scheme, and functioned within a structure designed to effectuate

the Enterprise's purpose, *i.e.*, through CVS's inflation of its U&C prices, coupled with the

PBMs' failures to disclose that inflation and misstatements to health plans regarding that

inflation.

**B.      Conduct of the HSP Pricing Enterprise**

205.      During the class period, CVS and Caremark exerted control over each HSP

Pricing Enterprise and participated in the operation or management of the affairs of each HSP

Pricing Enterprise, directly or indirectly, in the following ways:

   a.      CVS published its U&C prices, which did not include its HSP prices;

   b.      PBMs charged their clients U&C prices, which they knew did not include
           CVS's HSP prices and were therefore inflated;[146]

   c.      PBMs concealed that CVS's U&C price was inflated in order to allow
           themselves to charge health plans that inflated price; and

   d.      CVS and Caremark expected and intended that the PBMs would (and did)
           distribute through the U.S. Mail and interstate wire facilities,
           communications that failed to disclose that CVS's U&C prices were
           artificially inflated.

206.      Each scheme had a hierarchical decision-making structure that was headed by

CVS and Caremark.  CVS controlled the publication of its U&C price, and stood silent as PBMs

---

[146] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

charged their clients inflated prices for generic prescription prices based on the publication of

that price.

207.    The PBMs also participated in the conduct of the affairs of each respective HSP

Pricing Enterprise, directly or indirectly, in the following ways:

a.    The PBMs promised to, and did, keep secret that CVS was not reporting

its HSP prices as its U&C;

b.    The PBMs distributed through the U.S. Mail and interstate wire facilities,

communications which concealed the existence of each of the HSP Pricing

Enterprises; and

c.    The PBMs concealed the existence of CVS's inflated U&C prices to

further the fraudulent pricing scheme.

208.    The scheme devised and implemented by CVS and Caremark, as well as other

members of each HSP Pricing Enterprise, amounted to a common course of conduct intended to

(a) allow CVS to charge inflated prices for generic prescription drugs; (b) allow PBMs to charge

inflated prices for generic prescription drugs; and thereby (c) secure from health plans payment

for generic prescription drugs at inflated prices.

## C.    CVS's Pattern of Racketeering Activity

209.    CVS and Caremark conducted and participated in the conduct of the affairs of the

HSP Pricing Enterprise through a pattern of racketeering activity, including acts that are

indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire

fraud.  The pattern of racketeering activity by the HSP Pricing Enterprise likely involved

thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance

of the unlawful HSP pricing scheme.  Each of these fraudulent mailings and interstate wire

transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).

Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which CVS, Caremark, the remaining PBMs and ScriptSave intended to defraud Plaintiffs, members of the class, and other intended victims.

210.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class. CVS, Caremark the remaining PBMs and ScriptSave calculated and intentionally crafted the HSP pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for generic prescription drugs. In designing and implementing the scheme, at all times CVS and Caremark were cognizant of the fact that those to whom it reports U&C prices rely on the integrity of those reporting those prices consistent with NCPDP standards.

211.    By intentionally and artificially inflating its U&C prices, and then subsequently failing to disclose such practices to the health plans, CVS, Caremark, the remaining PBMs and ScriptSave engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

212.    CVS's, the PBMs' and ScriptSave's racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by CVS was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class. CVS and Caremark have engaged in the pattern of racketeering

activity for the purpose of conducting the ongoing business affairs of each HSP Pricing Enterprise.

213.    The pattern of racketeering activity alleged herein and each HSP Pricing Enterprise are separate and distinct from each other.  Likewise, CVS and Caremark are distinct from each HSP Pricing Enterprise.

214.    The pattern of racketeering activity alleged herein was continuing until February 1, 2016.

**D.     CVS's Use of the U.S. Mail and Interstate Wire Facilities**

215.    Each HSP Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the CVS's U&C prices; the benefits PBMs received from CVS's inflated U&C prices; and transmission of false or incomplete statements intended to mislead health plans regarding the publication of CVS's inflated U&C prices.

216.    During the class period, each HSP Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

217.    The nature and pervasiveness of each HSP pricing fraud scheme, which was orchestrated out of the corporate headquarters of CVS, Caremark, each remaining PBM, and ScriptSave, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

218.    Many of the precise dates of each HSP Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud)

have been hidden and cannot be alleged without access to CVS's, the PBMs' or ScriptSave's books and records.  Indeed, an essential part of the successful operation of each Enterprise alleged herein depended upon secrecy.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of each scheme; Plaintiffs describe this below.

