# EXHIBIT 11

Job No. 3168679

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF RHODE ISLAND
 2
                  CIVIL ACTION NOS.:
 3                   1:16-cv-46-S
                     1:16-cv-447-S
 4
    SHEET METAL WORKERS LOCAL         )
 5  NO. 20, et al.,                   )
                                      )
 6           Plaintiffs,              )
                                      )
 7             -vs-                   )
                                      )
 8  CVS PHARMACY, INC., et al.,       )
                                      )
 9           Defendants.              )
10
11
12         VIDEO DEPOSITION OF R. IRENE NEWMAN
13
14       The video deposition upon oral examination
    of R. IRENE NEWMAN, a witness produced and sworn
15  before me, Diane Zeyen, RPR, a Notary Public in
    and for the County of Hamilton, State of Indiana,
16  taken on behalf of the Defendants CVS Pharmacy,
    Inc., and Caremark, LLC, at the offices of
17  Taft Stettinius & Hollister, LLP, One Indiana
    Square, Suite 3500, Marion County, Indiana, on the
18  17th day of December, 2018, at 9:00 a.m., pursuant
    to the Federal Rules of Civil Procedure with written
19  notice as to time and place thereof.
20
21
22
23
24
25
                                              Page 1
```

```
 1    Q    And what email address was that?

 2    A    Irene.newman@benesys.com.

 3    Q    Did you ever use a personal email address?

 4    A    No.

 5    Q    Did you look at any other places beyond email

 6         for any documents?

 7    A    No.

 8    Q    Do you have any files of physical papers or

 9         documents related to Indiana Carpenters?

10    A    No.

11    Q    I want to talk a little bit more about your

12         responsibilities in your role at BeneSys and

13         previously with Zenith.

14              Just taking a step back, what in general

15         does BeneSys do?

16    A    They are a TPA.

17    Q    What's a TPA?

18    A    Third-party administrator.

19    Q    And what does a TPA generally do?

20    A    They are the administrator of certain accounts.

21    Q    And when you say "certain accounts," what kind

22         of accounts are you talking about?

23    A    Accounts that they are awarded or that they put

24         a bid in for and they get the account.

25    Q    Is it accounts in a specific type of industry?
```

Page 17

```
 1    A    Taft Heartly.

 2    Q    What's Taft Heartly?

 3    A    I just think of it as unit accounts.

 4    Q    Is it unit accounts dealing with all types of

 5         things or are we talking about in the healthcare

 6         industry, what type of accounts?

 7    A    Health and welfare funds.

 8    Q    So BeneSys is an administrator for certain union

 9         health and welfare funds?

10    A    Yes.

11    Q    And what is that, when you say "an

12         administrator," what does that mean?

13    A    They handle the day-to-day responsibilities.

14    Q    Day-to-day responsibilities, what does that

15         include?

16    A    Processing of medical claims and customer

17         service.

18    Q    Let's take those one at a time.  First,

19         processing claims, what does that work involve?

20    A    It is all mainly electronics and there are paper

21         claims, but the claims come to them.  And they

22         process those and then they send them back for

23         payment.  This is all medical claims.

24    Q    Does that include prescription drug claims?

25    A    No.
```

Page 18

```
 1    Q    Does any part of the processing claims,

 2         responsibility cover prescription drug issues?

 3    A    Not that I'm aware of.

 4    Q    And the second responsibility you mentioned was

 5         customer, I can't remember exactly what you

 6         said.

 7    A    Service.

 8    Q    Customer service.  And what types of things do

 9         you do on a customer service side?

10    A    Talking to the members or the providers to try

11         to get issues resolved or help the members with

12         our claims.

13    Q    And when you say "members," what does members

14         mean?

15    A    Members are the participants of the Indiana

16         Carpenters Welfare Fund.

17    Q    So individual people?

18    A    Yes.

19    Q    Who have benefits through the fund?

20    A    That's correct.

21    Q    And what kind of issues would those members

22         reach out to you for?

23    A    Well, they would check to see if a claim was

24         paid, why it was paid, why it wasn't paid.

25    Q    And would your customer service work cover
```

```
 1        prescription benefits?

 2   A    No.

 3   Q    So members would not ask questions to you of

 4        whether a prescription benefit was paid?

