# EXHIBIT 8

Job No. 3218030

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND
 2         CAUSE NOS. 1:16-cv-46-S and 1:16-cv-447-S
 3     SHEET METAL WORKERS LOCAL      )
       NO. 20, et al.,                )
 4                                    )
                   Plaintiffs,        )
 5                                    )
                   -vs-               )
 6                                    )
       CVS PHARMACY, INC., et al.,    )
 7                                    )
                   Defendants.        )
 8
 9
10
                  VIDEO DEPOSITION OF SCOTT PARKS
11
12
13
14          The deposition upon oral examination of
       SCOTT PARKS, a witness produced and sworn before me,
15     Amy Doman, RPR, CRR, CSR No. 10-R-3022, Certified
       Stenographer, Notary Public in and for the County of
16     Hamilton, State of Indiana, taken on behalf of the
       Defendants, at the offices of Ice Miller, LLP, One
17     American Square, Suite 2900, Indianapolis, Indiana,
       scheduled to begin at 9:00 a.m., on Wednesday,
18     February 27, 2019, pursuant to the Federal Rules of
       Civil Procedure.
19
20
21
22
23
24
25
                                                    Page 1
```

```
 1            that was somewhat modified to reflect the terms and
 2            conditions of the deposition today.  It would be
 3            similar to Exhibit 3.  It was a little bit of an
 4            outline, I suppose.
 5   Q    Did this outline have answers or was it just the
 6            topics or questions?
 7   A    Topics.
 8   Q    Did you make or receive any other written aid for
 9            your testimony today?
10   A    I did not.
11   Q    Did you bring any written material of any kind with
12            you today?
13   A    No.
14            MR. RENDELL:  And of course, CVS would request
15            copies of all of the notes that Mr. Parks prepared.
16            MR. TASIC:  We're not going to give you that.
17            MR. RENDELL:  We can discuss later why you are
18            refusing to provide the notes.
19     BY MR. RENDELL:
20   Q    Apart from what we've discussed, have you taken any
21            other steps to prepare for this deposition?
22   A    Reading meeting minutes; I read an email from CVS,
23            Dan Tibus; obviously reading the 30(b)(6)
24            deposition, reading the -- reviewing the trust
25            documents, speaking with the trustees, reviewing
```

                                                    Page 39

```
  1           the interrogatories.

  2                Did I pronounce that correctly?

  3    Q      Yes.

  4    A      Interrogatories.

  5    Q      Interrogatories, I think.

  6                Did you review your own deposition transcript?

  7    A      I did not.

  8    Q      Did you have an understanding about what this case

  9           involves, generally speaking?

 10    A      I do.

 11    Q      What is your general understanding?

 12    A      Usual and customary drug pricing was not applied.

 13    Q      Your understanding is that this case is about usual

 14           and customary drug pricing not being applied to

 15           what?

 16    A      Can you strike that?  My understanding is CVS

 17           Caremark inflated their pricing by not

 18           incorporating their drug program, and it was not

 19           factored into the usual and customary pricing.

 20    Q      Okay.  Now I'd like to turn to some questions about

 21           the fund and the trust agreement.  The fund was

 22           established through a trust agreement between the

 23           union and contractor associations in the state of

 24           Indiana, correct?

 25    A      Yes.
```

Page 40

```
 1    Q    The contractor associations covered different
 2         regions of the state?
 3    A    Yes.
 4    Q    Do those regions correspond to the union's seven
 5         regions?
 6    A    They do.
 7    Q    The union is the Indiana affiliate of an
 8         international union organization known as SMART,
 9         correct?
10    A    Correct.
11    Q    "SMART" stands for Sheet Metal, Air, Rail and
12         Transportation Workers?
13    A    It does.
14    Q    The union appointed half of the fund's trustees,
15         correct?
16    A    It does.
17    Q    Do the fund and Union share any staff?
18    A    No.
19    Q    Do they share any IT vendors or outside IT
20         professionals?
21    A    As of recently, yes.
22    Q    Approximately how recently is that?
23    A    Well, within the last year, eight months.
24    Q    Are they located in the same building, the fund and
25         the union?
```

Page 41

```
 1    A     Correct.

 2    Q     The fund -- do you have any factual understanding

 3          whether the fund is a land trust?

 4                MR. TASIC:  Objection; calls for a legal

 5          conclusion, outside of the noticed 30(b)(6) topics.

