REDACTED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                    )
SHEET METAL WORKERS LOCAL NO. 20    )
WELFARE AND BENEFIT FUND, and       )
INDIANA CARPENTERS WELFARE FUND,    )
on behalf of themselves and all     )        C.A. No. 16-046 WES
others similarly situated,          )
                                    )
            Plaintiffs,             )
                                    )
        v.                          )
                                    )
CVS PHARMACY, INC., et al.,         )
                                    )
            Defendants.             )
_____)
                                    )
PLUMBERS WELFARE FUND, LOCAL 130,   )
U.A., on behalf of itself and all   )
others similarly situated,          )
                                    )        C.A. No. 16-447 WES
            Plaintiffs,             )
                                    )
        v.                          )
                                    )
CVS PHARMACY, INC., et al.          )
                                    )
            Defendants.             )
                                    )
_____)

## <u>MEMORANDUM AND ORDER</u>

WILLIAM E. SMITH, District Judge.

Plaintiffs Sheet Metal Workers Local No. 20 Welfare and

Benefit Fund ("Sheet Metal Workers"), Indiana Carpenters Welfare

Fund ("Indiana Carpenters"), and Plumbers Welfare Fund Local 130

("Plumbers") (collectively, "Plaintiffs" or "named Plaintiffs")

move to certify four classes of third-party payors ("TPPs") or

health plans in two consolidated cases.  Pls.' Mem. in Supp. of
Pls.' Mot. for Class Certification ("Pls.' Mot.") 1-3, ECF No.
123;[1] see also Reply in Supp. of Pls.' Mot. for Class Certification
("Pls.' Reply") 3-4, ECF No. 145-1 (amending the class definition
for the "Omissions Consumer Protection Class").[2]  They allege that
Defendant CVS Pharmacy, Inc. ("CVS") and five pharmacy benefit
managers ("PBMs") – Defendant Caremark, L.L.C. ("Caremark",
together with CVS, "Defendants"), Express Scripts, Inc., OptumRx,
Inc., Medco Health Solutions, Inc.,[3] and MedImpact Healthcare
Systems, Inc. – engaged in a nationwide scheme and conspiracy to
overcharge TPPs, in violation of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and
various state laws.  First Am. Compl. ("FAC") 5-9, 52-84, ECF No.
171.  Specifically, Plaintiffs allege that CVS defrauded and
overcharged the health plans in failing to treat its Health Savings
Pass ("HSP") membership prices as its "Usual and Customary" ("U&C")
prices when reporting U&C prices to the PBMs.  Moreover, Plaintiffs

---

[1] All docket entries refer to the docket in C.A. No. 16-046.

[2] Defendants make much of the term "health plans" as overly
vague, but Plaintiffs clarify that it is used as a synonym for
"third-party payor" – "namely, any entity (other than the patient
or health care provider) that reimburses the patient's health care
expenses (e.g., pharmaceutical purchases)."  Pls.' Reply 18.  In
this opinion, "TPPs" and "health plans" are used interchangeably.

[3] Express Scripts purchased MedCo in 2012. FAC ¶¶ 12, 111.
During the life of the HSP Program, Indiana Carpenters' PBM was
MedCo.  Id. ¶ 12.

claim that CVS and the PBMs conspired to conceal from the TPPs that the HSP prices were not included in its U&C prices.

In addition, Caremark moves to dismiss Sheet Metal Workers' claims against Caremark, on the basis that the parties have agreed to arbitrate any disputes between them.  See generally Mem. in Supp. of Caremark LLC's Mot. under the FAA to Dismiss the Claims of Sheet Metal Workers ("Caremark Mot. to Dismiss") 1, ECF No. 163-1.

For the reasons that follow, Plaintiffs' Motion for Class Certification, ECF No. 120, is GRANTED, and Caremark's Motion to Dismiss, ECF No. 163, is also GRANTED.  The Court DENIES WITHOUT PREJUDICE Plaintiffs' Motions to Exclude the Expert Testimony of Catherine Graeff, Michael P. Salve, Ph.D., and Brett E. Barlag, ECF Nos. 140-42.

## I.   Background[4]

Retail pharmacy chains generally sell their prescription drugs to two groups of consumers:  those with prescription insurance, and those without insurance, also referred to as cash payors.  FAC ¶ 29.  Customers with insurance make up well over 90 percent of CVS's prescription drug business, and their prescription purchases are processed and paid for (in part or in

---

[4] The Court gleans the background from Plaintiffs' First Amended Complaint.  See generally First Am. Compl. ("FAC"), ECF No. 81-1.

full) by health plans, including health insurance companies, third-party administrators, health maintenance organizations, self-funding health and welfare benefit plans, health plans, and other health benefit providers (collectively referred to herein as "health plans" or "TPPs").  Id.

Pharmacies, including CVS, report the prices they charge cash customers, known as the "Usual and Customary" or "U&C" price, to PBMs and TPPs to comply with the National Council for Prescription Drug Program's ("NCPDP") requirements.  Id. ¶¶ 1, 33-35.  This arrangement (and the contracts between CVS and the PBMs), in part, guarantees that TPPs and insured consumers do not pay more for a prescription drug than an uninsured consumer would pay for the same drug.  Id. ¶ 1.

Pharmacy benefit managers, or PBMs, facilitate transactions between TPPs and pharmacies.  Id. ¶ 28.  TPPs contract with PBMs to perform services "including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services."  Id.  PBMs set up how pharmacy claims are adjudicated consistent with instructions from their TPP clients.  Id. ¶ 36.  Pursuant to PBM/TPP contracts, TPPs pay their PBMs for generic drugs purchased by their members based on the "lower of" three benchmark prices:  average wholesale price ("AWP") less a defined percentage (i.e., AWP - %); U&C; or

Maximum Allowable Cost ("MAC").  Id. ¶¶ 39-41.  A drug's AWP is set and published by third parties.  Id. ¶ 40.  PBMs set the MAC for each generic drug on their proprietary MAC lists.  Id. ¶ 41. The U&C is set by the pharmacy and is typically the highest of the three prices.  Id. ¶ 42.

PBMs also contract with pharmacies to dispense drugs to their TPP clients.  Id. ¶ 43.  In those contracts, PBMs also typically agree to pay pharmacies based on benchmark prices, such as AWP, U&C, and MAC.  Id.  As the middlemen, PBMs make their profit from charging their TPP clients more for drugs than they pay the pharmacy for the transactions.  Id.  Thus, PBMs do not disclose the prices they charge their TPP clients, nor what they pay pharmacies.  Id.

It was against this backdrop that, in September 2006, "Walmart turned the world of generic prescription drugs upside-down" by announcing that it would charge $4 for a 30-day supply, and $10 for a 90-day supply, of hundreds of generic prescription drugs. Id. ¶¶ 2, 52.  Target, Walgreens, Rite Aid, and other retailers with pharmacies followed suit.  Id. ¶ 52.  Walmart and Target (until CVS acquired Target pharmacies in 2015) reported $4 as their U&C prices.  Id.  Tweaking the model a bit, Walgreens and Rite Aid required customers to "join" their generic prescription drug programs to reap the benefits.  Id. ¶ 57.

Plaintiffs allege that CVS joined with Caremark (and later ScriptSave), a fellow subsidiary of CVS Health Corporation, to sketch out a discount generic drug program that shielded CVS from reporting the discount price as its U&C to PBMs.  Id. ¶¶ 56-57, 71-83.  In March 2008, prior to launching the HSP program, CVS and Caremark analyzed how adopting a generic discount program would impact CVS's revenue from TPPs.  Id. ¶ 59.  An analyst at CVS determined that the impact to TPP revenue would be $866 million annually if CVS included all the drugs on the Walmart list, and, if CVS included all the drugs on the Walgreens list, the impact would be an additional $329 million.  Id.  As a result, CVS structured its HSP differently, citing concerns that "[m]aking the program 'too attractive' creates higher risk for our 3rd party plan pricing and profitability."  Id. ¶ 61 (quoting CVSSM-0002427, at 2430 (May 8, 2008 presentation given to Larry Merlo, as edited by Bari A. Harlam at Caremark)).  Unlike Walmart and Walgreens, CVS decided to charge consumers a $10 annual fee to join the program.  Id. ¶ 65.  Plaintiffs allege that, in addition to collaborating with Caremark, CVS also "enlisted the participation of" three of the largest PBMs in the country, Express Scripts, OptumRx, and MedImpact, to embark on a scheme to conceal from health plans its HSP drug prices when reporting U&C prices.  Id. ¶ 3.

In November 2008, the HSP program went live. Id. ¶ 64. From November 9, 2008 through 2010, customers paid a $10 annual fee to join the program, which gave them access to a 90-day supply of 400 commonly prescribed generic drugs for $9.99. Id. ¶¶ 64-65. Starting in 2011, the annual fee went up to $15, and CVS raised the price for HSP-listed drugs to $11.99 for a 90-day supply and $3.99 for a 30-day supply. Id. ¶ 65. From November 2008 to February 2016, CVS did not report the HSP price as the U&C price for HSP-eligible drugs. Id. ¶ 66. Caremark administered the HSP program from its inception until July 2013, when ScriptSave took over its administration; the program was discontinued on January 31, 2016. Id. ¶¶ 23, 70, 83. Caremark played a dual rule in this saga: in addition to administering the HSP program, many TPPs used Caremark as a PBM. Id. ¶ 3.

Importantly, PBMs have incentive to encourage or conceal inflated U&C prices – PBMs make more money when U&C prices are higher. Id. ¶ 47. When a PBM pays a pharmacy the U&C price for a generic drug transaction, the TPP also pays the U&C price to the PBM. Under those circumstances, the PBM makes no profit or "spread" between what it pays the pharmacy and what the TPP pays the PBM. Id. ¶ 49. During the HSP program, CVS's HSP prices were often lower than the price a TPP would have paid under a formula using AWP or MAC as the benchmark price. Id. ¶ 50. Therefore, if CVS had reported its HSP prices as U&C prices, the U&C price

generally would have been the lowest benchmark price.  Id.  Thus, PBMs stood to lose "hundreds of millions of dollars in 'spread' opportunities" were HSP prices to be reported as U&C prices.  Id.

Plaintiffs allege that, for this reason, Caremark, Express Scripts, OptumRx, and MedImpact not only failed to intervene and prevent CVS's alleged fraudulent scheme, but concealed it "by adopting 'policies' that contradicted the language of their own contracts and provider manuals . . . ."  Id. ¶ 51.  Specifically, in its role as a PBM, Caremark instituted a policy that differentiated between Walmart's $4 generic program and "Club Plans" – like the HSP program – that required consumers to join and pay a membership fee.  Id. ¶ 4.  Under this policy, generic programs without membership fees were required to report their plan prices as U&C prices, and "Club Plans" were not.  Id.  Caremark did not disclose this policy to its TPP clients, other than those members of its Client Advisory Board.  As a result, Plaintiffs allege, CVS and Caremark – both as HSP administrator and PBM – concealed from TPPs that CVS was not reporting HSP prices as U&C prices for HSP-eligible drugs.  Id. ¶¶ 3-5.

## II.  Discussion

### A.  Defendant Caremark's Motion to Dismiss Sheet Metal Workers' Claims under the Federal Arbitration Act

Caremark moves to dismiss Sheet Metal Workers' claims under the Federal Arbitration Act ("FAA"), arguing that the operative

agreements between Caremark and Sheet Metal Workers include arbitration clauses.  See generally Caremark Mot. to Dismiss 1. Caremark argues that Sheet Metal Workers violated the parties'[5] agreements by initiating this suit against Caremark and by refusing to engage in dispute-resolution negotiations.  See id.  Caremark highlights that, under the parties' dispute-resolution provisions, Sheet Metal Workers agreed to do the following in advance of litigation:  (1) give notice of any dispute; (2) designate a dispute-resolution representative; (3) negotiate in good faith to resolve the dispute; and (4) submit to binding arbitration in Cook County, Illinois if negotiations did not resolve the dispute in 90 days.  Id.

On a motion to dismiss in favor of arbitration, a court considers "whether a valid arbitration clause exists, whether the movant is entitled to invoke the clause, whether the non-moving party is bound by it, and whether the clause covers the claims asserted."  FPE Found. v. Cohen, 801 F.3d 25, 29 (1st Cir. 2015) (citing Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011)).  A court may then consider whether a party has waived the right to arbitrate.  Id. Here, Sheet Metal Workers argues only that Caremark has forfeited its arbitration rights by sitting on its hands, and that not all

---

[5] In this section, "parties" refers only to Plaintiff Sheet Metal Workers and Defendant Caremark.

claims asserted fall within the relevant arbitration provisions. See Resp. in Opp'n to Def. Caremark's Mot. for Leave to File Mot. under the FAA to Dismiss the Claims of Sheet Metal Workers ("Pls.' Opp'n to Mot. to Dismiss") 5, ECF No. 132; Sheet Metal Workers Sur-Reply in Opp'n to Def. Caremark's Mot. For Leave to File Mot. Under FAA to Dismiss ("Sheet Metal Workers Sur-Reply") 8-9, ECF No. 164.