219.    CVS's and Caremark's use of the U.S. Mail and interstate wire facilities to perpetrate the HSP pricing fraud in each scheme involved thousands of communications throughout the class period including, *inter alia*:

a.    Communications of CVS's U&C price to health plans, which occurred on a regular basis as health plans' members purchased generic prescription drugs;[147]

b.    Written representations and telephone calls between CVS and Caremark regarding the HSP program and CVS's inflated U&C prices;

d.    Written representations and telephone calls between CVS and Express Scripts regarding CVS's inflated U&C prices;

e.    Written representations and telephone calls between CVS and OptumRx regarding CVS's inflated U&C prices;

f.    Written representations and telephone calls between CVS and MedImpact regarding CVS's inflated U&C prices;

g.    Written representations and telephone calls between CVS and ScriptSave regarding the HSP program and CVS's inflated U&C prices;

---

[147] *See, e.g.*, Nov. 13, 2013 transaction in which CVS reported U&C for amoxicillin 500 mg capsule that did not include HSP price; Jan. 19, 2014 transaction in which CVS reported U&C for glimepiride 2-mg tablet that did not include HSP price.

h.      E-mails between CVS, the PBMs and ScriptSave agreeing to or effectuating the implementation of each HSP pricing fraud scheme;

j.      Written and oral communications directed to health plans that fraudulently misrepresented CVS's U&C price that were designed to conceal each scheme, deter investigations into CVS's U&C pricing; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of each scheme.

220.    In addition to the above-referenced RICO predicate acts, it was foreseeable to CVS and Caremark that the PBMs and ScriptSave would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that CVS's U&C price was fraudulently inflated.

**E.      Motive and Common Purpose**

221.    CVS and Caremark's motive and purpose in creating and conducting the scheme and the Enterprise(s) was to compete in the cash payor business while not damaging its substantial health plan business by using a lower U&C price that could cost CVS billions.  Each PBM joined in that common purpose because each PBM made more money the higher the drug cost to health plans, either in the form of rebates from the manufacturers or from the difference between the spread, the amount charged the health plan and the cost to the PBM.  Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the rebates.  Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

F.     **Damages Caused by CVS's HSP Pricing Fraud**

222.     CVS's and Caremark's violations of federal law and its pattern of racketeering

activity have directly and proximately caused Plaintiffs and class members to be injured in their

business or property because Plaintiffs and class members have paid inflated out-of-pocket

expenses for generic prescription drugs.

223.     As described above, when a health plan pays for prescription drugs, its payment is

based on the lower of AWP, MAC or U&C.   When U&C is artificially inflated, the health plan

overpays due to a fraudulent price.

224.     Plaintiffs' injuries, and those of the class members, were proximately caused by

CVS's and Caremark's racketeering activity.   But for the misstatements made by CVS,

Caremark, the remaining PBMs and ScriptSave, the pricing scheme employed by each HSP

Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for generic

prescription drugs for their members.

225.     Plaintiffs' injuries were directly caused by CVS's and Caremark's racketeering

activity.   CVS's and Caremark's racketeering activity inflated the U&C price, the price upon

which Plaintiffs' payments for generic prescription drugs were based.

226.     And although the HSP Pricing Enterprise was effectuated to give CVS a

wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not

suffered by CVS's competitors.

227.     Plaintiffs and those similarly situated were most directly harmed by the fraud, and

there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic

harms to consumers from CVS's and Caremark's fraudulent scheme.

228.    By virtue of these violations of 18 U.S.C. § 1962(c), CVS and Caremark are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT THREE

## VIOLATIONS OF STATE CONSUMER PROTECTION ACTS

229.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

230.    This Count is brought by Plaintiffs, individually, under the laws of the States of Illinois and Indiana, and on behalf of the Multistate Class for violations of the state consumer protection acts including:

    a.    the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq*.;

    b.    the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq*.;

    c.    the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq*.;

    d.    the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq*. and 17500, *et seq*.;

    e.    the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.;

    f.    the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101, *et seq*.;

    g.    the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110, *et seq*.;

    h.    the Delaware Consumer Fraud Act, 6 Del. Code § 2513, *et seq*.;

    i.    the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq*.;

    j.    the Idaho Consumer Protection Act, Idaho Code Ann. § 48-601, *et seq*.;

k.      the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

l.      the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, *et seq.*;

m.      the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

n.      the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

o.      the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207, *et seq.*;

p.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A, *et seq.*;

q.      the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*;

r.      the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, *et seq.*;

s.      the Nebraska Consumer Protection Act, Neb. Rev. St. § 59-1601, *et seq.*;

t.      the Nevada Deceptive Trade Practices Act, Nev. Rev. St. § 41.600, *et seq.*;

u.      the New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. § 358-A:1, *et seq.*;

v.      the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*;

w.      the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, *et seq.*;

x.      the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

y.      the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15, *et seq.*;

z.      the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.*;

aa.      the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*;

bb. the South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24-1, *et seq*.;

cc. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq*.;

dd. the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199, *et seq*.;

ee. the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq*.;

ff. the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq*.; and

gg. the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, *et seq*.