 5   A    No.

 6   Q    Who would they ask that type of question.

 7   A    Express Scripts.

 8   Q    And what is the relationship between Express

 9        Scripts and the fund?

10   A    They are the PBM for the fund.

11   Q    And what is a PBM?

12   A    Pharmacy benefit manager.

13   Q    And so there's a direct contact that members had

14        made with ESI?

15   A    Yes, there was a service number for the Express

16        Scripts.

17   Q    And I was asking those questions in the context

18        of BeneSys.  Was your function, when you were at

19        Zenith Administrators, similar to what we just

20        talked about?

21   A    Yes.

22   Q    Was there any difference in the responsibilities

23        you had while at Zenith?

24   A    Yes.

25   Q    And what was the difference?
```

Stratos Legal
800.971.1127                  A Veritext Company                  713.481.2180

```
 1    A    With Zenith I had -- I attended the trustees,

 2         the Board of Trustees meetings, did the minutes

 3         for the meetings, had more contact with the

 4         actual trustees at that point.

 5    Q    And so it is fair to say that you no longer

 6         attend those meetings?

 7    A    Yes.

 8    Q    And when you were with Zenith Administrators,

 9         did your functions cover anything relating to

10         prescription drug benefits?

11    A    No.

12    Q    In your role with BeneSys or Zenith, do you

13         generally monitor trends in the medical market?

14    A    No.

15    Q    Do you monitor trends in the prescription drug

16         market?

17    A    No.

18    Q    Do you receive any emails from any groups about

19         what's going on in those markets?

20    A    No.

21              MR. TASIC:  Objection to form.

22              THE WITNESS:  Oh.

23    Q    Could you just state your answer to that

24         question again?

25    A    No.
```

Page 21

```
 1    Q    Who do you report to at the fund?
 2    A    Mary Weir.
 3    Q    Could you spell her last name?
 4    A    W-E-I-R.
 5    Q    And what's her title?
 6    A    She is a plan manager.
 7    Q    Is she employed by Indiana Carpenters Welfare
 8         Fund?
 9    A    No.
10    Q    Who is she employed by?
11    A    BeneSys.
12    Q    And how long have you reported to her?
13    A    Since January 1st, 2015.
14    Q    And, again, focusing on your time at BeneSys,
15         who's your primary contact at the fund?
16    A    At the fund office, in Troy, Michigan.
17    Q    I don't know where their office is, but --
18    A    Mary Weir.
19    Q    But she's employed by BeneSys?
20    A    Yes.
21    Q    Is there anyone employed by the fund?
22    A    No.
23    Q    Do you have any contacts with the Board of
24         Trustees despite not going to the meetings
25         anymore?
```

Page 22

```
 1    Q    Do you know if PSG attended meetings with the
 2         Board of Trustees?
 3    A    Yes, they did.
 4    Q    And at those meetings might they provide
 5         information about prescription drug benefits?
 6    A    Yes.
 7    Q    Did they ever provide information to the Board
 8         of Trustees on important developments in the
 9         prescription drug market?
10              MR. TASIC:  Objection to form.
11    A    Yes.
12    Q    Did they ever make recommendations to the Board
13         of Trustees on their prescription drug benefits?
14    A    I can't remember.
15    Q    Have you heard the term usual and customary
16         price before?
17    A    Yes.
18    Q    And will you understand if I refer to that as
19         U&C?
20    A    Yes.
21    Q    And as it relates to prescription drugs, what do
22         you understand U&C price to mean?
23    A    The usual and customary price for a drug for
24         that area.
25    Q    And is that a price set by the pharmacy?
```

Page 35

```
 1            MR. TASIC:  Objection to form.
 2   A   I don't know.
 3   Q   Do you know who sets the U&C price?
 4   A   No.
 5   Q   Do you know if a pharmacy submits its U&C price
 6       to Medco or to ESI during the claims
 7       adjudication process?
 8   A   No, I don't know.
 9   Q   Do you know if the U&C price factors into the
10       price that the fund pays for prescription drugs?
11            MR. TASIC:  Objection to form.
12   A   No.
13   Q   Do you know how Medco or ESI determines how much
14       the fund will pay for prescription drugs?
15   A   No.
16   Q   Do you know where you would look to figure that
17       out?
18   A   No.
19   Q   Do you understand that this litigation has
20       something to do with the usual and customary
21       price?
22   A   No.
23   Q   Are you familiar with the Walmart $4 list?
24   A   No.
25   Q   You never heard that term before?
```

Page 36