 6    A     I don't know.

 7       BY MR. RENDELL:

 8    Q     Has the fund's sole purpose ever been to own land?

 9    A     Based off the trust, no.

10    Q     Do you have an understanding, as a factual matter,

11          whether the fund is a real estate investment trust?

12                MR. TASIC:  Objection; calls for a legal

13          conclusion, outside of the noticed 30(b)(6) topics.

14    A     I don't know.

15       BY MR. RENDELL:

16    Q     Has anyone ever told you that the fund is a real

17          estate investment trust?

18    A     No.

19    Q     Has the fund's purpose ever been to buy and sell

20          real estate for profit?

21    A     I don't know.

22    Q     Has the fund ever engaged in investments, buying

23          and selling real estate for profit?

24    A     The fund has a portfolio.  What's in the portfolio

25          is managed by a party designated by the trustees.
```

Page 91

```
 1    Q    So setting aside the fund's investments, has the
 2         fund itself ever bought and sold real estate
 3         directly for profit-seeking purposes?
 4    A    I don't know.
 5              MR. TASIC:  Objection to form.
 6       BY MR. RENDELL:
 7    Q    Has the fund ever filed a tax return with the IRS
 8         as a real estate investment trust?
 9    A    I don't know.
10    Q    You understand that the fund has qualified with the
11         IRS as a Voluntary Employees Beneficiary
12         Association plan also known as a VEBA plan, right?
13    A    Yes.
14    Q    What steps were taken to qualify the fund as a VEBA
15         plan?
16    A    I don't know.
17    Q    When did the fund first qualify as a VEBA plan?
18    A    I don't know.
19    Q    What steps have been taken since 2008 to maintain
20         the fund's qualification as a VEBA plan?
21    A    I don't know.
22    Q    Is it your understanding that the fund is currently
23         qualified as a VEBA plan?
24    A    That's my understanding.
25    Q    You understand that the fund remains a trust,
```

Page 92

```
 1          correct?  Today?
 2              MR. TASIC:  Objection; calls for a legal
 3          conclusion.
 4     A    Restate the question.
 5        BY MR. RENDELL:
 6     Q    The fund is currently a trust, correct?
 7     A    The fund is currently a trust.  I don't know.  I'm
 8          not an attorney.
 9     Q    The fund still -- since becoming a VEBA plan, the
10          fund still has a board of trustees, right?
11     A    It does have a board of trustees.
12     Q    The trustees still have to follow the trust
13          agreement that we reviewed, right?
14     A    The trustees, yes.
15     Q    You told me that the trust agreement we reviewed
16          had not been amended since that last amendment in
17          March of 2016, right?
18     A    To the best of my knowledge, that's correct.
19     Q    So the trust agreement is still valid, correct?
20     A    Yes.
21     Q    The trustees still must follow the trust agreement
22          as stated, right?
23     A    Correct.
24     Q    Has anyone ever told the trustees that they could
25          start ignoring the trust agreement because the fund
```

Page 93

```
 1           Pharmacy's fourth set of interrogatories to
 2           plaintiffs, right, on the first page?
 3     A     Yes.
 4     Q     If you could please turn to page 6, the first
 5           page 6 of the document.  There are two -- some of
 6           the pages are apparently duplicated.  But the first
 7           page should say "Verification of Interrogatory
 8           Answers" at the top.
 9     A     Yes.
10     Q     Do you see that Hazel Compton, the fund
11           administrator, signed this verification?
12     A     I do.
13     Q     She did that on behalf of the fund, right?
14     A     She did.
15     Q     She verified under penalty of perjury that she
16           believed, based on reasonable inquiry, that the
17           foregoing answers are true and correct to the best
18           of her knowledge, information, and belief, right?
19     A     Yes.
20     Q     What inquiry did Ms. Compton undertake before she
21           signed this document?
22     A     I must -- legal counsel.
23     Q     When you say "legal counsel," do you mean that she
24           spoke to Mr. Rick Dennerline?
25     A     Yes.
```

Page 268

```
 1    Q    Are you aware whether she took any steps other than

 2         speaking to Mr. Dennerline before signing this

 3         verification?

 4    A    I'm not.

 5    Q    As part of your preparation for this deposition,

 6         did you ask the trustees that you spoke to whether

 7         they discussed the interrogatory answers with

 8         Mr. Dennerline before Ms. Compton signed this

 9         verification?