But before the Court can pass on whether Caremark waived its right to arbitration, the Court must first address a threshold issue: whether the Court or an arbitrator should decide whether Caremark forfeited its right to arbitrate through litigation-conduct waiver.[6]

### 1.    Who Decides Litigation-Conduct Waiver?

Caremark argues that whether it waived its right to arbitrate under the relevant contracts is an issue of arbitrability for an arbitrator, not the Court, to decide.  Reply in Supp. of Caremark's

---

[6] Caremark argues that Illinois law, not federal law, applies to this dispute.  Caremark Reply 8-9.  While the Court need not reach the issue, the First Circuit has signaled that litigation-conduct waiver is an issue of federal law.  See Rankin v. Allstate Ins. Co., 336 F.3d 8, 12 n.3 (1st Cir. 2003) (noting that, while not argued, "arbitration-related issues in this case are probably governed by the" FAA and, if so, "federal law would automatically govern waiver issues" (citation omitted)).  Under either body of law, the result here is the same.  See LRN Holding, Inc. v. Windlake Capital Advisors, LLC, 949 N.E.2d 264, 270-72 (Ill. App. 3d Dist. 2011) (noting that, under Illinois law, where a contract contains a choice-of-law provision and incorporates the American Arbitration Association rules of arbitration, federal law applies to questions regarding arbitration).

Mot. for Leave to File Mot. under the FAA to Dismiss the Claims of Sheet Metal Workers ("Caremark Reply") 1, ECF No. 135.  This is because, Caremark says, the contracts at issue here incorporate the commercial rules of the American Arbitration Association ("AAA"), which delegate the issue of arbitrability to an arbitrator.  Id. at 4-5 (citing Prescription Benefit Services Agreement ¶ 13.16 (Jan. 1, 2015) ("PBSA"), ECF No. 131-32).

In Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 14-15 (1st Cir. 2005), the First Circuit held that, even where a contract provides that an arbitrator shall decide issues of arbitrability, "waiver by conduct, at least where due to litigation-related activity, is presumptively an issue for the court."  Applying this rule, courts in this Circuit have decided issues of litigation-conduct waiver, distinct from issues of arbitrability.  See, e.g., In re Intuniv Antitrust Litig., No. 1:16-CV-12653-ADB, 2021 WL 517386, at *8 (D. Mass. Feb. 11, 2021) (citing Christensen v. Barclays Bank Del., No. 18-cv-12280, 2019 WL 1921710, at *5 (D. Mass. Apr. 30, 2019); Binienda v. Atwells Realty Corp., No. 15-cv-00253, 2018 WL 1271443, at *2-3 (D.R.I. Mar. 9, 2018); Cutler Assocs., Inc. v. Palace Constr., LLC, 132 F. Supp. 3d 191, 199-200 (D. Mass. 2015)).

Caremark contends that after the Supreme Court's decisions in BG Group, PLC v. Republic of Argentina, 572 U.S. 25 (2014), and Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524

(2019), Marie is no longer good law, and issues of litigation-conduct waiver are now consigned to an arbitrator.  Caremark Reply 3.  This argument gets no traction.

In BG Group, the Supreme Court recognized that "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration."  572 U.S. at 34 (citation omitted).  "These procedural matters include claims of 'waiver, delay, or a like defense to arbitrability.'"  Id. at 35 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 (1983)).  This Court previously considered, in Binienda, 2018 WL 1271443, at *2-3, whether BG Group displaced the reasoning in Marie, and concluded that it did not.

In BG Group, the Supreme Court emphasized that parties typically expect a forum-based decisionmaker to decide forum-specific procedural gateway matters, including "the satisfaction of 'prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate.'"  572 U.S. at 34-35 (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)).  Thus, "waiver", as contemplated in BG Group, does not include "litigation-conduct waiver".  See Binienda, 2018 WL 1271443, *2.  As it did in Binienda, this Court concludes that "[n]othing in BG Group undercuts the holding in Marie, that the Supreme Court did not intend to alter [the]

traditional rule that courts presumptively decide issues of litigation-conduct waiver." Id. (citation omitted); see also Rankin v. Allstate Ins. Co., 336 F.3d 8, 12 (1st Cir. 2003) (pre-dating BG Group, but emphasizing that "an arbitration provision has to be invoked in a timely manner or the option is lost" and, "[u]nder federal law, such a forfeiture is an issue for the judge" (citations omitted)).

Nor does Henry Schein come to Caremark's aid. In Henry Schein, the Supreme Court held that when a contract delegates arbitrability to an arbitrator, courts must give full meaning to that delegation and refrain from passing on any issues of arbitrability. 139 S. Ct. at 529. Here, in contrast, whether Caremark waived its right to arbitrate through litigation conduct in this judicial forum is a distinct issue from the underlying arbitrability of the dispute. See In re Intuniv Antitrust Litig., 2021 WL 517386, at *8 (concluding that the Supreme Court's decision in Henry Schein did not upset Marie's holding); see also Sabatelli v. Baylor Scott & White Health, 832 F. App'x 843, 848 n.3 (5th Cir. 2020) (noting that litigation-conduct waiver "is an issue for the court, rather than the arbitrator, to decide . . . because it 'implicates courts' authority to control judicial procedures or to resolve issues . . . arising from judicial conduct'" (quoting Vine v. PLS Fin. Srvs., Inc., 689 F. App'x 800, 802-03 (5th Cir. 2017));

<u>Ehleiter v. Grapetree Shores, Inc.</u>, 482 F.3d 207, 219 (3d Cir. 2007).[7]

The Court therefore concludes that litigation-conduct waiver is presumptively an issue for the Court, not an arbitrator, to decide.

### 2.   Litigation-Conduct Waiver

Next, Caremark argues that it has not waived its right to arbitrate Sheet Metal Workers' claims through its participation in this litigation.   Caremark Reply 8-15.   Generally, a party may waive its right to arbitration explicitly or through its conduct. <u>FPE Found.</u>, 801 F.3d at 29.   Under federal law, when deciding whether a litigant has waived its right to compel arbitration through litigation conduct, a court must consider several factors:

> (1) whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the litigation machinery has been substantially invoked and the parties [are] well into preparation of a lawsuit by the time an intention to arbitrate [is] communicated; (3) whether there has been a long delay

---

[7] Caremark further highlights that the current version of the AAA's Commercial Rules states that "[n]o judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate."   Caremark Reply 5 (quoting American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rule 52(a) (2013)). However, the AAA's Commercial Rules contained this same language when the First Circuit decided <u>Marie</u>, and thus, this argument is not persuasive.   <u>See</u> <u>In re Intuniv Antitrust Litig.</u>, 2021 WL 517386, at *8.   Moreover, one could interpret the text "judicial proceeding by a party" as denoting that a <u>plaintiff</u> does not waive its right to arbitrate by filing suit.   But in any event, the Rules only govern arbitration, they have no bearing on the Court's determinations.

> and trial is near at hand; (4) whether the party seeking
> to compel arbitration has invoked the jurisdiction of
> the court by filing a counterclaim; (5) whether
> discovery not available in arbitration has occurred;
> and, (6) whether the party asserting waiver has suffered
> prejudice.

Id. (citation and quotation omitted) (alterations in original).

In weighing the factors, no one factor carries the day, but rather,

"each case is to be judged on its particular facts." Tyco Int'l

Ltd. v. Swartz (In re Tyco Int'l Ltd. Sec. Litig.), 422 F.3d 41,

46 (1st Cir. 2005) (citation omitted). "'[W]aiver is not to be

lightly inferred,' thus reasonable doubts as to whether a party

has waived the right to arbitrate should be resolved in favor of

arbitration." Id. at 44 (quoting Restoration Pres. Masonry, Inc.

v. Grove Eur. Ltd., 325 F.3d 54, 61 (1st Cir. 2003)). Here, the

question is whether Caremark invoked its arbitration right in a

timely manner consistent with its desire to arbitrate. See id.

    While Plaintiffs initiated this suit against CVS in 2016,

they did not seek leave to amend their Complaint to add Caremark

as a defendant until June 5, 2017. See Pls.' Mot. for Leave to

File First Am. Compl., ECF No. 56. After being granted that leave,

on May 4, 2018, Plaintiffs filed the First Amended Complaint,

naming Caremark as a defendant. FAC, ECF No. 81-1. Caremark

answered on July 3, 2018, asserting that "putative class members

and at least one Plaintiff have agreed to, and failed to comply

with, dispute resolution procedures for their claims . . . ."
Caremark L.L.C.'s Answer to FAC ¶ 29, ECF No. 90.

On October 31, 2018, Caremark began the dispute-resolution
process and sent Sheet Metal Workers a Dispute Notice requesting
a response within ninety days in accordance with the arbitration
clause. See Caremark Dispute Resolution Ltr 1, ECF No. 129-79.
In that letter, Caremark designated a representative and requested
that Sheet Metal Workers do the same. Id. at 1-2. Sheet Metal
Workers responded on January 22, 2019, declining to participate in
the dispute resolution process and asserting that Caremark had
forfeited its right to compel that process. Sheet Metal Worker
Dispute Resolution Ltr 1-2, ECF No. 129-80. Caremark responded,
denying Sheet Metal Workers' forfeiture argument, on January 26,
2019. Caremark Dispute Resolution Ltr, ECF No. 129-81. The 90-
day period expired on January 29, 2019, and Sheet Metal Workers
did not respond to Caremark's final letter. See Caremark Mot. to
Dismiss 3. Plaintiffs filed their Motion for Class Certification
on April 29, 2019, and on July 17, 2019, Caremark filed its Motion
for Leave to File Motion under the FAA to Dismiss the Claims of
Sheet Metal Workers, ECF No. 127.

The upshot is that Caremark was added as a defendant on May
4, 2018, engaged in the dispute-resolution process from October
31, 2018 to January 29, 2019, and sought dismissal based on

arbitration on July 17, 2019.[8]  While the down time before and after the dispute resolution process (May to October 2018, and January to July 2019) remains somewhat unexplained, it was not particularly long.  Importantly, prior to its filing this Motion, Caremark's litigation-related activity vis-à-vis Sheet Metal Workers was limited to responding to discovery requests.  Caremark Reply 12.  Caremark further filed its Motion to Dismiss prior to any summary judgment deadline and well in advance of (a yet-to-be-scheduled) trial.  Id. at 13.

Thus, turning to the six factors the Court must consider, the first five factors lean in Caremark's favor.  During the period of delay, Caremark and Sheet Metal Workers participated very little in the lawsuit, no substantive motions were litigated, trial was still far off, Caremark filed no counterclaims against Sheet Metal Workers, and Sheet Metal Workers does not claim that Caremark secured discovery that is unavailable in arbitration.[9]  See FPE

---

[8] While Caremark makes much of putting Sheet Metal Workers on notice of its intent to arbitrate by asserting it as an affirmative defense, this Motion is the first time Caremark properly asserted its right.  See In re Citigroup, Inc., 376 F.3d 23, 27 (1st Cir. 2004) (noting that it is not sufficient to assert in an answer the right to arbitrate as an affirmative defense).

[9] The Court does understand Sheet Metal Workers to argue that CVS conducted discovery that would not have been available at arbitration and that CVS and Caremark have the same attorneys.  See Feb. 27, 2020 Hr'g Tr. 123-24, ECF No. 170.  While the Court is sympathetic to the realities of this situation, it is not confident that Sheet Metal Workers would have found itself in any different of a position had Caremark asserted its arbitration right

Found., 801 F.3d at 29.  Notably, Caremark did not, for instance, file counterclaims against Sheet Metal Workers, serve discovery requests on Sheet Metal Workers, file motions against Sheet Metal Workers, or seek adjudication of any arbitrable issue involving Sheet Metal Workers.  Caremark Reply 12.  Caremark further filed its Motion to Dismiss well in advance of any trial date, and before any other substantive deadlines, aside from class certification.  See FPE Found., 801 F.3d at 29; see also Creative Sols. Grp., Inc. v. Pentzer Corp., 252 F.3d 28, 33-34 (1st Cir. 2001) (holding that the right to arbitrate had not been waived where party moving to compel arbitration had not invoked formal discovery).