231. Plaintiffs have complied with the applicable notice requirements of the state statutes.

232. The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading U&C prices, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

233. Defendants' acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged Plaintiffs and members of the Class in connection with the sale of and payments for generic prescription drugs.  Defendants' conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or

advertisement of goods whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

234.    Plaintiffs and the Class members and beneficiaries purchased generic prescriptions from CVS primarily for personal, family, or household purposes.  Those prescriptions were paid for, in whole or in part, by Plaintiffs and the Class.

235.    Plaintiffs, on behalf of themselves and the Class members, seeks monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

## COUNT FOUR

## NEGLIGENT MISREPRESENTATION

236.    Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth herein.  Plaintiffs bring this count individually and on behalf of the Nationwide Class.

237.    Under the circumstances alleged, Defendants owed a duty to Plaintiffs and members of the Class to provide them with accurate information regarding the prices of its generic prescription drugs.

238.    Defendants misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  Defendants made such misrepresentations by reporting artificially inflated U&C prices for such drugs to health plans.

239.    Defendants had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that CVS reported to health plans were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

240.    Defendants intended to induce Plaintiff and Class members to rely on their misrepresentations and/or omissions.  Defendants knew that Plaintiffs and Class members would

rely on their misrepresentations and/or omissions regarding U&C prices and, as a result, would pay prices higher than the actual U&C prices for those generic prescription drugs.

241.    Plaintiffs and Class members justifiably relied upon Defendants' misrepresentations and/or omissions in that Plaintiffs and Class members would have paid for generic prescription drugs purchased at CVS at Health Savings Pass prices (or prorated prices) but for Defendants' misrepresentations and/or omissions.  Plaintiffs' and Class members' reliance on Defendants' misrepresentations and/or omissions was, thus, to their detriment.

242.    As a proximate result of Defendants' negligent conduct, Plaintiffs and Class members have been damaged because they paid for generic prescription drugs at prices that were far higher than the prices they would have paid but for Defendants' misconduct.

243.    Defendants are therefore liable to Plaintiff and members of the Class for the damages they sustained.

**COUNT FIVE**

**FRAUD**

244.    Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth herein.  Plaintiffs bring this court individually and on behalf of the Nationwide Class.

245.    Defendants materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in CVS's HSP program.  Defendants made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to health plans.

246.    Defendants made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that Defendants knew the prices that CVS reported to health plans were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

247.    Defendants intended to induce Plaintiffs and Class members to rely on their misrepresentations and/or omissions.  Defendants knew that Plaintiffs and Class members would rely on Defendants' representation and/or omissions regarding U&C prices, and, as a result, would pay more than the actual U&C prices for those generic prescription drugs.

248.    Plaintiffs and Class members justifiably relied upon Defendants' misrepresentations and/or omissions in that Plaintiffs and members of the class would not have purchased generic prescription drugs from CVS for more than the HSP prices but for Defendants' misrepresentations and/or omissions.  Plaintiffs' and Class members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

249.    As a proximate result of Defendants' conduct, Plaintiffs and Class members have been damaged because they paid for generic prescription drugs at prices that were far higher than the prices they would have paid but for Defendants' misconduct.

250.    Defendants are therefore liable to Plaintiff and Class members for the damages they sustained.

## COUNT SIX

## UNJUST ENRICHMENT

251.    Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth herein.  Plaintiffs bring this Count individually and on behalf of the Nationwide Class.

252.    By means of Defendants' wrongful conduct alleged herein, Defendants knowingly charged health plans for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

253.    Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class.  In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and Class members.

254.    As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

255.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

256.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, without justification, from the imposition of prices on Plaintiffs and members of the Class in an unfair and unconscionable manner.  Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

257.    Plaintiffs and the other Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Defendants to retain these wrongfully obtained proceeds.

258.    CVS is therefore liable to Plaintiffs and members of the Class for restitution in the amount of Defendants' wrongfully obtained profits.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court certify the putative Class, appoint Plaintiff as the representative for the Class, appoint its attorneys as Class Counsel, enter judgment for Plaintiff and the Class, and grant such other and further relief as this Court deems appropriate.

Dated:  June 5, 2017

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP


By: */s/ Steve W. Berman*
　　   Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email:  steve@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Tel: (708) 628-4949
Fax: (708) 628-4950
Email:  beth@hbsslaw.com

Jennifer Fountain Connolly
HAGENS BERMAN SOBOL SHAPIRO LLP
1701 Pennsylvania Ave. NW, Suite 300
Washington, D.C.  20006
Tel:  (202) 248-5403
Fax:  (202) 580-6559
Email:  jenniferc@hbsslaw.com

Stephen M. Prignano
MCINTYRE TATE LLP
321 South Main Street, Suite 400
Providence, Rhode Island 02903
Tel: (401) 351-7700 Ext. 227
Fax: (401) 331-6095
Email: smp@mtlesq.com

William Riley
RILEY WILLIAMS & PIATT, LLC
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, Indiana  46204
Tel: (317) 633-5270
Fax: (317) 426-3348