```
 1   A    No.
 2   Q    Are you familiar with pharmacy generic drug
 3        programs generally?
 4             MR. TASIC:  Objection to form.
 5   A    I would just say maybe, somewhat.
 6   Q    Okay.  Do you remember a time when Walmart
 7        announced that it would be offering certain
 8        generic drugs for $4?
 9   A    No.
10   Q    You don't recall seeing any media about that
11        announcement?
12   A    I don't shop at Walmart, I'm sorry, I don't.
13   Q    That's okay.
14   A    Sorry.
15   Q    Do you recall ever hearing that other pharmacy
16        chains, like Target, were offering generic drugs
17        for a reduced price?
18   A    Yes.
19   Q    What do you remember about that?
20   A    I just remember some drugs were free.
21   Q    Do you remember which pharmacy made that
22        announcement?
23   A    Meijer.
24   Q    How do you spell Meijer?
25   A    M-E-I-J-E-R.
```

Page 37

Job No. 3168679

```
 1        back to Exhibit 4, the email from Mr. Gerber.
 2        In the second paragraph Mr. Gerber states,
 3        quote, Listed at the bottom of this email is the
 4        full text on this topic.
 5             Did I accurately read that part of the
 6        sentence?
 7   A    Yes.
 8   Q    Turning to the second page, do you see that the
 9        full text he's referring to appears on that
10        page?
11   A    Yes.
12   Q    I am going to read aloud the first paragraph,
13        bear with me, if you will just let me know if I
14        have read it correctly.  "Medco is aware that
15        many retailers in the market place offer low
16        cost generic programs, and monitors these
17        offerings.  Medco has found that the low cost
18        generic programs vary from retailer to retailer;
19        some programs are offered free of charge to
20        patients whereby the low cost generic price can
21        be submitted via the U&C field through Medco's
22        TelePAID system (for example, the $4 Wal*Mart
23        generic program), other programs include
24        membership fees to gain access to a member-only
25        price that differs from the pharmacy's U&C price
```

Page 50

```
 1          (for example the program offered by Walgreens);
 2          other programs are marketed towards uninsured
 3          populations, and other programs offer a small
 4          list of free generic drugs."
 5              Did I read that paragraph correctly?
 6     A    Yes.
 7     Q    Before receiving this email, were you aware that
 8          there were two types of generic programs, some
 9          that offered drugs free of charge and others
10          that required a membership fee?
11     A    No.
12              MR. TASIC:  Objection to form.
13     Q    Upon receiving this email, did you understand
14          that there were two types of programs, ones that
15          offered drugs for a low cost to any person,
16          others that required a membership fee?
17              MR. TASIC:  Objection to form.
18     A    No.
19     Q    This email describes Walmart's program as free
20          of charge; right?
21     A    Yes.
22     Q    And it describes Walgreens' program as requiring
23          a membership fee; is that right?
24     A    Yes.
25     Q    So reading that email today, do you understand
```

Page 51

```
 1        that there's two different types of programs?
 2             MR. TASIC:  Objection to form.
 3   A    Yes.
 4   Q    Did you know that CVS's HSP program required a
 5        membership fee?
 6             MR. TASIC:  Objection to form.
 7   A    No.
 8   Q    Did you know one way or the other?
 9   A    No.
10   Q    And looking still at this first paragraph, do
11        you see where it says that, quote, the member
12        only price differs from the pharmacy's U&C
13        price?
14   A    Yes.
15   Q    Can you understand what you explained -- sorry,
16        strike that.
17             Can you explain what you understood that
18        sentence to mean?
19             MR. TASIC:  Objection to form.
20   A    No.
21   Q    No, you can't explain what you understand that
22        sentence to mean?
23   A    No.
24   Q    Doesn't it mean that the prices offered through
25        a membership program are not U&C prices?
```