10    A    I did not ask the trustees.

11    Q    Are you aware whether trustees were consulted

12         regarding these interrogatory answers before

13         Ms. Compton signed it?

14    A    Ms. Compton has the ability to sign these without

15         contacting us.  We have legal counsel that we work

16         with.

17    Q    So my question is, are you aware whether any

18         trustees were consulted in connection with these

19         interrogatory answers before Ms. Compton signed

20         them, before January 23, 2018?

21    A    I'm unaware.

22    Q    Not aware.  Okay.

23              Are you aware of any steps taken by the fund,

24         other than Ms. Compton communicating with

25         Mr. Dennerline, to verify the interrogatory answers
```

Page 269

```
 1            here?
 2    A    We rely on our legal counsel and our professionals.
 3    Q    Are you aware of any inquiry undertaken by the fund
 4            other than that reliance on counsel?
 5    A    No.
 6                (Deposition Exhibit 32 was marked for
 7            identification.)
 8    Q    I'd like to show you another document.  This will
 9            be marked Exhibit 32.  These are the fund's
10            responses to CVS Pharmacy, Inc.'s seventh set of
11            interrogatories, correct?
12    A    They are.
13    Q    Turning to the second-to-last page of this
14            document, Exhibit 32, do you see that says at the
15            top of the page "Verification of Interrogatory
16            Answers"?
17    A    Yes.
18    Q    And here, you, Mr. Parks, have verified the
19            interrogatory answers, correct?
20    A    I have.
21    Q    You verified under penalty of perjury that you
22            believe, based on reasonable inquiry, that the
23            answers in these interrogatory answers were true
24            and correct to the best of your knowledge,
25            information, and belief, correct?
```

Page 270

```
1    A    We did.

2    Q    Was that an executive committee vote or a full vote

3         of the --

4    A    Executive committee vote, if I'm not mistaken.

5    Q    Were you present -- strike that.

6              Did you participate in that vote, Mr. Parks?

7    A    I did.

8    Q    When was that vote?

9    A    Early in 2016.

10   Q    Was the vote made at a regular meeting or was there

11        a special meeting convened for the purpose of the

12        vote?

13   A    It was via email and telephone conversation.

14   Q    So there was no in-person meeting; is that right?

15   A    Correct.

16   Q    In this case the lawsuit against CVS was brought in

17        the name of the fund itself, right?

18   A    Okay.

19   Q    You have served -- Mr. Parks, you have served as

20        the named plaintiff for lawsuits on behalf of the

21        fund, correct?

22   A    Yes.

23   Q    In fact, most of the time -- strike that.

24              In most cases where the fund has brought a

25        lawsuit, a trustee has served as the named
```

Page  274

```
 1            plaintiff, right?
 2                MR. TASIC:  Objection; outside of the scope
 3            and also object to form.
 4    A       I think the fund has sued as well as myself as the
 5            trustee in the past.
 6       BY MR. RENDELL:
 7    Q       And when you've sued, yourself, as trustee, your
 8            name is actually listed on the lawsuit, right?
 9    A       It has been.
10    Q       In this case the named plaintiff is the fund and
11            not a trustee or trustees.  Do you know why that
12            is?
13    A       I would assume that was legal counsel's -- I do not
14            know.
15    Q       Are you aware of the factual basis for this lawsuit
16            against CVS?
17    A       Based off reading the complaint, I know what I
18            read.  As far as interpreting, I'm not an attorney.
19    Q       And I just want to ask you about facts that the
20            fund was aware of in connection with the decision
21            to sue CVS.
22                When did the fund first become aware of the
23            facts on which it has sued CVS in this case?
24    A       We were aware of the theory, the reasons, on
25            January of '16.  Basically, we took a deeper dive,
```

Page 275

```
 1          myself, two weeks ago.
 2    Q     Is it fair to say -- when you refer to
 3          January 2016, learning the factual basis, was that
 4          before the vote by the executive committee to
 5          authorize the lawsuit?
 6    A     I believe so.
 7    Q     Were any of the facts that you learned on which you
 8          base the lawsuit from sources other than legal
 9          counsel?
10    A     No.
11    Q     So the only factual basis for this lawsuit is what
12          lawyers communicated to the fund, correct?
13              MR. TASIC:  That's objection to form.
14    A     Yes.
15      BY MR. RENDELL:
16    Q     Is the fund aware that Caremark has been added as a
17          defendant in this case?
18    A     Yes.
19    Q     Was there a vote to add Caremark as a defendant in
20          the case?
21    A     The executive committee, if I'm not mistaken -- you
22          know what?  No.  I'm not going to say there was.
23    Q     When did the fund learn that it was suing Caremark
24          for the first time?
25              MR. TASIC:  Also, I'm just also going to
```

Page 276