On the last of the six factors, Sheet Metal Workers contends that it has been prejudiced by Caremark's dilatory effort to move for arbitration.  In particular, it argues that if it is sent to arbitration now, Sheet Metal Workers will be prejudiced by the need to litigate potential defenses related to statutes of limitations and laches (even assuming that the defenses eventually fail).  Moreover, it contends that Caremark may argue that its claims are barred for failure to comply with the dispute-resolution procedures.  Pls.' Opp'n to Mot. to Dismiss 6-7.  However, the only relevant prejudice is that which is a product of a defendant's failure to timely invoke the arbitration procedure, not a product

---

earlier.  Presumably CVS and Sheet Metal Workers would have engaged in that same discovery.

of arbitration itself.  See In re Citigroup, Inc., 376 F.3d 23, 26 (1st Cir. 2004)).  For that reason, Sheet Metal Workers' claims that it may face new defenses in arbitration (statute of limitations, laches, and failure to comply with dispute-resolution procedures) fail because Caremark already has alleged those affirmative defenses in its Answer.  Caremark Reply 14.

Sheet Metal Workers further argues that it is prejudiced because it did not have the opportunity to add a substitute named plaintiff without an arbitration clause in its relevant agreement; this argument, however, also fails as it is not the product of any alleged delay.  Moreover, named Plaintiffs and the putative class suffer no prejudice because, as discussed below, the Court is not persuaded that the absence of a named plaintiff that contracted with a specific PBM advances Defendants' typicality argument.

Having considered all the relevant factors, the Court concludes that Caremark has not waived its right to arbitration through its litigation conduct.  See FPE Found., 801 F.3d at 29.

### 3.  Claims Subject to Arbitration

Sheet Metal Workers further argues that, even if the Court finds no litigation-conduct waiver, Caremark is still not entitled to arbitrate all of Sheet Metal Workers' claims.  Sheet Metal Workers highlights that the contracts containing the arbitration clause do not cover the entire class period – they are dated January 1, 2011 and January 1, 2015.  Sheet Metal Workers Sur-

Reply 9.  Sheet Metal Workers thus argues that Caremark has no right to arbitrate claims arising prior to January 1, 2011. Further, Sheet Metal contends that it is unclear whether the parties entered into the January 11, 2011 agreement.  Id.

In pertinent part, the dispute resolution provision in the January 1, 2015 contract provides:

> Dispute Resolution.  In the event of a dispute between the parties and prior to commencing any litigation or other legal proceeding, each party shall, by giving written notice to the other party ("Dispute Notice"), request a meeting of authorized representatives of the parties for the purpose of resolving the dispute.

PBSA ¶ 13.16; see also id. ¶ 13.12 (providing that the dispute resolution clause survives termination of the agreement).  Whether this dispute-resolution provision requires the parties to arbitrate disputes arising out of contracts entered prior to or after the January 1, 2015 contract is an issue of arbitrability. The parties have delegated the issues relating to arbitrability to an arbitrator, see PBSA ¶ 13.16 (incorporating the AAA rules), and therefore, these arbitrability questions must be decided by an arbitrator.  See Henry Schein, Inc. v. Archer and White Sales, Inc., 139 S. Ct. 524, 529 (2019) (holding that, where "the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract", even where "the argument

that the arbitration agreement applies to a particular dispute is wholly groundless").

In conclusion, because Caremark has not waived its right to arbitrate Sheet Metal Workers' claims against it through its conduct in this litigation, the Court GRANTS Caremark's Motion to Dismiss.[10]

## B.   Plaintiffs' Motion for Class Certification

Plaintiffs Sheet Metal Workers, Indiana Carpenters, and Plumbers now move to certify the following classes under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure:

> **Nationwide Class.** All health plans that, at any time between November 2008 and February 1, 2016, (1) had Caremark, L.L.C., Express Scripts, Medco, OptumRx, or MedImpact (or any of their predecessors) as their pharmacy benefit managers, (2) paid for generic prescription drugs purchased from CVS that were included in CVS's Health Savings Pass program, and (3) paid for those drugs based on a formula containing Usual and Customary price.

> **Unjust Enrichment Class.** All health plans that, at any time between November 2008 and February 1, 2016, (1) had Caremark, L.L.C., Express Scripts, Medco, OptumRx, or MedImpact (or any of their predecessors) as their pharmacy benefit managers, (2) paid for generic prescription drugs purchased from CVS that were included in CVS's Health Savings Pass program in Arkansas, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Indiana, Iowa, Missouri, New Mexico, New York,

---

[10] Neither party argues that a stay, rather than dismissal, is the more appropriate remedy.  See Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 372 (1st Cir. 2011) (noting that a district court has the discretion to dismiss claims where one party has a right to arbitrate all claims (citing Next Step Med. Co. v. Johnson & Johnson Int'l, 619 F.3d 67, 71 (1st Cir. 2010))).

Oklahoma, and West Virginia, and (3) paid for those drugs based on a formula containing Usual and Customary price.

**Unfair and Deceptive Conduct Consumer Protection Class.** All health plans that, at any time between November 2008 and February 1, 2016, (1) had Caremark, L.L.C., Express Scripts, Medco, OptumRx, or MedImpact (or any of their predecessors) as their pharmacy benefit managers, (2) paid for generic prescription drugs purchased from CVS that were included in CVS's Health Savings Pass program in California, Florida, Illinois, Iowa, Massachusetts, New Jersey, New York, Ohio, and Washington, and (3) paid for those drugs based on a formula containing Usual and Customary price.

**Omissions Consumer Protection Class.** All health plans that, at any time between November 2008 and February 1, 2016, (1) had Caremark, L.L.C., Express Scripts, Medco, OptumRx, or MedImpact (or any of their predecessors) as their pharmacy benefit managers, (2) paid for generic prescription drugs purchased from CVS that were included in CVS's Health Savings Pass program in Illinois, Michigan, Nevada, and New Jersey, and (3) paid for those drugs based on a formula containing Usual and Customary price.

Pls.' Reply 3-4.

Plaintiffs have excluded the following payors from the proposed classes: (1) any governmental payors, including Medicare and Medicaid; (2) any health plans that served on Caremark's Client Advisory Committee since January 1, 2008; (3) any health plans that have had parent, subsidiary, or affiliate relationships with any pharmacy benefit manager at any time since January 1, 2008; and (4) health plans making payments processed by OptumRx after January 29, 2015. They further exclude: (1) CVS, and its management, employees, subsidiaries, and affiliates; and (2) CVS

Caremark and its officers and directors.  See id. (amending the class definition).

### 1.  Legal Standard

In ruling on a motion for class certification, the Court must "undertake a 'rigorous analysis'" to determine whether the putative class satisfies each of the four prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure: numerosity, commonality, typicality, and adequacy of representation.  In re Nexium Antitrust Litig., 777 F.3d 9, 17-18 (1st Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)).  In addition to the Rule 23(a) prerequisites, to be certified, a putative class must demonstrate that it satisfies one of the requirements set forth in Rule 23(b).  Here, Plaintiffs contend that they have satisfied Rule 23(b)(3), that is, that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The Supreme Court has cautioned that Rule 23 "does not set forth a mere pleading standard" but rather, a plaintiff "must affirmatively demonstrate [its] compliance with" the Rule.  Comcast, 569 U.S. at 33 (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).  This inquiry "frequently . . .

'overlap[s] with the merits of the plaintiff's underlying claim.'" Id. at 33-34 (quoting Dukes, 564 U.S. at 351).

Here, Plaintiffs argue that each of the prerequisites of Rule 23 has been met and that the Court should certify the proposed classes accordingly. Defendants disagree, of course, arguing that Plaintiffs fail to satisfy the requirements of Rule 23, and thus, class certification is not appropriate. Specifically, Defendants argue that the named class representatives do not satisfy the typicality and adequacy requirements, the proposed classes are not ascertainable, and Plaintiffs have failed to demonstrate that issues common to the classes predominate over individual issues, as required by Rule 23(b)(3).

### 2.   Numerosity and Commonality

To be certified under Rule 23, the members of a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As a general rule, if the named plaintiffs demonstrate "that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)). The Court concludes that the proposed class – comprising hundreds if not thousands of TPPs – is too numerous to render joinder practical, and thus numerosity is established.

Rule 23(a)(2) requires "questions of law or fact common to the class." A common question is one that is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Dukes</u>, 564 U.S. at 350. "[E]ven a single [common] question will do[.]" <u>Id.</u> at 359 (quotations omitted). The Court is satisfied that a common question exists regarding whether Defendants engaged in a scheme to defraud TPPs by failing to report HSP prices as U&C prices, and accordingly, the commonality prerequisite is also met.

### 3. **Typicality and Adequacy of Representation**

For a class to be certified under Rule 23, the proposed class representatives must demonstrate that they "will fairly and adequately protect the interests of the class[,]" Fed. R. Civ. P. 23(a)(4), and the "claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3).

Named Plaintiffs assert that their claims are typical of the claims of class members because they allege a singular fraudulent scheme: that CVS overcharged class members for drugs by not reporting HSP prices as the drugs' U&C prices. Pls.' Reply 9. Moreover, named Plaintiffs assert they are adequate representatives with knowledge of the claims and no conflicts. <u>Id.</u> at 11-14.

25

Defendants counter that named Plaintiffs are neither typical of the putative class members nor adequate to represent the proposed classes. Specifically, Defendants argue that named Plaintiffs cannot adequately represent health plans that contracted with PBMs with whom named Plaintiffs had no relationship; named Plaintiffs are subject to additional unique defenses; they lack familiarity with the basic elements of their claims; and they had actual knowledge of the alleged scheme. Mem. in Supp. of Defs.' Obj. to Pls.' Mot. for Class Certification ("Defs.' Opp'n") 58-64, ECF No. 133.

**OptumRx and MedImpact.** Defendants contend that because none of the named Plaintiffs contracted with the PBMs OptumRx or MedImpact, they are not suitable to represent putative class members who did. Defs.' Opp'n 6; <u>see also</u> Defs.' Sur-Reply in Opp'n to Pls.' Mot. for Class Certification ("Defs.' Sur-Reply") 22, ECF No. 166-1.[11] Defendants insist that named Plaintiffs have no incentive to develop or present evidence that the specific language about U&C pricing in OptumRx's and MedImpact's contracts support the absent class members' claims. Defs.' Opp'n 60-61. These arguments ring hollow. Named Plaintiffs, represented by a reputable, national plaintiffs-side firm, have every incentive to

---

[11]   Defendants also advance this argument as to Caremark in pressing its Motion to Dismiss. <u>See</u> Feb. 27, 2020 Hr'g Tr. 110:20-111:2, ECF No. 170.   The argument fails for the same reasons it fails as to OptumRx and MedImpact.

develop the claims of those health plans that did contract with OptumRx and MedImpact in order to establish the strongest trial and/or settlement position as a class.  See, e.g., In re Loestrin 24 Fe Antitrust Litig., No. 1:13-MD-2472, 2019 WL 3214257, at *12 (D.R.I. July 2, 2019) (noting that the plaintiffs, represented by the same law firm as the TPPs here, were "in blunt, strategic terms" motivated to pursue the full extent of absent class members' claims "[b]ecause the bigger the claim, the bigger the leverage on [the defendants] and hopefully the bigger the settlement").

Moreover, Defendants' theory of the case on the merits is that "all of the U&C definitions should be interpreted, in light of the uniform industry understanding, to mean that membership program prices like HSP are not U&C prices."  Defs.' Opp'n 30. This focus on industry understanding provides ample motivation for named Plaintiffs to pursue evidence regarding OptumRx and MedImpact, as well as all PBMs more generally.  Thus, the Court is confident that the named Plaintiffs have the incentive to address contract language or other evidence unique to health plans that contracted with these two PBMs.  Any purported conflict arising from different U&C contract terms is merely speculative.  See Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (holding that only fundamental conflicts that "go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement" (citation and quotation omitted)).

**Additional Unique Defenses.** Defendants argue that named Plaintiffs are subject to additional defenses – rendering them atypical – because they have sued in the name of trusts, rather than in the name of their trustees. Defs.' Opp'n 6. Whether named-Plaintiff trusts have the capacity to sue under state law presents an interesting legal question – but not one that undermines their ability to serve as adequate and typical class representatives.