```
 1              MR. TASIC:  Objection to form.
 2    A    I don't know.
 3    Q    Having read this text, do you believe that
 4         Walgreens was submitting its program pricing as
 5         its U&C prices?
 6              MR. TASIC:  Objection to form.
 7    A    I don't know.
 8    Q    Putting aside whether you knew at the time you
 9         received this email and just looking at the
10         language today, would you agree that this text
11         means that Walgreens was not submitting --
12              MR. TASIC:  Objection to form.
13    Q    -- its program prices as its U&C prices?
14    A    I don't know.
15              MR. TASIC:  Objection to form, that the
16         document speaks for itself.
17    Q    Did anyone from Walgreens ever tell you that
18         they were submitting their program prices as U&C
19         prices?
20    A    No.
21    Q    Have you ever seen a document saying that
22         Walgreens was doing that?
23    A    No.
24    Q    And that's because Walgreens' program prices
25         were not, in fact, its U&C prices; right?
```

Page 53

```
 1              MR. TASIC:  Objection to form.  Asked and
 2         answered.
 3    A    I don't know.
 4    Q    I'll represent to you that CVS's HSP program was
 5         a membership program like Walgreens.
 6              Is it then fair to say that CVS was not
 7         required to submit its membership program prices
 8         as its U&C prices?
 9              MR. TASIC:  Objection to form.
10    A    I don't know.
11    Q    What do you understand this language to mean?
12              MR. TASIC:  Objection to form.  What
13         language are you referring to?
14              MS. HOOVER:  Looking again at the language
15         that says "a member-only price differs from the
16         pharmacy's U&C price."
17    A    No.  I mean, I'm just not aware of this of how
18         this worked.
19    Q    Looking at the fourth paragraph on this page, I
20         am just going to read the first sentence this
21         time, "In instances where a Medco card holder
22         pays to enroll in one of the retailers' low cost
23         generic programs, it is the decision of the
24         member as to which card and/or benefit they
25         would like to utilize for the filling of their
```

Page 54

```
 1        prescription, as only one benefit card can be
 2        used at the point of sale."
 3             Did I read that sentence correctly?
 4    A   Yes.
 5    Q   Is it possible that some of the fund's members
 6        or the beneficiaries chose to enroll in programs
 7        like Walgreens' program?
 8             MR. TASIC:  Objection to form.
 9    A   I don't know.
10    Q   The first part of this sentence says "where a
11        Medco card holder pays to enroll in one of the
12        retailers' low cost generic programs," what do
13        you understand a Medco card holder to mean?
14    A   Well, in this case, it would be a participant
15        under the Indiana Carpenters Welfare Fund.
16    Q   So does this sentence, do you understand this
17        sentence to suggest that those -- the fund's
18        members could enroll in these programs?
19    A   Yes.
20             MR. TASIC:  Objection to form.
21    Q   Still focused on that sentence, do you
22        understand that if those members enrolled in the
23        program they couldn't combine the benefit they
24        had through the fund with the benefit under the
25        program?
```

Page 55

```
 1              MR. TASIC:  Objection to form.
 2    A    I read that in the paragraph, yes.
 3    Q    In other words, they had to choose one or the
 4         other?
 5              MR. TASIC:  Objection to form.
 6    A    Yes.
 7    Q    And if they chose the membership program price,
 8         then that claim would be adjudicated outside of
 9         the benefit under the fund?
10              MR. TASIC:  Objection to fund.
11    A    I don't know that.
12              MR. TASIC:  I just want to ask, how much
13         longer are we going to spend on this document?
14         We are up to an hour or so.  I think it would be
15         a good time to take a break soon.
16              MS. HOOVER:  I would say less than ten
17         minutes.
18              MR. TASIC:  Okay.
19              MS. HOOVER:  We will finish up with this
20         one and then move on.
21              THE WITNESS:  Okay.
22              MR. TASIC:  Does that sound okay?
23              THE WITNESS:  Yes.
24              MR. TASIC:  Good.
25    Q    So looking at the top email, the second email on
```

Page 56