```
 1   Q    Okay.  Now, I'm not going to read all of these, but
 2        let's go to page 23 and look at subsection (b).
 3        Does page 23, subsection (b), which again, lists
 4        the trustees' power -- powers, excuse me, plural.
 5        Does subsection (b) state that one of the trustees'
 6        powers is "to designate other persons to carry out
 7        their fiduciary responsibilities or any part
 8        thereof to the full extent permitted by the
 9        Employee Retirement Income Security Act of 1964 as
10        may be amended from time to time"?
11            Did I read that correctly?
12   A    Yes.
13   Q    If you could turn to the next page, page 24.  Does
14        subsection (d) state, "To employ on their own
15        behalf or to authorize any other fiduciary to
16        employ one or more persons to render advice with
17        regard to any responsibility assumed by or imposed
18        by law upon such"?
19            Did I read that accurately?
20   A    I did.
21   Q    Let's skip to page 26.  The last subsection is
22        subsection (m).  And referring back to the list of
23        the trustees' powers, subsection (m) states:  "To
24        do all acts, whether or not expressly authorized
25        herein, which the trustees may deem necessary or
```

Page 318

Scott Parks - February 7, 2019
Job No. 3218030

```
 1            proper to carry out the purposes of the trust or

 2            for the protection of the property held hereunder."

 3                Did I read that accurately?

 4   A     Yes.

 5   Q     Now, you testified several times today that the

 6            fund relies on its consultants for certain things;

 7            is that accurate?

 8   A     Yes.

 9   Q     Do the sections that I just read from the trust

10            agreement, do those sections authorize the fund to

11            do that?

12                MR. RENDELL:  Object to form.

13   A     Yes.

14      BY MR. TASIC:

15   Q     You've also mentioned several times how the fund

16            relies on advice of counsel.  Under the sections I

17            read and just the duties and the powers of the

18            trustees generally that are listed in this

19            agreement, is it the -- does the fund believe that

20            it's authorized to do so under this agreement?

21                MR. RENDELL:  Object to form.

22   A     Yes.

23      BY MR. TASIC:

24   Q     So just to kind of clarify that a little bit, a

25            consultant like Segal, for example, do you remember
```

Page 319

```
 1          Segal being listed in one of the Rule 30(b)(6)

 2          topics?

 3   A      Yes.

 4   Q      Did the fund rely on Segal to negotiate its

 5          contract with Caremark?

 6   A      Yes.

 7   Q      Is it the fund's understanding that the trust

 8          agreement enables the fund to rely on a consultant

 9          for that purpose?

10              MR. RENDELL:  Object to form.

11   A      Yes.

12     BY MR. TASIC:

13   Q      Now, let me direct you to page 21 of the trust

14          agreement and direct you to Section 3.07.  It

15          states:  "The trustees may employ or contract with

16          an individual or firm to act as fund manager.  The

17          manager will administer the day-to-day business

18          operations of the fund and may receive employer

19          contributions, deposit the same into designated

20          depositories, make disbursements from the trust

21          fund under the direction of the trustees, maintain

22          all books and records of the trust, and perform all

23          other functions necessary or appropriate to the

24          operation of the trust."

25              Did I read that accurately?
```

Page 320

```
 1    A    Yes.

 2    Q    From 2008 to -- let me ask it this way:  From

 3         November 2008 until February of 2016, who was the

 4         fund manager?

 5    A    Hazel Compton.

 6    Q    Did Hazel Compton, as the fund administrator,

 7         maintain all books and records of the trust and

 8         perform -- well, let me just ask you that first.

 9             Did she maintain all books and records of the

10         trust?

11    A    Yes.

12    Q    Is it the understanding of the fund that any emails

13         or documents concerning fund business would have

14         been sent to, received by, and maintained by

15         Hazel Compton acting as the fund manager?

16             MR. RENDELL:  Object to form.

17    A    Yes.

18      BY MR. TASIC:

19    Q    Now, in preparation for this deposition today, did

20         you prepare to testify about the fund's

21         preservation and collection of documents?