The First Amended Complaint alleges that named-Plaintiff trusts are "employee welfare benefit plan[s]" and "employee benefit plan[s]" as defined in the Employee Retirement Income Security Act ("ERISA"). FAC ¶¶ 9, 11, 13. Named Plaintiffs have staked out the position that they are not traditional trusts, but rather Voluntary Employees Beneficiary Association Plans ("VEBAs"), which are welfare benefit plans under Section 501(c)(9) of the Internal Revenue Code. See Ltr from E. Fagen to K. Hoover 1 (May 4, 2018), ECF No. 144-12. "A VEBA is subject to some aspects of ERISA, but is not considered to be a qualified retirement plan." Id.

It is not clear at this juncture whether ERISA conveys to named Plaintiffs, as VEBAs, the capacity to sue as discussed below. That said, were Defendants to convince the Court on summary judgment that named Plaintiffs do not have the capacity to sue as trusts, it would not undermine named Plaintiffs' ability to serve

as adequate and typical class representatives.  As a remedy in
those circumstances, First Circuit authority favors directing
plaintiff-trusts to substitute their trustees as plaintiffs, not
dismissal of the claims.  See Yan v. Rewalk Robotics Ltd., 973
F.3d 22, 37 (1st Cir. 2020) (stating that Rule 17 "expressly
anticipates the possibility that a complaint might be brought by
someone who turns out not to be the party in interest" and
"expressly admonishes that '[t]he court may not dismiss an action
for failure to prosecute in the name of the real party in interest
until, after an objection, a reasonable time has been allowed for
the real party in interest to ratify, join, or be substituted into
the action'" (quoting Fed. R. Civ. P. 17(a)(3))).

To the extent an employee benefit plan is subject to ERISA,
courts have concluded that ERISA provides it with the capacity to
sue under state law.  See Int'l Union of Bricklayers & Allied
Craftsmen, Local No. 1 of Rhode Island v. Menard & Co. Masonry
Bldg. Contractors, 619 F. Supp. 1457, 1462 (D.R.I. 1985) (Selya,
J.) (construing 29 U.S.C. § 1132(d)(1) as providing employee
benefit plans with the "right . . . to sue and be sued like
corporations and other legal entities, thereby eliminating
artificial state law capacity-to-sue barriers and authorizing
suits brought by funds in situations where there would properly be
jurisdiction" (citing Pressroom Unions-Printers League Income Sec.
Fund v. Cont'l Assurance Co., 700 F.2d 889, 893 (2d Cir. 1983)));

see also *Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 185
F.3d 978, 984 (9th Cir. 1999) (holding that § 1132(d)(1) gives
ERISA plans the capacity to sue where the court otherwise has
jurisdiction); *Labul v. XPO Logistics, Inc.*, No. 3:18-CV-2062
(VLB), 2019 WL 1450271, at *6 (D. Conn. Apr. 2, 2019) (rejecting
a similar challenge to pension funds' appointment as lead plaintiff
in a class action, holding that the funds had capacity to sue under
§ 1132(d)(1)); 29 U.S.C. § 1132(d)(1) ("An employee benefit plan
may sue or be sued under this subchapter as an entity.").

The Second Circuit in *Pressroom* and then-District Judge Selya
in *Menard* specifically spoke to the capacity of ERISA trusts to
bring state law claims in federal court, noting that

> "if a fund became involved in a contract dispute, and
> wished to pursue a state law contract claim, § 1132(d)(1)
> would allow the fund to bring such an action in its own
> name."
> . . .
> And, insofar as § 1132(d)(1) does cede to trust funds
> capacity to sue as entities in their own behalf, it
> satisfies an obvious need.  Conferral of entity status
> on an [employee benefit plan] eliminates an artificial
> impediment to the prosecution of actions by such a fund
> . . . and thereby enhances an important purpose of ERISA:
> furtherance of the stability and integrity of [employee
> benefit plans].

*Menard*, 619 F. Supp. at 1462 (quoting *Pressroom*, 700 F.2d at 893).
Thus, to the extent named Plaintiffs are subject to ERISA, they
would have capacity to sue.  Moreover, Rule 17(b)(3)(A) of the
Federal Rules of Civil Procedure provides that an unincorporated
association "may sue or be sued in its common name to enforce a

substantive right existing under the United States Constitution or laws", and therefore, named Plaintiffs have capacity to pursue their federal RICO claims.  Fed. R. Civ. P. 17(b)(3)(A)).

For these reasons, Defendants' capacity-based argument does not undermine Plaintiffs' ability to serve as adequate and typical class representatives.

**Class Representatives' Lack of Familiarity with Basic Elements of their Claims.**  Defendants next argue that the named Plaintiffs are inadequate class representatives because they are unfamiliar with the basic elements of their claims.  Defs.' Opp'n 6.  Defendants say that, during depositions, the funds' representatives did not know basic facts about the suit and could not speak to the veracity of the allegations.  Id. at 64-65.  The record belies this argument.  Plaintiffs' proposed class representatives have "the minimal degree of knowledge" necessary to satisfy the Rule 23 adequacy requirement.  See In re Pharm. Indus. Average Wholesale Price Litig., 277 F.R.D. 52, 60 (D. Mass. 2011) ("[I]n a complex [pharmaceutical] case such as this, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." (citation and quotation omitted)); In re Advance Auto Parts, Inc., Sec. Litig., No. CV 18-212-RGA, 2020 WL 6544637, at *6 (D. Del. Nov. 6, 2020) ("It is well-settled that a class representative

need only possess a minimal degree of knowledge necessary to meet the adequacy standard." (quoting Roofer's Pension Fund v. Papa, 333 F.R.D. 66, 77 (D.N.J. 2019)). Each named Plaintiffs' 30(b)(6) representative provided a brief and broad overview of his understanding of the case and testified that he relied on the advice of counsel. See, e.g., Sheet Metal Workers Trustee Scott Parks Dep. 40:16-19, ECF No. 144-5 ("My understanding is CVS Caremark inflated their pricing by not incorporating their drug program, and it was not factored into the usual and customary pricing."); Indiana Carpenters Trustee Michael Joseph Lauer Dep. 141:8-11, ECF No. 144-13 (confirming that the representative understood from the Complaint that Carpenters was "suing CVS in this case for not reporting its HSP prices as its U&C prices"); Plumbers Trustee Joseph Ohm Dep. 14:21-25, ECF No. 144-14 (describing the pending claims as addressing "various retail generic drug programs offered at the retail level by various pharmacies").

**Actual Knowledge.**  As explained in more detail below, the Court disagrees that any purported actual knowledge of the HSP pricing scheme on the part of the named Plaintiffs renders them inadequate or atypical class representatives.  The Court is prepared to manage any such knowledge issues with subclasses.

For these reasons, the Court concludes that named Plaintiffs are adequate and typical class representatives for the proposed classes. <u>See</u> Fed. R. Civ. P. 23(a)(3) & (a)(4).

### 4.   Ascertainability

To meet their burden on a motion for class certification, named Plaintiffs must demonstrate, "by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria." <u>Nexium</u>, 777 F.3d at 19 (quoting <u>Carrera v. Bayer Corp.</u>, 727 F.3d 300, 306 (3d Cir. 2013)). Defendants argue that the proposed classes in the instant case are not ascertainable.

### a.   Whether Plaintiffs' Class Definition is Too Vague

Defendants argue that Plaintiffs have used overly vague terms to define the proposed classes of "health plans" and the class exclusions (namely, "governmental payor" and "affiliates") and that Plaintiffs have not provided a reliable methodology for identifying the universe of health plans from electronic claims data. Defs.' Sur-Reply 4; <u>see also</u> Defs.' Opp'n 3, 26-27. The Court disagrees.

The Court is satisfied that the universe of TPPs is identifiable in an administratively feasible manner through requests for production to Caremark and subpoenas to third-party PBMs. <u>See</u> Pls.' Reply 16 n.75. At this juncture, the Court need

only be satisfied that Plaintiffs can execute their plan; they do not need to have the information in hand.   See In re Asacol Antitrust Litig., 907 F.3d 42, 58 (1st Cir. 2018) ("And to determine whether a class certified for litigation will be manageable, the district court must at the time of certification offer a reasonable and workable plan . . . .").

Plaintiffs' expert, Dr. Rena Conti,[12] has detailed her method for excluding pharmacy claims paid by government payors, and, in response to input from Mr. Brett Barlag, Defendants' expert, she updated her CVS Condor Codes (i.e., the CVS data field used to identify the PBM associated with each claim) for identifying and excluding government payors to be more inclusive.   See Expert Report of Rena Conti, ("Conti Report") ¶ 71, ECF No. 123-6; see also Reply Report of Rena Conti, ("Conti Reply") ¶ 47, ECF No. 145-2; In re Loestrin 24 FE Antitrust Litigation, 410 F. Supp. 3d 352, 386, 394, 401 (D.R.I. 2019) (approving a similar methodology for removing governmental payors from the proposed class).

---

[12] Dr. Conti is an Associate Research Director of Biopharma & Public Policy for the Boston University Institute for Health System Innovation & Policy, an Associate Professor at the Boston University Questrom School of Business, Department of Markets, Public Policy and Law, and an Academic Affiliate of Greylock McKinnon Associates.   Expert Report of Rena Conti, ¶ 1, ECF No. 123-6.   She received a B.A. from Kenyon College and a Ph.D. in Health Policy (Economics Track) from Harvard University.   Id. ¶ 5.   Defendants do not dispute her qualifications to offer expert opinion.   They do, however, offer counter expert opinion.

Moreover, Dr. Conti has set forth a method for excluding Caremark's Client Advisory Committee and those health plans with affiliate relationships with PBMs once discovery is completed. See Conti Report 5 n.11; see also Conti Reply ¶ 39 (detailing plans to exclude Caremark's Client Advisory Committee once CVS provides the pertinent data). It strains credulity for Defendants to suggest they do not have access to data on their own Client Advisory Committee and affiliates, and indeed, they have every incentive to come forward with data on Plaintiffs' exclusions, as Mr. Barlag's expert report plainly demonstrates. Thus, the Court is satisfied by a preponderance of the evidence that Plaintiffs have the tools – and Defendants the motivation to sharpen those tools – to precisely identify class members and apply class exclusions.

Plaintiffs have thus established by a preponderance of the evidence that they can identify the universe of TPPs, as well as apply the class definition and class exclusions in an administratively feasible way on a class-wide basis.

           **b.    Identifying TPPs that Contracted for U&C Pricing Terms[13]**

---

[13] To the extent Plaintiffs assert that (challenged) testimonial affidavits and declarations from class members may be used to establish class membership, Pls.' Reply 15 (citing In re Dial Complete Mktg. and Sales Practices Litig., 312 F.R.D. 36, 50 (D.N.H. 2015)), they are incorrect. See In re Asacol Antitrust Litig., 907 F.3d 42, 52-53 (1st Cir. 2018) (rejecting rebutted, testimonial affidavits as proof of injury at class certification).

At the crux of this suit is the allegation that CVS failed to report its HSP prices as its U&C prices for eligible generic drugs, and as a result, putative class members paid more than they should have. Thus, to fall within the putative class, a TPP or health plan must have been entitled to "lower-of U&C pricing" (hereinafter, "lower-of pricing") during the class period. Lower-of pricing provides that, for specified prescription drugs, a TPP will pay the lowest of several pricing metrics, often including the U&C.[14] Pls.' Mot. 4-5.

While many TPP/PBM and CVS/PBM contracts provided for lower-of pricing during the class period, some did not. See, e.g., Conti Reply ¶¶ 46, 48 (updating her damages calculation to "exclude[] claims identified by Mr. Barlag that may not have had U&C in the lower-of pricing formula"). Complicating matters, some TPPs had different contracts over the course of the class period, which in turn may have contained different pricing provisions and covered different prescriptions. Defendants highlight Sheet Metal Workers as an example: "For part of the class period, Sheet Metal didn't get U&C pricing at all. For part of the class period, it did. And for part of the class period, it got U&C for some prescriptions

---

14 ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████

but not other[s] . . . ." Feb. 27, 2020 Hr'g Tr. 43:16-19. The parties forecast that there may be upward of 40,000 TPP contracts. Id. at 49-50.

Seizing on this, Defendants next argue that there is no manageable way to identify which health plans or TPPs paid for HSP drugs based on a formula that incorporates U&C as a pricing metric. Defs.' Sur-Reply 1. Instead, they say, to determine class membership, one would need to review thousands of contracts. Defs.' Opp'n 3. To do so, Defendants' expert, Brett Barlag, states that "one would likely need to (1) link the individual prescription transactions to the individual TPP associated with that transaction and (2) review the contract between the PBM and that TPP to determine whether the contract entitled the TPP to U&C pricing – and, if so, for what time periods." Decl. of Brett E. Barlag ("Barlag Decl.") ¶ 119, ECF No. 131-1.