```
 1        this chain, back on the first page, do you see
 2        that you forwarded this email to four recipients
 3        on April 23rd, 2010?
 4   A    Yes.
 5   Q    And who were those recipients, starting with the
 6        email address mjlmbl@a- --
 7   A    Mike Lauer.
 8   Q    That's Mike Lauer.  Is that a personal address?
 9   A    Yes.
10   Q    Do you know if he also used a business address
11        for fund issues?
12   A    Yes.
13   Q    And who is Mike Lauer?
14   A    A trustee.
15   Q    And the second benefic- -- or, sorry, the second
16        recipient that you forwarded the email to is
17        David Tharp?
18   A    Yes.
19   Q    Who is David Tharp?
20   A    He's the EST.
21   Q    He's the what?
22   A    The EST.
23   Q    What is that?
24   A    Actually on this it would be he was the
25        co-chairman of the Board of Trustees for the
```

Page 57

```
 1        Indiana Carpenters Welfare Fund.
 2   Q    And what did you say he was?  What was the first
 3        thing you said?
 4   A    Executive secretary/treasurer for the
 5        Indiana Carpenters.
 6   Q    The union?
 7   A    The union, yes.
 8   Q    Okay.  So he had, at the time of this email he
 9        had a position within the union --
10   A    Yes.
11   Q    -- separately at a position within the fund?
12   A    Yes.
13   Q    And he was receiving this email in his capacity
14        as a trustee for the fund?
15   A    Yes.
16   Q    And Wnix@industrialcontractors.com?
17   A    William Nix, he was a co-chairman.
18   Q    Co-chairman for what?
19   A    Indiana Carpenters Welfare Fund.
20   Q    In other words, David Tharp and William Nix were
21        the co-chairmen of the fund's Board of Trustees?
22   A    Yes.
23   Q    And you cc'd MaryJayne Mahern?
24   A    Yes.
25   Q    Who is that?
```

Page 58

```
 1    A    That's Dave Tharp's secretary.

 2    Q    Do you recall why you forwarded this email to

 3         these recipients?

 4    A    Because they're the main trustees.

 5    Q    What do you mean when you say "main trustees"?

 6    A    Well, two are the co-chairmen.  And then

 7         Mike Lauer, he had some knowledge about the

 8         prescription plan, and he had asked the question

 9         below also.

10    Q    When you say Mike Lauer had some knowledge about

11         prescription drug -- or the prescription drug

12         plan, what do you mean?

13    A    He asked the question below.

14    Q    Do you recall him other times raising other

15         issues about the prescription drug benefit?

16    A    At times, yes.

17    Q    Does he stick out in your mind as asking more

18         questions about that benefit than other

19         trustees?

20    A    No.

21    Q    How many trustees were there at the time?

22    A    I believe five union, five management.

23    Q    Okay.

24    A    But I would probably have to go back to my

25         records and check that.
```

Page 59

```
 1    STATE OF INDIANA        )

                              )   SS:

 2    COUNTY OF HAMILTON       )

 3

 4         I, Diane Zeyen, RPR, a Notary Public in and for

 5    the County of Hamilton, State of Indiana, at large,

 6    do hereby certify that R. IRENE NEWMAN, the deponent

 7    herein, was by me first duly sworn to tell the

 8    truth, the whole truth, and nothing but the truth in

 9    the aforementioned matter;

10         That the foregoing deposition was taken on

11    behalf of the Defendants CVS Pharmacy, Inc., and

12    Caremark, LLC, at the offices of Taft Stettinius &

13    Hollister, LLP, One Indiana Square, Suite 3500,

14    Indianapolis, Marion County, Indiana, on the 17th

15    day of December, 2018, at 9:00 a.m., pursuant to the

16    Federal Rules of Civil Procedure;

17         That said deposition was taken down in

18    stenograph notes and afterwards reduced to

19    typewriting under my direction, and that the

20    typewritten transcript is a true record of the

21    testimony given by the said deponent; and that the

22    signature by said deponent to her deposition was not

23    waived;

24         That the parties were represented by their

25    counsel as aforementioned.
```

Page 100

```
 1          I do further certify that I am a disinterested

 2    person in this cause of action, that I am not a

 3    relative or attorney of either party or otherwise

 4    interested in the event of this action, and that I

 5    am not in the employ of the attorneys for any party.

 6          IN WITNESS WHEREOF, I have hereunto set my hand

 7    and affixed my notarial seal on this 7th day of

 8    January, 2019.

 9

10

11                           N O T A R Y   P U B L I C

12

13    My Commission Expires:

14    September 2, 2024

15    County of Residence:

16    Hamilton County

17

18

19

20

21

22

23

24

25
```

Page 101