22    A    Yes.

23    Q    Did you speak to Hazel Compton about that topic?

24    A    Yes.

25    Q    Is the fund aware that during the course of this
```

Page 321

```
 1              litigation, the electronic files of Hazel Compton
 2              and other fund employees were electronically copied
 3              and searched?
 4    A    Yes.
 5    Q    Is it the fund's understanding that the hard copy
 6              documents that were maintained by Ms. Compton were
 7              searched in order to produce documents that are
 8              relevant to this lawsuit?
 9              MR. RENDELL:  Object to form.
10    A    Yes.
11      BY MR. TASIC:
12    Q    Now, this -- again, just one last question about
13              this section.  This states that "The fund manager
14              shall maintain all books and records of the trust."
15              Does the fund have any reason to believe that
16              Hazel Compton, acting as fund manager, did not
17              maintain all books and records of the trust?
18    A    No.
19    Q    Thank you.
20              Now, on a related topic, you were asked about
21              whether all major decisions are made by trustees on
22              behalf of the fund.
23              Do you recall being asked that?
24    A    I do.
25    Q    Do you recall what your response to that was?
```

Page 322

```
 1    A    I believe it was "yes."

 2    Q    What did you understand the term "major decisions"

 3         to mean?

 4    A    The schedule of benefits is my interpretation,

 5         anything that would cause disruption for the

 6         members.

 7    Q    Is that just a single example?

 8    A    Yes.

 9    Q    Thank you.

10         Is it fair to say that -- are there important

11         functions -- are there functions that the fund

12         considers to be important on which it relies on

13         consultants?

14    A    Yes.

15    Q    Are there functions that the fund considers to be

16         important for which it relies on the advice of its

17         legal counsel?

18    A    Yes.

19    Q    And again, is it the understanding of the fund that

20         it's allowed to do so under the trust agreement

21         that we looked before that's Exhibit 4?

22         MR. RENDELL:  Object to form.

23    A    Yes.

24      BY MR. TASIC:

25    Q    You can go ahead and answer.
```

Page 323

```
 1    A    Yes.
 2    Q    Do you recall being asked by defense counsel about
 3         your communications with trustees in preparation
 4         for this deposition?
 5    A    Yes.
 6    Q    Do you recall being asked whether you talked to the
 7         trustees about Costco, Giant Eagle, HEB, Caremark,
 8         Kroger, Meijer, Publix, Rite Aid, Safeway,
 9         SuperValu, Target, Walgreens, and Walmart?
10    A    Yes.
11    Q    Is this current lawsuit for which you're being
12         deposed right now, is that lawsuit against Costco,
13         Giant Eagle, HEB, Caremark, Kmart, Kroger, Meijer,
14         Publix, Rite Aid, Safeway, SuperValu, Target,
15         Walgreens, or Walmart?
16    A    No.
17    Q    I'd like to return to the notice of the deposition
18         for a moment, if we could, please, Exhibit
19         Number 2.  And if you could also pull up Exhibit
20         Number 3, please.
21             Now, in the topics, starting on page 9 and
22         going through page 12, do you see a mention of
23         Costco, Giant Eagle, HEB, Kmart, Kroger, Meijer,
24         Publix, Rite Aid, Safeway, SuperValu, Target, or
25         Walgreens?
```

Page 324

```
 1                    MR. RENDELL:  Object to form.
 2          BY MR. TASIC:
 3     Q    Does this email say that members are being charged
 4          more under their fund prescription benefit than the
 5          HSP price?
 6     A    No.
 7                    MR. RENDELL:  Object to form, asked and
 8          answered.
 9          BY MR. TASIC:
10     Q    As a follow-up to that, it talks about what the
11          beneficiaries pay; is that correct?
12     A    Yes.
13     Q    Does Mr. Tibus state in the email that the fund is
14          paying more for drugs on the HSP list?
15                    MR. RENDELL:  Object to form.
16     A    No.
17          BY MR. TASIC:
18     Q    So in Exhibit 17, the email again states that under
19          the Walmart generic program, the members do not pay
20          a higher cost; is that accurate?
21     A    That's accurate.
22     Q    It doesn't say -- in Exhibit 16, in contrast, it
23          doesn't say either one way or the other about the
24          CVS Health Savings Pass; is that accurate?
25                    MR. RENDELL:  Object to form.
```

Page 330