Plaintiffs counter that the process doesn't need to be that complicated. They say that class members can be identified from the PBM/TPP contracts and existing PBM data. Pls.' Reply 15-16 (citing Defs.' Opp'n 3; Conti Reply ¶¶ 10-17); see also Conti Reply ¶ 11 (stating that "PBMs maintain electronic claims data for each TPP and electronically store generic price algorithms" that could be used to "identify whether a TPP's generic pricing algorithm contained the U&C price as a term"). Plaintiffs would develop and deploy a computer program to identify whether a TPP's generic

pricing algorithm contained the U&C price as a term, and if it did, to determine whether that TPP had paid for any HSP drugs at CVS during the class periods. Conti Reply ¶ 11. According to Plaintiffs, any TPPs that satisfy these two conditions and do not fall into a class exclusion are properly included in the putative classes. Id. If their classes are certified, Plaintiffs will seek the information through requests for production to Caremark and document subpoenas to the third-party PBMs. Pls.' Reply 16 n.75; see also Conti Reply ¶¶ 12-13 (confirming a data field in the Caremark/Sheet Metal Workers data containing a variable that can be used to identify price basis by which a claim is adjudicated, such as U&C price); Expert Report of Catherine Graeff 2, ECF No. 129-2 (noting that the NCPDP developed the Universal Claim Form in 1980 in an effort to standardize pharmacy benefit claims and that pharmacies and TPPs contract for which data fields on the UCF shall be filled out for claims adjudication).

As a fallback position, if the PBMs fail to produce the requisite data, Plaintiffs also offer to review each of the contracts – estimated to number upwards of 40,000 – for lower-of U&C pricing provisions. See Conti Reply ¶ 14; Feb. 27, 2020 Hr'g Tr. 19-20. Under this method, Plaintiffs would identify PBM/TPP contracts with the U&C price included in the generic pricing formula. Once identified, Plaintiffs would review the PBM claims data to confirm that the TPP paid for an HSP drug purchased at CVS

during the class period.  Conti Reply ¶ 15.  Dr. Conti's team reviewed the 450 contracts in its possession from Caremark, Express Scripts, MedImpact, and OptumRx to test this method, and confirmed they could determine whether each contract indicated "presumptive class membership."  Id. ¶ 16.

After carefully reviewing the expert reports and considering Plaintiffs' proposed methodology, the Court is satisfied that Plaintiffs have demonstrated an administratively feasible method by which to determine which TPPs were entitled to lower-of U&C pricing during the class period.  At bottom, whether a health plan or TPP is a member of the proposed class is objectively ascertainable from either documents (i.e., contracts) or datasets. This case is clearly distinguishable from, for example, the landmark case of In re Asacol, 907 F.3d at 51-53.  In Asacol, class membership depended on brand loyalty, which was only knowable by questioning a putative class member.  Id.  Here, in contrast, class membership can be determined either from "identify[ing] whether a TPP's generic pricing algorithm contained the U&C price as a term," Conti Reply ¶ 11, or an objective contract review.[15]   Thus,

---

[15] The Court is not convinced that any differences in the contracts' U&C pricing provisions render this exercise unmanageable.  To the extent the parties need to litigate whether certain TPPs' contract language entitled them to U&C pricing, Defs.' Opp'n 23 & n.6, this can be done in subclasses.  If Defendants have actual proof that some contracts are ambiguous (which the Court understands to not be Defendants' primary merits position) the Court will proceed to develop subclasses to litigate

Plaintiffs' proffered methodology presents a workable plan to ascertain class membership from objective criteria. See Matamoros v. Starbucks Corp., 699 F.3d 129, 139 (1st Cir. 2012) ("For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." (quoting 5 James Wm. Moore et al., Moore's Federal Practice § 23.21[3][a] (3d ed. 2012))); see also Asacol, 907 F.3d at 52; Byrd v. Aaron's Inc., 784 F.3d 154, 171 (3d Cir. 2015), as amended (Apr. 28, 2015) (stating that "'the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification'" because "[t]o hold otherwise would seriously undermine the purpose of a Rule 23(b)(3) class to aggregate and vindicate meritorious individual claims in an efficient manner" (quoting Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 539–40 (6th Cir. 2012))).

The cases cited by Defendants do not convince this Court otherwise. In Skelaxin, the district court concluded that the class was not ascertainable where class member identification required "individual inquiry into contracts covering millions of [prescription] purchases" and the putative class had "not

---

individual issues. The Court always has the option of decertifying a class where such an inquiry proves overwhelming; that said, at this point, Plaintiffs have met their burden in establishing that the classes are ascertainable.

identified what in each transaction would be required to determine" class membership.  In re Skelaxin (Metaxalone) Antitrust Litig., 299 F.R.D. 555, 570, 572 (E.D. Tenn. 2014).  That is not the case here.  As recited in detail above, Plaintiffs have demonstrated that they can employ either an algorithm or contract review to determine whether a TPP paid for drugs during the class period using U&C pricing.

In Manson, the second case Defendants rely upon, the court held that the putative class was not ascertainable because the public records proposed by the plaintiffs established only "the possibility that a particular homeowner might fall within the class."  Manson v. GMAC Mortg., LLC, 283 F.R.D. 30, 38 n.26 (D. Mass. 2012).  Here, Plaintiffs' proposed methodology will be able to identify class members with a far greater degree of certainty.  Thus, the Court concludes that Plaintiffs have set forth an administratively feasible plan for ascertaining the contours of their proposed class.

### 5. Predominance

Under Rule 23(b)(3), a putative class must demonstrate that common issues predominate over individual issues.  Asacol, 907 F.3d at 51 (citing Amgen, Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013)).  Class members' "claims must depend upon a common contention."  Dukes, 564 U.S. at 350.  "That common contention, moreover, must be of such a nature that it is

capable of classwide resolution — which means that determination
of its truth or falsity will resolve an issue that is central to
the validity of each one of the claims in one stroke." Id. The
Supreme Court emphasized that "[w]hat matters to class
certification . . . is not the raising of common 'questions' —
even in droves — but rather, the capacity of a class-wide
proceeding to generate common answers apt to drive the resolution
of the litigation." Id. (quoting Richard A. Nagareda, Class
Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97,
132 (2009)). Pervasive "[d]issimilarities within the proposed
class" may serve to prevent "the generation of common answers."
Id. (quoting Nagareda, 84 N.Y.U. L. Rev. at 132). To find
predominance, the district court must determine that it can dispose
of any differences among class members' claims "in a manner that
is not 'inefficient or unfair.'" Asacol, 907 F.3d at 51 (quoting
Amgen, 568 U.S. at 469).

In Asacol, the First Circuit described inefficiency "as a
line of thousands of class members waiting their turn to offer
testimony and evidence on individual issues." Id. The flip side
of this inefficiency is unfairness, illustrated well as "an attempt
to eliminate inefficiency by presuming to do away with the rights
a party would customarily have to raise plausible individual
challenges on those issues." Id. at 51-52. Thus, where a putative
class action raises individual issues for adjudication, a class

may be certified only if "the proposed adjudication will be both 'administratively feasible' and 'protective of defendants' Seventh Amendment and due process rights.'"   Id. at 52 (quoting Nexium, 777 F.3d at 19).

To this end, and before certifying a class, a district court must "offer a reasonable and workable plan for how that opportunity will be provided in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues."   Id. at 58; see also In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008) ("Under the predominance inquiry, 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" (quoting Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000))).

Defendants argue that common issues do not predominate because the differences between class members - in their contracts, their purported knowledge of the alleged fraud, and their payment structures - would render a class action "inefficient" and/or "unfair."   Defs.' Opp'n 27-28 (quoting Asacol, 907 F.3d at 51).

Here, the Court is satisfied that the common issues to be tested by the proposed classes - namely, whether CVS fraudulently failed to include its HSP prices in its U&C pricing - will provide common answers.   See Dukes, 564 U.S. at 350 (emphasizing that a

Rule 23(b)(3) action must have the capacity to produce common answers); see also Corcoran v. CVS Health Corp., 779 F. App'x 431, 433 (9th Cir. 2019) (holding, in consumer suit with similar allegations against CVS, that there existed triable issue of fact as to whether contract language supported finding that PBM contracts required CVS to include HSP prices as U&C prices in consumer class action).  Thus, after careful consideration, the Court concludes that common issues predominate, and as discussed further below, any issues relating to subsets of classes – in particular, those relating to contract interpretation, knowledge, statute of limitations, and arbitration issues – can be adjudicated in an administratively feasible manner with the use of subclasses.[16]

### a.  Injury

With respect to injury, Defendants contend that several issues must be litigated individually, and thus individual issues predominate over common ones.  The Court takes them up seriatim.

### i.  Contract Interpretation

Defendants contend that common issues do not predominate because there are too many issues requiring individual contract

---

[16] Indeed, Defendants themselves compiled a chart purporting to reflect the individual issues at play in 39 MedImpact contracts proposed in this case.  See Defs.' App'x B, ECF No. 133-1.  In doing so, they also demonstrate that each of these issues is capable of resolution before trial.

interpretation.   For a TPP to have sustained injury under the alleged scheme at issue, it must have paid an overcharge when CVS failed to include HSP prices in its U&C prices.   In Defendants' view, that determination is dependent on the drug-pricing formula dictated by individual contracts, including generic effective rate discounts ("GERs").   To sort this out, they contend, one must review thousands of individual contracts between CVS and PBMs, as well as between the five PBMs at issue and the putative class members.   What is more, some putative class members had multiple PBMs and/or multiple contracts with a single PBM during the class period.   Defs.' Opp'n 36.

Assuming that the parties do not convince this Court on summary judgment that either all TPPs or no TPPs were entitled to receive HSP prices as U&C prices, the contract language will make a difference.   See Corcoran, 779 F. App'x at 433 (holding that there existed a triable issue of fact as to whether the contract language supported a finding that the PBM contracts required CVS to include HSP prices as their U&C prices in a consumer class action).   The parties have forecasted that each will argue at summary judgment that industry standard dictates the result here: Defendants will argue that "when the varying U&C price definitions . . . are interpreted in light of industry understanding, the only conclusion is that the U&C definitions do not include membership program prices", Defs.' Sur-Reply 9

(emphasis omitted), and Plaintiffs will argue that HSP prices were – without exception – U&C prices per industry standard, see Pls.' Reply 1.

While this merits question is not before the Court now, contract review – by human or computer – appears inescapable. First, some TPPs have no colorable claim to being entitled to lower-of U&C pricing, and thus must be removed from any putative classes, as discussed above. Second, those TPPs entitled to lower-of U&C pricing for some or all of the class period may or may not have been entitled to receive the HSP price as its U&C price. Some contracts expressly exclude membership programs from U&C prices, some are silent, and still others may expressly include or exclude discounts. If Defendants do not prevail on summary judgment, some or all of these differences in contract language will likely present fact issues for trial. See Corcoran, 779 F. App'x at 433.

There may be upwards of 40,000 contracts, and while the relevant language in each contract must be isolated to ensure that Defendants are afforded the opportunity to litigate the merits as it pertains to the various TPPs, see Asacol, 907 F.3d at 53, there will be a small universe of answers to the common question posed. In the Court's view the contract language can be sorted into various buckets and litigated group by group. See Byrd v. Aaron's Inc., 784 F.3d 154, 171 (3d Cir. 2015), as amended (Apr. 28, 2015) ("[T]he size of a potential class and the need to review individual

46

files to identify its members are not reasons to deny class certification . . . ." (quoting Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 539–540 (6th Cir. 2012))); cf. Asacol, 907 F.3d at 53 (denying class certification to a putative class that included brand loyal consumers, in part because the plaintiffs had not been "provided any basis from which [the court] could conclude that the number of affidavits to which the defendants will be able to mount a genuine challenge is so small that it will be administratively feasible").

In sum, Plaintiffs have demonstrated through their expert that they are capable of using algorithms, or undertaking contract-by-contract review, to identify the universe of lower-of U&C pricing. Plaintiffs have further demonstrated that they can organize the relevant contract language into various buckets or subclasses for the jury to consider. It is not fathomable (or supported by evidence) that the putative class TPPs and the at-issue PBMs drafted 40,000 contracts with 40,000 distinct lower-of-U&C pricing provisions. Cf. Corcoran, 779 F. App'x at 434 (noting, in addressing typicality, that there was no "meaningful differences in the PBM agreements that would result in the interests of the class representatives being misaligned with those of the absent class members"). Instead, the record evidence suggests that some of the U&C language expressly included discount programs, and other language was silent on discount programs.