```
 1    A     That's accurate.
 2      BY MR. TASIC:
 3    Q     You can respond.
 4    A     That's accurate.
 5    Q     Thank you.
 6          I'd like you to look at Exhibit 14.  These are
 7          the meeting minutes from March 20, 2009, of the
 8          fund; is that accurate?
 9    A     Yes.
10    Q     I'd like to turn you to page 2 of that document.
11          You were asked about the second-to-last paragraph
12          on this page, which reads, "Some questions arose
13          regarding the plan's current mail order co-pays.
14          The trustees request that the Segal Company work
15          with CVS Caremark to determine if the plan's
16          current co-pay structure is appropriate.  Currently
17          some pharmacies are offering some prescriptions for
18          less than the plan's co-pay amount."
19          Did I read that accurately?
20    A     You did.
21    Q     Does it say anything about CVS charging less for
22          prescriptions than the plan's co-pay amount?
23    A     No.
24          MR. RENDELL:  Object to form.
25      BY MR. TASIC:
```

Page 331

```
 1              for some generic drugs and much more for some other
 2              generic drugs, and that based on the distribution
 3              and number of those claims, the average cost could
 4              be $28.67?
 5                   MR. RENDELL:  Object to form.
 6    A    Yes.
 7       BY MR. TASIC:
 8    Q    So a number that represents an average, does that
 9              give you any information about the price
10              distribution?
11                   MR. RENDELL:  Object to form.
12    A    No.
13       BY MR. TASIC:
14    Q    So, for example, if you had an average that was an
15              extremely low number, that could mean that you had
16              five claims for -- or I'm sorry -- that you had,
17              let's say, a thousand claims for $1 and one claim
18              for a hundred?
19                   MR. RENDELL:  Object to form.
20       BY MR. TASIC:
21    Q    Is that accurate?
22    A    Yes.
23    Q    Alternatively, a higher average could mean that you
24              had more claims at a higher price, but it doesn't
25              mean that you didn't have claims at the lower price
```

                                                  Page 336

```
 1        as well; is that accurate?
 2   A    Yes.
 3   Q    Thank you.
 4          MR. BURKE:  Can we go off the record for five
 5        minutes?  We're going to need to make alternative
 6        plans.
 7          MR. TASIC:  Yeah, that's fine.
 8          THE VIDEOGRAPHER:  We are off the record at
 9        6:59 p.m.
10          (A recess was taken.)
11          THE VIDEOGRAPHER:  We are back on the record
12        at 7:10 p.m.
13     BY MR. TASIC:
14   Q    Mr. Parks, I just have a few more questions for
15        you.  If I could ask you to pull out Exhibits 33,
16        34, and 35, please.
17   A    Okay.
18   Q    Let me ask you first about Exhibit 33.  This is a
19        copy of the first amended complaint filed in this
20        suit.  Is that accurate?
21   A    Yes.
22   Q    Did you draft this complaint?
23   A    I did not.
24   Q    Did any of the trustees draft this complaint?
25   A    They did not.
```

Page 337

```
 1   Q    Did the fund rely on its lawyers to draft this
 2        complaint?
 3   A    Yes.
 4   Q    Did the fund rely on its lawyers to investigate the
 5        facts and the evidence underlying the allegations
 6        in this complaint?
 7             MR. RENDELL:  Object to form.
 8   A    Yes.
 9     BY MR. TASIC:
10   Q    Why would the fund rely on its lawyers to do that?
11   A    We're not attorneys.
12   Q    And does the fund's trust agreement authorize the
13        fund to rely on legal counsel for legal services?
14   A    The trust document does.
15   Q    So as a trustee, is it your responsibility to
16        review all of the documents and all of the evidence
17        in this lawsuit?
18             MR. RENDELL:  Object to form.
19   A    No.
20     BY MR. TASIC:
21   Q    Do you know how many documents have been produced
22        in this lawsuit?
23   A    I do not.
24   Q    Are you aware that the amended complaint was filed
25        in May 2018?
```

Page 338

Job No. 3218030

```
 1    A      Not until recently.

 2    Q      But you are aware of that now --

 3    A      Yes.

 4    Q      -- is that right?

 5    A      Yes.

 6    Q      And you can see -- since this is the proposed first

 7           amended complaint, if you look at the top of the

 8           document, do you see that it was filed -- it says

 9           "filed 06/05/17."  Do you see that?