Assuming the case proceeds to trial, a jury may find that some, none, or all of the class TPPs' contracts entitled them to HSP pricing, but this factual determination is not as overwhelming as Defendants have suggested.  See Asacol, 907 F.3d at 61 (Barron, J., concurring) (stating that Rule 23(b)(3) "'does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof' but only to show that there is no 'reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate'" (quoting Nexium, 777 F.3d at 21)).

### ii.   Actual Knowledge

Defendants next argue that individualized issues of knowledge defeat class certification because Plaintiffs' claims are undermined where class members were aware that U&C pricing did not include HSP prices.  Defs.' Opp'n 41.  They argue that some health plans knew they were not receiving HSP prices, pointing to evidence purporting to demonstrate this for two of the three named plaintiffs.  Defs.' Opp'n 4.  Defendants argue that actual knowledge both undermines injury for each claim in the Complaint and provides an affirmative defense.  To mount this defense, Defendants say, requires an individualized review of class-member communications and other class-member-specific evidence.  Defs.' Opp'n 39; Defs.' Sur-Reply 11.  Alongside most of Defendants' arguments, the road leads back to Asacol:  if some members of the

putative class were uninjured because they had actual knowledge of the underlying fraud, Defendants must have the opportunity to challenge and remove those uninjured class members in an administratively feasible and efficient fashion. Defs.' Sur-Reply 12-13 (citing Asacol, 907 F.3d at 53-54).

While this argument is compelling at first blush, upon closer review, Defendants have not put forth evidence of actual knowledge as to the named Plaintiffs, nor the broader putative class, sufficient to block Plaintiffs' bid for class certification.

First, the evidence presented as to the named Plaintiffs is notably thin.  With respect to Sheet Metal Workers, Defendants offer a June 2009 email chain between Dan Tibus, a Caremark account executive, and Sheet Metal Workers' prescription benefits consultants "regarding prescription benefits, including drug prices."  Decl. of Daniel Tibus ¶ 4, ECF No. 131-9; Email from Daniel Tibus to Rick Gerasta (June 23, 2009) ("Tibus Email"), at CAREMARKSM_0006154, ECF No. 131-43.  In this email, the account manager explained to the outside consultants that the HSP "does not integrate with the RX benefit. . . . This retail program was initially launched as a benefit for uninsured customers.  Naturally, consumers with insurance use it as a substitute if the Health Savings Pass provides a richer benefit than their employer plan."  Tibus Email at CAREMARKSM_0006154.  In addition, Defendants point to evidence that one of the Sheet Metal Workers trustees

49

signed up for HSP for himself.   That trustee's deposition makes plain that he did not recall signing up for the HSP, did not recall whether it required a membership fee, and did not recall the pricing under the program.   See Michael Jones Dep. 83:3-12, ECF No. 129-21 ("I couldn't even tell you if I signed up, but I think I did.").

It is not clear at all to the Court that this is sufficient to conjure an issue of material fact on the issue of knowledge. Defendants offer nothing to suggest that the knowledge of Sheet Metal Workers' outside consultants is imputable to the health plan, nor is there any mention in the email chain of U&C price or CVS's failure to report its HSP price as its U&C price.   What is more, there is nothing in this record suggesting that a reasonable juror could conclude from this sole HSP-enrolled trustee's deposition that he had knowledge of the alleged fraudulent scheme simply because he signed up for the HSP program.   See Corcoran v. CVS Healthcare Corp., Case No. 15-cv-03504-YGR, 2017 WL 3873709, at *7 (N.D. Cal. Sept. 5, 2017), rev'd on other grounds Corcoran v. CVS Health Corp, 779 Fed. App'x 431 (9th Cir. 2019) ("[T]he evidence proffered by defendants does not sufficiently demonstrate that potential [consumer] class members, even those who were members of HSP, knew of the allegedly deceptive practices. . . . Putative class members likely did not understand the relationship between

the pharmacy's U&C and what the pharmacy charges them, which may be at times less than or more than the HSP program prices.").

The same is true of Indiana Carpenters.  In support of its contention that Indiana Carpenters had actual knowledge of the alleged fraud, Defendants offer a single email from Indiana Carpenters' MedCo account executive to Indiana Carpenters' client services manager.  The email contains broad talking points about generic prescription drug programs ("such as Walmart & Kmart"), and a notice providing more detail.  See Email from Bart Gerber to Irene Newman (Apr. 2, 2010), ECF No. 129-64.  In that notice, MedCo account executive, Bart Gerber, never once mentions CVS or the HSP program specifically; instead, the notice states:

> Medco has found that the low cost generic programs vary
> from retailer to retailer; some programs are offered
> free of charge to patients whereby the low cost generic
> price can be submitted via the U&C field through Medco's
> TelePAID system (for example, the $4 Wal*Mart generic
> program), other programs include membership fees to gain
> access to a member-only price that differs from the
> pharmacy's U&C price (for example the program offered by
> Walgreens)[.]

Id.  The client services manager did not understand from the email that CVS was not reporting the HSP price as the U&C price, and more generally, she had no understanding of the role U&C prices played in the claims adjudication process or how drug prices were set.  See, e.g., R. Irene Newman Dep. 35:15-36:18, 52:10-53:7, ECF No. 144-8; see also Lauer Dep. 89:3-21; 90:22-24, ECF 145-8 (indicating that person copied on email did not understand the

meaning of "a member-only price that differs from the pharmacy's U&C price" and that he did not know what the email sender and recipient "were talking about"); David Tharp Dep. 60:12–61:12, ECF No. 144-10; William Nix Dep. at 101:11-24, 102:25–103:5, ECF No. 144-11.  Simply put, there is no evidence that anyone at Indiana Carpenters had actual knowledge of the alleged scheme here.

Second, even with all the incentive to do so, Defendants offer very little to suggest that a significant number of putative class members other than the named Plaintiffs had actual knowledge of the alleged scheme.  Defendants offer evidence suggesting that no more than a dozen TPPs were informed they had not received HSP prices as their U&C pricing.  See Defs.' Opp'n 15-17, 42-43 (setting forth summary of eleven TPPs' knowledge); Pls.' Reply 32, 34-35 (noting that, of the TPPs Defendants have identified, five are not class members for other reasons).

As in any action in which "determining whether any given [class member] was injured (and therefore has a claim) turns on an assessment of the individual facts[,]" Defendants here must be afforded "the opportunity to challenge each class member's proof that the defendant is liable to that class member." Asacol, 907 F.3d at 55 (citing Dukes, 564 U.S. at 366-67).  But the need to assess individual circumstances – here, with respect to individual TPPs' knowledge of the facts underlying the alleged fraud – does not alone foreclose class certification.  Instead, class

certification is precluded only where "such challenges are reasonably plausible in a given case" and "the plaintiff cannot demonstrate that allowing for such challenges in a manner that protects the defendant's rights will be manageable and superior to the alternatives." Id. (citing Fed. R. Civ. P. 23(b)(3)). In the instant case, Plaintiffs have demonstrated that successful challenges to individual TPPs based on actual knowledge will be few and far between. To the extent these challenges present genuine issues of material fact, the Court will manage them in subclasses and afford Defendants the opportunity to challenge the class member(s)' proof. See Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 60 (1st Cir. 2013) ("Moreover, the district court has many tools at its disposal to address concerns regarding the appropriate contours of the putative class, including redefining the class during the certification process or creating subclasses." (citing Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 197 (N.D.N.Y. 2009))).

That said, the Court does not anticipate being bogged down with requests to perform thousands upon thousands of depositions to explore issues of knowledge with each class member. There can be no question that there is room for large classes under Rule 23. See Asacol, 907 F.3d at 59 (Barron, J., concurring) ("Rule 23 was clearly written to facilitate large consumer class actions." (citations omitted)). Defendants have access to their own emails

and documents.  If they present colorable claims of knowledge, the Court will entertain those concerns, thus protecting Defendants' Seventh Amendment rights.  However, the Court will not allow "arguments woven entirely out of gossamer strands of speculation and surmise to tip the decisional scales in a class certification ruling."  See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000) (citing Zeigler v. Gibralter Life Ins. Co., 43 F.R.D. 169, 173 (D.S.D. 1967)); see also id. ("[W]hen the court supportably finds that an issue which, in theory, requires individualized factfinding is, in fact, highly unlikely to survive typical pretrial screening . . . , a concomitant finding that the issue neither renders the case unmanageable nor undermines the predominance of common issues generally will be in order.").[17]

Defendants also argue that individual knowledge issues will predominate insofar as they dictate when class TPPs' statute-of-limitations periods began to run.  The First Circuit has made clear that affirmative defenses, such as statute-of-limitations

---

[17] To the extent Defendants argue that CVS's alleged fraudulent pricing scheme cannot be the proximate cause of overpayment under the civil RICO statute because it did not "directly" lead to the violation, Defs.' Opp'n 39, the Court rejects the argument.  As pleaded, and given the record before the court on class certification, Plaintiffs have plainly established that the putative class members were "the primary and intended victim[s] of the scheme to defraud, and that the injury suffered was a foreseeable and natural consequence of the fraudulent scheme."  In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 51, 58 (1st Cir. 2013) (internal quotations and citations omitted).

defenses, "are appropriate for consideration in the class
certification calculus." Mowbray, 208 F.3d at 295. That said,
the First Circuit has explained:

> Although a necessity for individualized statute-of-
> limitations determinations invariably weighs against
> class certification under Rule 23(b)(3), we reject any
> per se rule that treats the presence of such issues as
> an automatic disqualifier. In other words, the mere
> fact that such concerns may arise and may affect
> different class members differently does not compel a
> finding that individual issues predominate over common
> ones.

Id. at 296 (citing 5 James Wm. Moore et al., Moore's Federal
Practice § 23.46[3], at 23-210 to -211 (3d ed. 1999)); Smilow v.
Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)
("[W]here common issues otherwise predominated, courts have
usually certified Rule 23(b)(3) classes even though individual
issues were present in one or more affirmative defenses." (citation
omitted)). In Mowbray, the First Circuit affirmed the district
court's certification of the class despite "possible differences
in the application of a statute of limitations to individual class
members" because the district court properly engaged in a "case-
specific analysis". 208 F.3d at 296-97 (quotation and citation
omitted). As in Mowbray, the Court is confident that, here, "most
class members' claims [are] unaffected by possible limitations
defenses", Mowbray, 208 F.3d at 297 (citation omitted), and
accordingly, that the application of individual statute-of-
limitation defenses do not bar certification. The Court will take

full advantage of its authority to "place class members with potentially barred claims in a separate subclass or exclude them from the class altogether" where "evidence later shows that an affirmative defense is likely to bar claims against at least some class members". Smilow, 323 F.3d at 39-40 (internal citations omitted).

### iii. Arbitration Clauses

Defendants aver that many absent class members may be subject to arbitration clauses in their PBM/TPP contracts. If a class is certified, Defendants state they will move to dismiss or to compel arbitration, causing individual issues to predominate. Defs.' Opp'n 53-54 & n.29. Importantly, these contracts are between TPPs and PBMs – CVS is a party to none of these contracts, and Caremark is only a party where the contracting PBM was Caremark. See id. at 5; Pls.' Reply 37-38.

First, in arguing that CVS will move to compel arbitration under any PBM/TPP contracts containing an arbitration clause, Defendants overstate the number of absent class members subject to mandatory arbitration. Under First Circuit precedent, CVS – as a nonparty and nonsignatory to these contracts – would only succeed at compelling a TPP to arbitrate as a third-party beneficiary where it could "demonstrate with 'special clarity that the contracting parties intended to confer a benefit on'" CVS. Hogan v. SPAR Grp., Inc., 914 F.3d 34, 39 (1st Cir. 2019) (quoting McCarthy v. Azure,

22 F.3d 351, 362 (1st Cir. 1994)).   It is not enough for a nonsignatory to have some resulting benefit from "a signatory's exercise of its contractual rights".   Id. at 40 (quoting Ouadani v. TF Final Mile LLC, 876 F.3d 31, 39 (1st Cir. 2017)).   Instead, the PBM/TPP contract must "mention [or] manifest an intent to confer specific legal rights upon" CVS.   Id. (quoting InterGen N.V. v. Grina, 344 F.3d 134, 147 (1st Cir. 2003)) (alteration in original).