10    A      Yes.

11    Q      I want you to hold onto that complaint for a minute

12           and look at Exhibits 34 and 35.

13    A      Okay.

14    Q      Are you aware that Exhibit 34 was produced by

15           Caremark in November of 2018?

16              MR. RENDELL:  Object to form.

17    A      No.

18       BY MR. TASIC:

19    Q      Were you aware that Exhibit 35 was produced by

20           Caremark in November 2018?

21              MR. RENDELL:  Object to form.

22    A      I was not.

23       BY MR. TASIC:

24    Q      So correct me if I'm wrong, maybe my math doesn't

25           hash out, but is November 2018 almost a year and a
```

Page 339

```
 1    Q     Aside from what attorneys have communicated to the

 2          fund, is the fund aware of any facts supporting the

 3          allegations in this complaint?

 4              MR. TASIC:  Objection to form.

 5    A     I'm only aware of what's in the complaint.

 6      BY MR. RENDELL:

 7    Q     So the fund is only aware of allegations; is that

 8          your testimony?

 9              MR. TASIC:  Objection to form.

10    A     What's in the complaint.

11              MR. TASIC:  Calls for a legal conclusion.

12      BY MR. RENDELL:

13    Q     You understand that the complaint contains

14          allegations, right?

15    A     Yes.

16    Q     Do you understand the difference between a fact and

17          an allegation?

18              MR. TASIC:  Objection to form.

19    A     Yes.

20      BY MR. RENDELL:

21    Q     What's the difference?

22    A     Fact, we wouldn't be sitting here talking about the

23          allegations.  It's been alleged.  If this were

24          totally factual, I think it would be -- we wouldn't

25          be here today.
```

Page 348

```
 1    Q    So you understand that what's in the complaint are

 2         disputed allegations, not proven facts at this

 3         point, right?

 4    A    At this point.

 5    Q    And setting aside the allegations in the complaint

 6         and anything attorneys may have told you, the fund

 7         does not have independent knowledge of facts

 8         supporting these allegations?

 9    A    That is correct.

10         MR. TASIC:  Objection to form.

11    A    That's correct.

12      BY MR. RENDELL:

13    Q    Without going into the substance, have attorneys

14         communicated to the fund factual information

15         supporting the allegations in this complaint?

16    A    In my opinion, yes.

17    Q    Did lawyers communicate to the fund what facts

18         formed the basis for the allegations in this

19         complaint?

20         MR. TASIC:  Objection; calls for

21         attorney-client communications.

22         Instruct the witness not to answer.

23      BY MR. RENDELL:

24    Q    Mr. Parks, including -- strike that.

25         Including anything that attorneys may have
```

Page 349

```
 1          told the fund, what facts is the fund aware of that
 2          form the basis for the allegations in this
 3          complaint?
 4              MR. TASIC:  Objection to form, vague.
 5    A     Including what attorneys have told the fund?
 6      BY MR. RENDELL:
 7    Q     Including factual information communicated from
 8          attorneys to the fund.  So including that
 9          information, what facts is the fund aware of
10          supporting the allegations in this complaint?
11              MR. TASIC:  Objection the form.
12              Also, instruct the witness not to answer to
13          the extent he can't give an answer without
14          revealing attorney-client communications.  If you
15          can give a response without talking about what your
16          attorney has told you, you can give a response --
17    A     That would be impossible.
18              MR. TASIC:  -- if that makes sense.
19              In that case, I instruct the witness not to
20          answer based on attorney-client privilege.
21              MR. RENDELL:  Okay.  Thank you, Mr. Parks.
22          That's all I have at this point.
23              MR. TASIC:  Just got a couple of final
24          questions.
25      RECROSS-EXAMINATION
```

                                        Page 350

```
 1        this lawsuit was filed?  I'm talking about the
 2        emails from Mr. Tibus in 2009.
 3   A    To?
 4   Q    To the fund.
 5   A    At the time, Mr. Potesta would have had knowledge
 6        of what was sent to him by Dan.
 7   Q    And if Mr. Tibus sent something to Hazel Compton,
 8        did the fund have independent -- sorry.
 9        Did the fund have knowledge of that?
10   A    The fund would have had knowledge.
11   Q    Did Mr. Tibus attend board meetings between 2008
12        and 2016?
13   A    Yes.
14   Q    Did the fund have knowledge that he attended --
15   A    Yes.
16   Q    -- the board meetings?
17        Earlier we discussed the trust agreement and
18        what it authorized the trustees to do.
19        Do you recall that?
20   A    Yes.
21   Q    Do you remember testifying that the trust agreement
22        authorizes trustees to delegate?
23   A    Yes.
24   Q    Once a fund -- once the fund is provided
25        information about a potential lawsuit and
```

Page 364