A TPP would further only be equitably estopped from avoiding arbitration under narrow circumstances.   "[F]ederal courts 'have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues . . . to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Id. at 40-41 (quoting Ouadani, 876 F.3d at 38).   The First Circuit has held that arbitration with a nonsignatory can be compelled where the parties to the contract agreed to arbitrate any action "arising out of, or relating in any way to" the agreement. Sourcing Unlimited, Inc. v. Asimco Int'l, Inc., 526 F.3d 38, 48 (1st Cir. 2008.   Where contract language explicitly limits the agreement to disputes between the signatories and there is no evidence of the signatory's intent to arbitrate with the nonsignatory, arbitration cannot be compelled.   See Hogan, 914 F.3d at 42 (finding "no legal basis for forcing [signatory] to arbitrate his claims against [nonsignatory] when he demonstrated no intent to do so").

Plaintiffs point to the arbitration clauses of over twenty PBM/TPP contracts that explicitly state that the parties did not intend to create rights for third parties.  See Pls.' Reply 37 n.179 ("This agreement . . . is intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights, and this Agreement does not confer any such rights, upon any other third party . . . ." (quoting Service Agreement, at MI-SM_00000539, ECF No. 145-22)).  No one suggests that the PBM/TPP contracts created any legal rights or duties for CVS; indeed, CVS had its own contracts with the PBMs.  Thus, CVS finds support in neither the third-party beneficiary doctrine nor the equitable estoppel doctrine.

Second, that some putative class members may be subject to mandatory arbitration is not a bar to class certification.  See Smilow, 323 F.3d at 39 (noting that, "where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses"); see also Walsh v. Gilbert Enters., No. CV 15-472-WES, 2019 WL 1206885, at *4 (D.R.I. Mar. 14, 2019) (holding that named plaintiff – whose contract did not have an arbitration clause - was typical of class that included individuals subject to arbitration clauses because common issues otherwise predominated).  Defendants may pursue those rights under motions to compel

arbitration and/or dismiss following class certification, and the Court will employ the procedural tools at its disposable to exclude those TPPs from the class or place them in a subclass.  For these reasons, the Court is confident that the existence of arbitration clauses in some PBM/TPP contracts will not result in individual issues predominating over common issues.

### b.   Generic Effective Rate

Defendants argue that individual issues further predominate because many PBM/TPP contracts contain "aggregate discount guarantees" (also called "generic effective rate guarantees" or "GERs") that, in their view, negate injury in fact and/or any damages from alleged overstated U&C prices.  Defs.' Opp'n 4, 45–48.  A common PBM/TPP contract provision, a GER clause guarantees that a TPP will receive an average percentage discount off a benchmark price (e.g., average wholesale price) for all drugs in a category (e.g., all generic drugs) for a specified period of time (e.g., one calendar year).  Expert Report of Alan Sekula ("Sekula Report") ¶ 10, ECF No. 129-4.  In practice, it looks something like this:  a PBM guarantees its contracting TPP that it will receive an average discount of 70% off the average wholesale price ("AWP") for generic prescription drugs for calendar year 2021.  For any one generic drug, the TPP's discount may be higher than 70% and for any other, lower.  But in the aggregate, the health plan is entitled to a 70% (or greater) discount off AWP for

generic drugs.  Id.  In this example, if the TPP paid more than 30% of AWP for the generic drugs purchased in 2021, the PBM would issue a reconciliation payment to make up the difference.  Id. ¶ 15.

Defendants offer Sheet Metal Workers as an example; once Sheet Metal Workers' 2014 GER reconciliation is considered, it incurred no damages in 2014, a stark contrast to the $21,498 alleged. Defs.' Opp'n 52; Feb. 14, 2020 Hr'g Tr. 69-70; see also Barlag Decl. ¶¶ 137-38.[18]  In such situations, Defendants contend, health plans would be left without damages.  Furthermore, Defendants suggest that removing these uninjured putative class members – as required by Asacol - would be unduly laborious, and individual issues therefore predominate.  See Defs.' Opp'n 49-52.

Plaintiffs retort that GERs are not relevant to injury; at most, they say, GERs may offset damages for some putative class members.  For this proposition, Plaintiffs point to antitrust law where injury accrues the moment an overcharge is incurred, regardless of whether it is later offset.  See In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015); see also Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 267-68 (1992) (concluding

---

[18] To fall within one of the class definitions, a TPP need only have suffered an injury during the class period; a TPP may not have incurred damages in any one single calendar year, but still aptly be included in one of the classes for injury incurred during another year covered by the class period.

that Congress used the same words in drafting RICO as it had in the already-enacted Sherman Act and Clayton Act, and thus the Court could "only assume it intended them to have the same meaning that courts had already given them" (citation omitted)).

The Court concludes that, on this record, GERs are not relevant to putative class TPP injury in fact. Still, as discussed below, Plaintiffs must demonstrate an administratively feasible way to identify and apply GER offsets to damages in order to ensure that the proposed classes' damages calculations are accurate, and Defendants' due process rights are honored.

First, PBMs do not make GER reconciliation payments at the transaction level; instead, GER reconciliation payments are calculated in the aggregate, across a subset of drugs, for a defined period, after claims have been adjudicated and paid. Conti Reply ¶ 54; see also Sekula Report ¶ 15. Thus, this arrangement is factually distinguishable from those in which an injury offset could be traced back to a specific transaction. See Barlag Decl. ¶ 136 (recognizing that GERs are not applied at the transaction level, but rather in the aggregate, by noting that "[e]ven if one assumes submitting the HSP price as the U&C price would have changed the amount paid by Sheet Metal on an individual claim, it does not change the aggregate annual amount paid by Sheet Metal across all claims").

The First Circuit authority dictates that a RICO claim has not accrued where injury to a plaintiff's property is speculative. DeMauro v. DeMauro, 115 F.3d 94, 97-98 (1st Cir. 1997). In DeMauro, plaintiff-wife sued defendant-husband, and others, alleging that they had fraudulently concealed separate and marital assets during protracted and contentious divorce proceedings. Id. at 95. The First Circuit held that any injury to the plaintiff's legal claim had not accrued because it was too speculative, as no one yet knew whether the alleged concealment would diminish her award in the divorce proceeding. Id. at 97 (citing Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990)). The First Circuit noted concern that "it is hard to see how a court would calculate damages now, given the dual uncertainties of what [the plaintiff] will be awarded and how it will be affected by concealment." Id. (citing First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994)). This concern did not arise, however, where the plaintiff alleged concealment of property in which she held a present ownership interest; for that property, the court concluded she had alleged injury under RICO. Id. at 98 (citing Grimmett v. Brown, 75 F.3d 506, 516-17 (9th Cir. 1996)).

Here, each alleged injury stems from an overcharge paid by a TPP as a result of an inflated U&C price. The injury fully accrued when the claim was adjudicated and paid. At that point, the only

loose end was the possibility of an aggregate offset in the form of a GER reconciliation payment. "[T]he injury has occurred and is known, but it is speculative whether the damages might be reduced or even eliminated"; this is not a case in which "the injury is speculative because it is not known whether it will occur at all" due to some future event that may or may not occur. See Grimmett, 75 F.3d at 517; see also DeMauro, 115 F.3d at 97; cf. Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp., 617 F.3d 54, 61–62 (1st Cir. 2010) ("Fairly viewed, that claim does not suggest that the trustees have alleged a speculative injury, the existence of which depends upon future events that may or may not occur. Rather, the claim is that a future event may change the type of remedy available to redress an existing injury. Consequently, it is the future event, not the trustees' injury, that is speculative.").

Defendants' cited cases do not counsel otherwise, as each involves speculative, future events that may undermine the purported RICO injury. See, e.g., Maio v. Aetna, 221 F.3d 472 (3d Cir. 2000) ("There is no factual basis for appellants' conclusory allegation that they have been injured in their 'property' because the health insurance they actually received was inferior and therefore 'worth less' than what they paid for it."); In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig., 155 F. Supp. 2d 1069, 1091 (S.D. Ind.), on reconsideration in part, No. MDL NO.

1373, 2001 WL 34691976 (S.D. Ind. Nov. 14, 2001), <u>rev'd on other</u> <u>grounds</u> 288 F.3d 1012 (7th Cir. 2002) ("RICO affords a monetary remedy only to plaintiffs who have actually realized the diminished value or experienced product failure, and not to those who allege a risk (or even a probability) of such loss.").

The Court is satisfied that, on this record, Plaintiffs' injury from overcharge accrued at the time of payment.

Second, regardless of whether the GER reconciliation payments go to injury or damages, Defendants will get their day in court to meaningfully challenge the effect of GER payments on class damages. In the wake of <u>Asacol</u>, the Court can be confident of a few things. A class may be certified without each putative class member first establishing standing, and Rule 23 does not require the district court to establish injury in fact for each class member prior to class certification.   <u>Asacol</u>, 907 F.3d at 58.   But, Defendants must be afforded a meaningful opportunity to challenge injury in fact and pick off uninjured class members before or at trial.   <u>Id.</u> And there is no question, post-<u>Asacol</u>, that a district court may not certify a class where a body of uninjured class members stand to recover, regardless of whether the defendants are found liable for the aggregate damages amount.   <u>See generally</u> <u>id.</u>

The circumstances presented here are clearly distinguishable from those in <u>Asacol</u>.   In <u>Asacol</u>, the First Circuit was presented with a putative class with a small percentage of members known to

be uninjured – the so-called brand loyalists.  Moreover, there was no administratively feasible way to allow the defendants a meaningful opportunity to challenge the uninjured class members' inclusion.  See id. at 53.  As a result, the uninjured class members were all but guaranteed to collect damages from the defendants.  Here, in contrast, we don't inhabit the theoretical but-for world of antitrust law; instead, a world where alleged injury and damages are knowable and well documented.  Even if a subset of putative class members incurred overcharges that were later offset by GER reconciliation payments, Defendants will have the opportunity to challenge them at (or before) trial.  No uninjured putative class members stand to recover.

Finally, the Court is satisfied that Plaintiffs' expert, Dr. Rena Conti, will be able to incorporate GER offsets into her damages calculations on a class-wide basis.  She offers two methods.  First, if provided with reconciliation payment data, Dr. Conti will perform the following calculation.  Dr. Conti will first isolate a TPP's measured effective rate and compare it to its contracted GER guaranteed rate (i.e., the guaranteed GER in that TPP's contract).  Conti Reply ¶ 55.  A measured effective rate is 1 minus (the sum of all ingredient costs paid/the sum of all AWP amounts).  Id.  If a TPP pays less in the aggregate for the specified drugs than it would under its GER provision (e.g., paying an aggregate of AWP minus 76%, where its contract provides that it

pay no more than AWP minus 75%), the PBM would submit no reconciliation.  Id. ¶ 56.  If the TPP pays more (e.g., its aggregate payment was equal to AWP minus 72%, where its GER was AWP minus 75%), the PBM would reconcile this with a payment equal to the 3% (75%-72%) difference.  Id. ¶ 57.  Dr. Conti incorporates reconciliation-payment offsets into her damages calculation, and where a reconciliation payment is greater than the calculated damages, the damages are bottomed out at $0.  Id. ¶¶ 58-61.  Dr. Conti's formula appropriately errs on the side of being conservative in response to Defendants' expert's critique.  See id. ¶¶ 59 (formula 8), 62-64 (noting additional exclusions to provide for a conservative damages model).

In the alternative, if Dr. Conti is not provided with reconciliation payments data, she sets forth a conservative method for calculating the effect of GERs on a class-wide basis.  Id. ¶ 65.  Under this method, Plaintiffs would first review all PBM contracts for a range of annual GER guarantees and identify each PBM's highest GER guarantee for each year.  Id. ¶¶ 65-66.  Next, using claims data for the generic drugs included in each PBM's GER calculation and a list of the HSP-eligible drugs, Plaintiffs would calculate the impact of adjusting the HSP price on the conservative GER reconciliation payment.  Id. ¶¶ 66, 69.  This delta in GER reconciliation payment would be used to offset Plaintiffs' overcharge calculation.  Id. ¶ 66.

The Court concludes that Plaintiffs have demonstrated by a preponderance of the evidence that they have a "reasonable and workable plan" for determining the effect of a GER on the putative class members' damages "that is protective of the defendant[s]'s constitutional rights and does not cause individual inquiries to overwhelm common issues." Asacol, 907 F.3d at 58. Though Defendants' experts have declared the process overly burdensome, they acknowledge that an expert ostensibly could, for any health plan, identify any applicable GER provisions, determine the periods they cover, the drugs to which they apply, whether the health plan received reconciliation payments, and the effect any reconciliation payments had on offsetting any alleged overcharge to the health plan. See Sekula Report ¶¶ 19; Defs.' Opp'n 47-48.