```
 1          authorizes that suit, does the fund then delegate
 2          responsibility for the litigation of that suit to
 3          the fund's attorneys?
 4              MR. RENDELL:  Object to the form.
 5     A    Yes.
 6        BY MR. TASIC:
 7     Q    Does the fund's attorney give periodic updates on
 8          the suit?
 9     A    Yes.
10     Q    Does the trust agreement -- does the trust
11          agreement authorize the fund to do that?
12     A    Yes.
13     Q    If the fund had had knowledge or any idea to
14          believe that CVS or Caremark were committing fraud,
15          if anybody in the fund had had that knowledge
16          before December 2015 or January 2016, would the
17          fund have sought legal advice?
18              MR. RENDELL:  Object to the form.
19     A    Yes.
20              MR. RENDELL:  Calls for speculation.
21        BY MR. TASIC:
22     Q    And if the attorney advised the fund that it had a
23          legitimate claim, would the fund have authorized a
24          lawsuit?
25     A    Yes.
```

Page 365

```
 1              MR. TASIC:  I have no more questions.
 2     FURTHER REDIRECT EXAMINATION
 3       QUESTIONS BY JARIEL A. RENDELL:
 4     Q    Mr. Parks, I'd like to direct your attention back
 5          to Exhibit 16.  That's the email from Mr. Tibus
 6          that Mr. Tasic asked you about just a moment ago.
 7              Mr. Parks, you testified that when Mr. Potesta
 8          and Ms. Compton received this email in June 23 of
 9          2009, the fund had knowledge of the information in
10          this email, right?
11              MR. TASIC:  Objection; misstates the
12          testimony.
13     A    Please rephrase that.
14       BY MR. RENDELL:
15     Q    You testified that when Mr. Potesta received this
16          email in June of 2009, the fund would have had
17          knowledge of this email, right?
18              MR. TASIC:  Object to form.
19     A    Yes.
20       BY MR. RENDELL:
21     Q    And when Ms. Compton received this email, the fund
22          had knowledge of the contents of this email in
23          June 2009, right?
24              MR. TASIC:  Object to the use of "this email."
25          This is actually a series of emails, and the top
```

Page 366

```
 1    STATE OF INDIANA          )

                                )  SS:

 2    COUNTY OF HAMILTON         )

 3

 4          I, Amy Doman, Stenographic Reporter, RPR, CRR,

 5          CSR No. 10-R-3022, Notary Public in and for the

 6          County of Hamilton, State of Indiana, at Large, do

 7          hereby certify that SCOTT PARKS, the deponent

 8          herein, was by me first duly sworn to tell the

 9          truth, the whole truth, and nothing but the truth

10          in the aforementioned matter;

11          That the foregoing deposition was taken on

12          behalf of the Defendants, at the offices of Ice

13          Miller, LLP, One American Square, Suite 2900,

14          Indianapolis, Indiana, on Wednesday,

15          February 27, 2019, pursuant to the Federal Rules of

16          Civil Procedure;

17          That said deposition was taken down in

18          stenograph notes and afterwards reduced to

19          typewriting under my direction, and that the

20          typewritten transcript is a true record of the

21          testimony given by the said deponent; and that

22          signature was requested by the deponent and all

23          parties present;

24          That the parties were represented by their

25          counsel as aforementioned.
```

Page 371

```
 1            I do further certify that I am a disinterested

 2       person in this cause of action, that I am not a

 3       relative or attorney of either party or otherwise

 4       interested in the event of this action, and that I

 5       am not in the employ of the attorneys for any

 6       party.

 7            IN WITNESS WHEREOF, I have hereunto set my

 8       hand and affixed my notarial seal this 4th day

 9       of March, 2019.

10

11

12

13

14            Amy Doman, RPR, CRR, CSR No. 10-R-3022

15            Stenographic Reporter

16            Notary Public

17

18

19  My Commission Expires:

20  September 30, 2025,

21  Residing in Hamilton County, Indiana

22

23

24

25

                                        Page 372
```