In the Court's view, the need to account for GER damages offsets does not impede certification. The parties will confer before trial on which putative class members fall away as incurring no damages. Should there be a dispute over a subset of health plans, Defendants will have the opportunity to challenge their inclusion in the classes. Asacol, 907 F.3d at 53 (suggesting a class would be ripe for certification where "a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial"). Because this information is knowable from PBM/TPP contracts and data, individual issues will not predominate – not now, and not at trial.

### c.   Damages

To satisfy the predominance requirement, not only must liability be established through common proof, but Plaintiffs must also demonstrate that "any resulting damages would likewise be established by <u>sufficiently</u> common proof."   <u>Nexium</u>, 777 F.3d at 18 (quoting <u>New Motor Vehicles</u>, 522 F.3d at 20).   To do so, Plaintiffs must establish that damages are both "capable of measurement on a classwide basis" and tied to their theory of liability.   <u>See Comcast</u>, 569 U.S. at 34-36.

A model measuring class-wide damages in a class action "must measure only those damages attributable to that theory."   <u>Id.</u> at 35.   "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."   <u>Id.</u> "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ."   <u>Id.</u> (internal citations and quotations omitted).

In support of their Motion for Class Certification, Plaintiffs offer the expert opinion of Dr. Rena Conti.   <u>See generally</u> Conti Report; Conti Reply.   Using her model, Dr. Conti measures damages for the Nationwide Class as the delta between what a TPP paid for certain HSP-eligible drugs and the amount it would have paid for those HSP drugs had the U&C price incorporated

the HSP price.  Conti Report ¶ 62.  For this model, Dr. Conti used CVS pharmacy claims data for HSP drugs across 14 states[19], as well as HSP price data.  Id. ¶¶ 11, 63.  Under her model, damages for these 14 states total $334.2 million, exclusive of any GER offsets. Conti Reply ¶ 4.  The model is flexible and can be adjusted to account for more or higher quality data as discovery proceeds. Id. ¶ 5.

After careful review of Dr. Conti's reports, the Court concludes that her model reflects a reliable and sound methodology[20] by which to measure Plaintiffs' alleged damages given

---

[19] The data cover thirteen states and the District of Columbia.  For ease of reference, the Court refers to them as the "14 states" in this decision.

[20] While Defendants have not yet filed a Daubert motion to exclude Dr. Conti's expert opinion, it was inescapable for the Court to consider the soundness of her methodology in determining whether damages are capable of measurement on a class-wide basis and tied to Plaintiffs' liability theory.  Moreover, the Court considered the expert reports offered by Defendants criticizing Dr. Conti's report.  The Court otherwise DENIES WITHOUT PREJUDICE the Motions as premature and will consider them once refiled as the case proceeds.  See Pls.' Mots. to Exclude the Expert Testimony of Brett E. Barlag, Catherine Graeff, Michael P. Salve, Ph.D., ECF Nos. 140-42.  To the extent those reports conclude Dr. Conti's methodology is unreliable or inaccurate, the Court disagrees for the reasons set forth herein; the Court understands the experts as largely offering competing views that go to the weight, and not admissibility, of the opinion.  See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998) ("Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." (citation omitted)).

that she intends to procure and incorporate additional data to strengthen the model.  A summary of the model is helpful.  Dr. Conti began with all the CVS pharmacy patient claims data for the 14 states covering transactions occurring between November 2008 and December 2015.  Conti Report ¶ 70.  She then excluded drugs that never appeared on the HSP formulary drug list during the relevant time, limited the claims to the five PBMs implicated in this case, and excluded government payors.  Id. ¶ 71.  She further excluded claims that were paid based on lesser-of pricing formulas that do not include U&C.  Conti Reply ¶ 48.

Using the remaining claims, Dr. Conti calculated the TPP overpayment amount as the TPP adjudicated payment amount less the HSP price, adjusting for the amount paid by the pharmacy customer. Conti Report ¶ 73.  Moreover, Dr. Conti applied a damages offset for the annual HSP membership fees paid by cash customers to access the HSP prices, and explained the technique she could apply to incorporate GER offsets, if the Court deemed them relevant.  Conti Reply ¶¶ 54-69; Conti Report ¶¶ 75-76.

Dr. Conti opined that, after discovery produces the requisite PBM data, she will use this same method to calculate damages on a classwide basis using the updated data.  Conti Report ¶ 77.  From PBM data, she will also be able to identify individual class members.  Id.  Indeed, she demonstrated this by using the PBM data for named Plaintiffs to calculate their damages during the class

70

period.  Id.  Dr. Conti further extrapolated the damages for the 14 states to the remaining 36 states using state-specific data (viz., demographic information, total retail prescription sales, Medicaid claims, and CVS's dominance in that market).  Id. ¶ 78.

Defendants argue that Plaintiffs' proposed damages model both cannot measure damages on a class-wide basis and is not tied to Plaintiffs' liability theory.  In particular, they take issue with Plaintiffs' failure to test certain data.

Defendants' argument implicates a joint stipulation that had resolved a May 2017 discovery dispute between the parties.  See Joint Stipulation Regarding Pls.' Motion to Compel CVS to Produce Nationwide Data ("Joint Stipulation Nationwide Data"), ECF No. 54. In the stipulation, Plaintiffs agreed to accept the subset of data produced in the Corcoran case in the Northern District of California, which involved twelve states and the District of Columbia.  See id.  In exchange for Plaintiffs' agreeing to abandon their claim to CVS's nationwide transaction data, Defendants agreed that Plaintiffs could rely upon this subset of data to demonstrate that damages could be calculated on a class-wide basis. See id.  To this end, the stipulation states:

> CVS will not challenge Plaintiffs' methodology for
> calculating classwide damages (a) on the basis that the
> data fields that CVS has produced to date for the
> Corcoran States represent different types of information
> than is available for states other than the Corcoran
> States or (b) by using data from states other than the

Corcoran States, which has not been produced to Plaintiffs.

Id. at 2. Caremark produced claims data only for HSP drugs purchased in Indiana and Illinois at CVS pharmacies between November 2008 and January 2016. Pls.' Reply 30.

Under Plaintiffs' theory, the damages of any given TPP are the difference between the amount it actually paid for certain HSP drugs and the amount it would have paid for those drugs if the HSP price had been reported as the U&C price. Conti Report ¶ 62. In preparing Plaintiffs' damages model, Dr. Conti did not have TPP payments data – due to the Joint Stipulation – and thus based Plaintiffs' model on PBM payments data. Defendants now complain that Dr. Conti did not calculate the class TPP damages at all, instead she calculated the difference between what the PBMs paid and what they would have paid had HSP prices included U&C prices. Defs.' Opp'n 49.

For purposes of class certification, and given that Dr. Conti asserts that she intends to update this model once more data are made available, the Court finds that PBM data are a reliable proxy for TPP data for purposes of class certification. See New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc., 248 F.R.D 363, 370 (D. Mass. 2008) (stating, in a RICO case involving fraudulently reported average wholesale drug prices, that the "data [were] a reasonable proxy of TPP reimbursements for drugs").

Plaintiffs' model generates a conservative damages estimate, or, in other words, "underestimates the overcharges attributable to Defendants' alleged fraud", because TPPs compensate "PBMs for their services at a markup of what PBMs pay pharmacies."  Conti Reply ¶ 40; see also Pls.' Reply 27-28 & n.130 (noting that for any one HSP drug, CVS would submit the inflated U&C price to the adjudicating PBM, the PBM would pay CVS, and the inflated price would "ultimately be passed to the Class member in the form of an even higher price so that the PBM would profit from the 'spread' between what it paid CVS and what the Class member paid the PBM" (citing Conti Report ¶¶ 62, 73)).

In addition to modeling damages using PBM claims data as a proxy for TPP claims data, Dr. Conti provides that once more PBM data are produced for the HSP drugs, her "method is flexible to accommodate their inclusion in estimating damages."  Conti Reply ¶ 40.  Indeed, the model's flexibility is on display where Dr. Conti updates her estimate of named-Plaintiff Sheet Metal Workers' damages to reflect coinsurance payments and the effect of the Maintenance Choice Program.  Id. ¶ 53 & n.70; see also id. ¶¶ 54-69 (describing how model can take GERs into account).

Given that this methodology produces a conservative damages model using PBM claims data, and has the demonstrated flexibility to be adjusted to accommodate additional data, the Court is satisfied that, while not "exact[,]" the model is "consistent with

[the proposed classes'] liability case."  Comcast, 569 U.S. at 35 (citations and quotation omitted).  It is true that the model has not been tested using TPP data, but the shortcomings of Plaintiffs' data are directly attributable to Defendants' strategic decision and will be resolved at the liability stage.  Moreover, the record supports a finding that, in the aggregate, any overcharges incurred by PBMs were passed on to the putative class.  See Conti Reply ¶ 40.  In sum, Dr. Conti's methodology is solid and the data are forthcoming.[21]

Defendants also challenge the amount of individualization necessary to calculate damages under Plaintiffs' model.  See Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A., No. 14-CV-09764, 2018 WL 739580, at *15 (S.D.N.Y. Jan. 10, 2018) (noting that expert's method was sufficiently reliable and he was not required to present a "comprehensive model at the class certification stage" but concluding that the methodology required individualized determinations).  While there can be no question that some individualized inquiry is required under the instant damages

---

[21] Defendants' other criticisms are sufficiently addressed in Dr. Conti's Reply Report.  See Conti Reply ¶ 48 (adjusting model to exclude claims that may have been paid based on formulas that do not include U&C pricing); id. ¶¶ 52-53 (adjusting model to account for patient payment structures).  And as addressed at length above, the Court is satisfied that Dr. Conti's damages model can accurately and reliably account for GERs.

model, the Court is satisfied that damages can "be established by sufficiently common proof."  Nexium, 777 F.3d at 18.

Accordingly, the Court concludes that Plaintiffs have demonstrated that common issues predominate as to damages and that the damages are both "capable of measurement on a classwide basis" and tied to their theory of liability.  See Comcast, 569 U.S. at 34-36.

### 6.  Superiority

For the final prerequisite to class certification, Plaintiffs bear the burden of establishing that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In undertaking this analysis, the Court examines four factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Id.  The Court is mindful that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 617 (1997) (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).  The superiority and

predominance inquiries thus ensure that class action litigation will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Id. (quoting Advisory Committee's Notes on Fed. R. Civ. P. 23).

Defendants argue that class adjudication is not superior to other methods of adjudication because (1) the elements of the state law causes of action are materially different, and (2) the putative class members are sophisticated entities capable of bringing suit on their own. Defs.' Opp'n 6, 68-69.

The Court is satisfied that class adjudication is the superior method of adjudication. Though some putative class members may be capable of suing on their own, and there may be some opportunity to recover fees for a successful suit under RICO and some state statutes, judicial economy plainly favors certification. Managing subclasses within this action alleging a single fraudulent scheme is superior to managing several thousand suits.

Moreover, variations in the underlying state law claims do not undermine Plaintiffs' certification efforts. The classes are narrowly tailored and are not unlike numerous other nationwide class actions that courts have certified. See, e.g., In re Loestrin 24 FE Antitrust Litig., 410 F. Supp. 3d 352, 375-76, 406-07 (D.R.I. 2019) (certifying class action brought under numerous

state laws and analyzing viability of pharmaceutical antitrust claims under those state statutes).[22]  For these reasons, the Court concludes that, in this case, a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  See Fed. R. Civ. P. 23(b)(3).

## III. Conclusion

For the above reasons, Caremark's Motion to Dismiss, ECF No. 163, is GRANTED; Plaintiffs' Motion for Class Certification, ECF No. 120, is GRANTED; Plaintiffs' Motions to Exclude the Expert Testimony of Brett E. Barlag, Catherine Graeff, Michael P. Salve, Ph.D., ECF Nos. 140-42, are DENIED WITHOUT PREJUDICE.  The Court further appoints Hagens Berman Sobol Shapiro LLP as Class Counsel and appoints named Plaintiffs as Class Representatives.


IT IS SO ORDERED.

_William E. Smith_

William E. Smith
District Judge
Date: May 11, 2021

---

[22] The Court gives Plaintiffs fifteen days from the entry of this order to show cause why the Unfair and Deceptive Conduct Consumer Protection Class definition should not be amended to exclude health plans that paid for generic prescription drugs in New Jersey, Ohio, and Iowa, as Defendants assert these state laws were never pleaded in the Amended Complaint and/or were dropped earlier in this suit.  See Defs.' Sur-Reply 27.